**EXHIBIT "A"**

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

 4

 5                      CASE NO.:  3:23-cv-03652-VC

 6

 7

 8   JULIO JIMENEZ LOPEZ and YESENIA
     CRUZ CRUZ
 9

10              Plaintiffs,

11   -vs-

12   CITY OF SAN RAFAEL; SAN RAFAEL
     POLICE DEPARTMENT; DAISY
13   MAZARIEGOS; BRANDON NAIL; and
     DOES 1-50, inclusive
14

15

16              Defendants.

17   _____/

18

19
            REMOTE VIDEO DEPOSITION OF ROGER CLARK
20

21            Monday, October 28, 2024
                 9:38 a.m. - 3:09 p.m.
22

23

24         Stenographically Reported By:
                    Susan Mullen
25
```

1   of that; is that correct?
2        A    Well, that's my understanding.
3        Q    Right.  I mean all you can do is go off what you
4   read in the IA file provided to you.  And in the IA
5   file provided to you, Chief Spiller wrote a letter that
6   Ms. Mazariegos, at the conclusion of Mr. Henry's
7   investigation, severing her from the department under
8   her probationary status, otherwise, terminated; is that
9   correct?
10       A    Yes.
11       Q    And she has never been rehired by the San Rafael
12  Police Department; is that correct?
13       A    That's my understanding.
14       Q    Right.  Just as an aside here, have you been
15  following -- or did you have any information what
16  happened in the criminal case against Ms. Mazariegos?
17       A    That she was not held to answer.
18       Q    The case was dismissed by Judge Stephen Murphy
19  -- or Kevin Murphy?
20       A    I don't recall the judge's name, but that's my
21  understanding.
22       Q    Okay.  Now with regard to Mr. Nail, did you see
23  anything in any of the records that were produced to
24  indicate that he had not complied with his training in
25  I believe in the five years from his hire to the date

```
 1   of this incident?
 2       A    No.  There's nothing so indicating.
 3       Q    All right.  And at the time of this incident, he
 4   had -- how many IA complaints had he had against him?
 5       A    I can't recall as I sit here.  I'd have to go to
 6   the file.
 7       Q    Would that be important as to whether or not he
 8   should have been maintained as a Peace Officer with the
 9   City of San Rafael?
10       A    Well, based on my evaluation to the commentary
11   and his conduct that night -- that day -- I considered
12   this would have been obvious to the department, is that
13   your question?
14       Q    No.  My question is, would you consider the fact
15   that if he had internal affairs complaints or the
16   results of those complaints or no internal affairs
17   complaints a flag for the department as to whether he
18   should have been disciplined or even terminated earlier
19   than the incident in question?
20            MR. EMISON:  Calls for speculation.
21            THE WITNESS:  I considered that as far as on
22       paper, no, but certainly based on what he expected
23       as indicated in his conduct a longstanding
24       understanding that he was -- he could do what he
25       did, that was my assessment, and it's my testimony,
```

```
 1       but other than that, no, there's nothing on Paper
 2       that I considered and referenced in my report.
 3    BY MR. ALLEN:
 4       Q   Mr. Clark, have you ever given testimony that
 5    officers who have a history of internal affairs'
 6    complaints are red-flagged for departments as to
 7    whether or not that officer has a propensity for
 8    violating policy and as in this case the allegation he
 9    used excessive force?
10       A   Oh, many, many times.  And there's a system,
11    which I understand was Santa Rafael and would be the
12    early warning sytem for complaints that would flag him
13    as a troubled officer.
14       Q   And one of those is the number of complaints,
15    not necessarily how a department ends up determining
16    whether there was a violation or not; is that correct?
17       A   Well, right, these systems are called EWS, early
18    warnings systems or EES [sic], early intervention
19    systems, and that they go back to Rodney King.
20       Q   So I'm kind of a -- I'm twisted here a little
21    bit, Mr. Clark, you got to help me.  All right.  Is it
22    your testimony that your lack of knowledge of whether
23    or not he had a series of complaints for use of
24    excessive force or otherwise -- and I'll add in this --
25    abusive behavior to citizens, is it relevant or
```

```
 1              MR. ALLEN:  All right.  Thanks a lot.
 2              THE VIDEOGRAPHER:  We are now off the record.
 3        The time is 1:08 p.m., Pacific Time.
 4              (A recess was taken.)
 5              (The proceedings resumed as follows:)
 6              THE VIDEOGRAPHER:  We are now on the record.
 7        The time is 1:44 p.m., Pacific Time.
 8    BY MR. ALLEN:
 9        Q   Mr. Clark, I'd like to direct you to paragraph 7
10    and right -- it's the last sentence and it states the
11    officer's conduct during the use of force against Mr.
12    Lopez were at the incident scene after Mr. Lopez's
13    arrest, during the subsequent investigation demonstrate
14    at minimum, a culture of indifference to use of
15    inappropriate and unnecessary force by officers
16    consistent with a culture that endorses such use of
17    force.
18            Were you provided -- first off, were you
19    provided any statistics on how often force was applied
20    hands-on force was applied in the San Rafael Police
21    Department in the years preceding this incident?
22        A   Nothing was provided to me when I wrote the
23    report.  I don't recall seeing any statistical review.
24        Q   Okay.  And would a statistical review be helpful
25    for you to see whether or not there was some history or
```

```
 1   culture of use of force out of proportion of what you
 2   might expect from a like-sized police department and a
 3   like-sized community?
 4            MR. EMISON:  Calls for speculation, incomplete
 5      hypothetical.
 6   BY MR. ALLEN:
 7      Q   You're an expert.  Isn't that a foundational
 8   point?
 9      A   That can provide data for that kind of a
10   conclusion.  As you know, it says -- this opinion is
11   based -- the officer's conduct during the use of force
12   in this particular incident, but I agree statistical
13   reviews are helpful when they are available.
14      Q   All right.  And you did not do any statistical
15   review in this case?
16      A   I did not.
17      Q   Okay.  So -- I think this is repeating the
18   opinion for the foundational of your previous opinions,
19   but I believe what your foundation is, is the acts that
20   occurred and their behavior in discussing the acts that
21   occurred and demeanor towards Corporal O'Con are the
22   foundation for your belief there's a culture of
23   indifference to inappropriate and unnecessary force by
24   officers of the San Rafael Police Department?
25            MR. EMISON:  Again, misstates testimony and
```

```
 1          MR. ALLEN:  Fair enough.  I'll withdraw the
 2     question.
 3   BY MR. ALLEN:
 4     Q   With respect to those late reports of this late
 5   report -- strike that.
 6          Did you see statistics on how many complaints
 7   had been filed for excessive use of force against the
 8   San Rafael Police Department in the five years prior to
 9   this incident?
10     A   I remember seeing in one of the reviews some
11   table, but I can't recall it specifically.
12     Q   Okay.  You don't know what the stats were for
13   use of force -- actual excessive use of force
14   complaints prior to the date of this incident; is that
15   right?
16     A   Not as I sit here, correct.
17     Q   Okay.  We're going to go to number eight.  Did
18   you see any statistics on complaints of officers
19   escalating situations and -- that led to the use of
20   force in the five years prior to this incident?
21     A   Well, as I said, I can't recall seeing any kind
22   of five-year study -- this has to do with the -- the
23   concept that you can escalate to de-escalate that was
24   -- I felt it was necessary to specifically comment on
25   that in eight.
```

```
 1   and if you do I'm going to hit you.
 2       Q   All right.  Have you ever testified in a case
 3   where you believed that the culture of the department
 4   was where profanity was used and not disciplined?
 5       A   I don't recall any such case that I had.
 6       Q   Okay.  Is it your opinion the fact that he said
 7   sit the fuck down -- well, let me ask you, did you hear
 8   any profanity besides sit the fuck down directed to Mr.
 9   Lopez?
10       A   No.
11       Q   And you believed that when Nail said sit the
12   fuck down, that was the reason he went hands-on and
13   punched Mr. -- pushed him, threw him to the ground, and
14   then punched Mr. Lopez because he said sit the fuck
15   down?
16           MR. EMISON:  I'm not -- vague and ambiguous.
17       Compound.  Misstates testimony.
18           THE WITNESS:  No.
19           MR. ALLEN:  Did you understand the -- can I
20       have the question read back?  The objection's
21       preserved.  I want to make sure I understood what he
22       said, so I move on or I don't.
23           (Question read back by the court reporter.)
24           MR. ALLEN:  I'm going to ask that question
25       again.
```

```
 1   BY MR. ALLEN:
 2       Q   Mr. Clark, do you believe that the reason for
 3   Officer Nail punching Mr. Lopez in the face was derived
 4   from him saying sit the fuck down?
 5       A   I already answered, I said no.  I don't believe
 6   that.
 7       Q   Okay.
 8       A   You asked me my belief.
 9       Q   I understand.  Is it your opinion that he
10   punched him in the face -- well, let me strike that.
11           Have you seen any photographs or any -- so still
12   photographs or in the video by stop and start where
13   Officer Nail says Mr. Lopez grabbed his utility vest
14   before Mr. Nail punched him in the face?
15       A   I saw that.
16       Q   You did see that?
17       A   I saw the claim.
18       Q   I understand.  I'm asking you what you saw in
19   the video that is supportive of your opinions in
20   today's deposition, did you happen to see in the video
21   any evidence that Mr. Lopez grabbed the utility vest of
22   Mr. Nail during the struggle when they were trying to
23   handcuff or his -- the officers claim they were trying
24   to handcuff him?
25       A   I saw no such evidence.
```

```
 1              CERTIFICATE OF REPORTER
 2       I, Susan Mullen, a Stenographic Shorthand
 3   Reporter, do hereby certify:
 4       That the foregoing proceedings were taken
 5   remotely before me at the time and place herein set
 6   forth; that any witness in the foregoing
 7   proceedings, prior to testifying, were placed under
 8   oath; that a verbatim record of the proceedings was
 9   made by me using machine shorthand which was
10   thereafter transcribed under my direction; further,
11   that the foregoing is an accurate transcription
12   thereof.
13       I further certify that I am neither financially
14   interested in the action nor a relative or employee
15   of any attorney or any of the parties.
16       Further, that if the foregoing pertains to the
17   original transcript of a deposition in a Federal
18   Case, before completion of the proceedings, review
19   of the transcript was not requested.
20       IN WITNESS WHEREOF, I have this date.
21   subscribed my name.
22   DATED:   November 1, 2024
23           _____
             Susan Mullen
24           Notary Public, State of Florida
             Commission No.:  HH347663
25           Commission Expires:  January 21, 2027
```