# EXHIBIT "P"

**Independent Investigative Consultants, LLC**

8800 Lakewood Dr., Suite 356, Windsor, CA 95492
(707) 484-7871
paul@ph-investigations.com
CA. Lic. #187795

# CONFIDENTIAL
# ADMINISTRATIVE INTERNAL AFFAIRS
# INVESTIGATIVE REPORT



## SAN RAFAEL POLICE DEPARTMENT

## THIS IS A CONFIDENTIAL DOCUMENT NOT FOR REVIEW WITHOUT THE PERMISSION OF THE POLICE CHIEF, OR THEIR DESIGNEE

Investigated by:
## PAUL HENRY
## INDEPENDENT INVESTIGATIVE CONSULTANTS, LLC

Integrity  ★  Discretion  ★  Results

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

# San Rafael Police Department
## Internal Affairs Investigation Report

| INCIDENT TYPE:<br>Standard of Conduct | DATE REPORTED:<br>07/27/2022 | DATE OF INCIDENT:<br>07/27/2022 | FILE NUMBER:<br>22-04 |
|---|---|---|---|

| EMPLOYEE:<br>Daisy Mazariegos | DIVISION OR ASSIGNMENT:<br>Police Officer | WORK LOCATION:<br>San Rafael Police Department |
|---|---|---|

| COMPLAINANT:<br>San Rafael Police Department | | ADDRESS:<br>1400 Fifth Avenue | |
|---|---|---|---|
| CITY:<br>San Rafael | | STATE:<br>CA | ZIPCODE:<br>94901 |
| HOME TELEPHONE: | | WORK OR CONTACT TELEPHONE:<br>(415) 485-3000 | |

SUMMARY:

San Rafael City Attorney, Robert Epstein, requested Independent Investigative Consultants (IIC-LLC) conduct an independent administrative personnel investigation into allegations of misconduct against Officer Mazariegos.

Officer Mazariegos was alleged to have used excessive force during the detention and arrest of Julio Jimenez Lopez on July 27, 2022. Additionally, Officer Mazariegos was alleged to have failed to accurately document her actions and the incident in her written police report.

The purpose of the investigation was to determine if Officer Mazariegos violated any City or Police Department policies.

| INVESTIGATION CONDUCTED BY:<br>Independent Investigative Consultants, LLC. | DATE ASSIGNED:<br>09/09/2022 | DATE COMPLETED:<br>03/29/2023 |
|---|---|---|
| INVESTIGATOR:<br>Paul Henry | SUPERVISOR (S) REVIEW:<br>San Rafael City Attorney and Police Department Administration | |

2

## ADMINISTRATIVE PERSONNEL INVESTIGATION

## TABLE OF CONTENTS

Internal Affairs Report

I.    Introduction .................................................................................................7
II.   Summary of Findings ................................................................................10
III.  Investigative Procedure ...........................................................................13
IV.   Applicable Policies ...................................................................................14
V.    Timeline of Events ...................................................................................20
VI.   Evidence, Analysis, Findings ...................................................................21

**ALLEGATION 1**: Officer Mazariegos used excessive during her detention and arrest of Julio Jimenez Lopez on July 27, 2022.

1.   Witness Officer Nail's Summary Statement ....................................21
2.   Witness Corporal O'Con's Summary Statement ............................28
3.   Summary of Officer Nail's Body-worn Camera Video ...................33
4.   Summary of Officer Mazariegos's Body-worn Camera Video ........37
5.   Summary of Corporal O'Con's Interview with Mr. █████████.........41
6.   Summary of Corporal O'Con's Interview with Mr. █████████ .........42
7.   Summary of Corporal O'Con's Interview with Mr. Lopez................43
8.   Subject Officer Mazariegos's Summary Statement........................44
9.   Credibility Assessment ...................................................................50
10.  Substantive Factual Findings .........................................................51
11.  Findings Upon Alleged Policy Violations ........................................56

**ALLEGATION 2**: Officer Mazariegos failed to consider alternative tactics to using force and she failed to employ de-escalation techniques during her arrest of Julio Jimenez Lopez on July 27, 2022.

1.   Witness Officer Nail's Summary Statement ....................................60
2.   Witness Corporal O'Con's Summary Statement ............................62
3.   Subject Officer Mazariegos's Summary Statement........................63
4.   Credibility Assessment ...................................................................65
5.   Substantive Factual Findings .........................................................65
6.   Findings Upon Alleged Policy Violations ........................................69

**ALLEGATION 3**: Officer Mazariegos's conduct was discourteous and disrespectful toward Julio Jimenez Lopez during his detention and arrest on July 27, 2022.

1.   Subject Officer Mazariegos's Summary Statement........................71
2.   Credibility Assessment ...................................................................72
3.   Substantive Factual Findings .........................................................73
4.   Findings Upon Alleged Policy Violations ........................................74

3

## ADMINISTRATIVE PERSONNEL INVESTIGATION

**ALLEGATION 4**: Officer Mazariegos failed to provide medical attention to Julio Jimenez Lopez after having used force to affect his arrest on July 27, 2022.

1.    Witness Officer Nail's Summary Statement ....................................76
2.    Witness Firefighter Lopes's Summary Statement ..........................76
3.    Witness Corporal O'Con's Summary Statement ............................77
4.    Witness Officer Gamble's Summary Statement .............................77
5.    Subject Officer Mazariegos's Summary Statement........................78
6.    Credibility Assessment ................................................................78
7.    Substantive Factual Findings .......................................................78
8.    Findings Upon Alleged Policy Violations ........................................79

**ALLEGATION 5**: Officer Mazariegos's police report, documenting her arrest of Julio Jimenez Lopez on July 27, 2022, failed to accurately reflect the facts and circumstances of his arrest.

1.    Summary of San Rafael Police Report #22-05221 ........................80
2.    Subject Officer Mazariegos's Summary Statement........................83
3.    Credibility Assessment ................................................................84
4.    Substantive Factual Findings .......................................................84
5.    Findings Upon Alleged Policy Violations ........................................86

**ALLEGATION 6**: Officer Mazariegos failed to conduct a thorough investigation into the incident that led to the arrest of Julio Jimenez Lopez on July 27, 2022.

1.    Subject Officer Mazariegos's Summary Statement........................88
2.    Credibility Assessment ................................................................89
3.    Subjective Factual Findings .........................................................89
4.    Findings Upon Alleged Policy Violations ........................................91

**ALLEGATION 7**: Officer Mazariegos's conduct during the detention and arrest of Mr. Lopez on July 27, 2022, brought discredit to the San Rafael Police Department.

1.    Summary of ABC News Stories .....................................................92
2.    Summary of Memorandum Authored by Lieutenant Eberly ...........93
3.    Substantive Factual Findings .......................................................93
4.    Findings Upon Alleged Police Violations ........................................95

VII.    Conclusion ....................................................................................................97

4

## ADMINISTRATIVE PERSONNEL INVESTIGATION

**Attachments**

- San Rafael Police Department Report #22-05221.
- San Rafael Police Department Use of Force Analysis Form
- San Rafael Fire Department Patient Care Report
- Corporal O'Con Body-Worn Camera Audit
- Officer Nail Body-Worn Camera Audit
- Officer Mazariegos Body-Worn Camera Audit
- Photographs of Mr. Lopez and of the scene
- Computer Aided Dispatch Report #2207270089
- Memorandum from Lieutenant Holton to Officer Nail
- Memorandum from Lieutenant Holton to Officer Mazariegos
- Memorandum from Lieutenant Holton to Captain Leon
- Email communications from Lieutenant Holton to Captain Leon
- Medical records from Marin General Hospital
- Four Body-worn Camera Videos from Corporal O'Con
- Three Body-worn Camera Videos from Officer Mazariegos
- Body-worn Camera Video from Officer Nail
- Body-worn Camera Video from Officer Ahlenslager
- Body-worn Camera Video from Officer Chiu
- Body-worn Camera Video from Officer Schraeder
- Two Body-worn Camera Videos from Officer Gamble
- Email communication from Attorney Dresow
- Memorandum from Lieutenant Eberle

**Transcripts**

- Witness Officer Ahlenslager
- Witness Officer Chiu
- Witness Officer Gamble
- Witness Officer Schraeder
- Witness Officer Mazariegos
- Witness Officer Nail
- Witness Firefighter Lopes
- Witness Fire Captain Northern

5

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

- Witness Firefighter Gordon
- Witness Firefighter Hagberg
- Witness Firefighter Taylor
- Witness Mr. █████████
- Witness Mr. █████████
- Witness Mr. Lopez
- Subject Corporal O'Con

**Advisement Forms**

- Corporal O'Con Notice of Investigation
- Corporal O'Con Administrative Admonishment
- Corporal O'Con Lybarger Admonishment
- Corporal O'Con Miranda Advisement
- Officer Mazariegos Notice of Investigation
- Officer Mazariegos Administrative Admonishment
- Officer Mazariegos Lybarger Admonishment
- Officer Mazariegos Miranda Advisement
- Officer Nail Notice of Investigation
- Officer Nail Administrative Admonishment
- Officer Nail Lybarger Admonishment
- Officer Nail Miranda Advisement
- Officer Ahlenslager Notice of Investigation
- Officer Ahlenslager Administrative Admonishment
- Officer Chiu Notice of Investigation
- Officer Chiu Administrative Admonishment
- Corporal Gamble Notice of Investigation
- Corporal Gamble Administrative Admonishment
- Officer Schraeder Notice of Investigation
- Officer Schraeder Administrative Admonishment

**Electronic Copy of the Investigation**

Thumb drive containing an electronic copy of the entire Administrative Internal Affairs Investigation

6

**CONFIDENTIAL**                    COSR (Lopez) 000867

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

## I.    INTRODUCTION

On July 27, 2022, at approximately 1853 hours, Officer Mazariegos contacted three subjects on Windward Way, in the City of San Rafael.  The subjects were standing near a pickup truck and two of them were holding a beer bottle.  Officer Mazariegos had been driving through the area when she decided to contact the subjects to determine if they were drinking alcohol in public, a violation of a City Ordinance.

Officer Mazariegos contacted Julio Jimenez Lopez, ███████████████████, and ███████████████    For the purposes of this administrative investigation, the subjects will be referred to as Mr. Lopez, Mr. █████████, and Mr. █████████.

Officer Mazariegos requested a "routine back" through the San Rafael Dispatch Center and Officer Nail was dispatched to assist Officer Mazariegos.

Upon contacting the three male Hispanic subjects, Officer Mazariegos noted there were numerous empty beer bottles on the ground near where they were standing.

Officer Mazariegos directed the subjects to put down their beer bottles and to sit on the curb near the pickup truck and she began asking them if they were aware that it is illegal in the City of San Rafael to drink alcohol in public.

Officer Nail arrived to assist Officer Mazariegos as she was speaking with the subjects.

Officer Mazariegos, who is fluent in Spanish, spoke to the subjects in both English and Spanish.  Mr. Lopez, who also spoke both Spanish and English, and Officer Mazariegos

7

## ADMINISTRATIVE PERSONNEL INVESTIGATION

had a conversation about why Mr. Lopez and his two friends were in the area drinking their beer.

Officer Mazariegos asked the subjects to give her their identification.  Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ remained seated, and Mr. ▮▮▮▮▮▮ handed Officer Mazariegos his identification.  Mr. Lopez stood up to remove his wallet from his front left pants pocket.  Officer Mazariegos told Mr. Lopez to sit down.  When he did not immediately comply with Officer Mazariegos's order, Officer Nail told Mr. Lopez to "sit the fuck down".

Officer Mazariegos directed Mr. Lopez to give her his identification.  Mr. Lopez, who was holding his wallet in his hand, tried to explain that he had to stand to get his identification out of his pants pocket.  Mr. Lopez then stood again.

Officer Mazariegos told Mr. Lopez to sit down several more times but Mr. Lopez remained standing as he tried to explain himself.  Officer Mazariegos then decided to restrain Mr. Lopez in handcuffs.  She grabbed Mr. Lopez's right arm while Officer Nail grabbed his left arm.

Mr. Lopez resisted the officer's attempt to put handcuffs on him by trying to pull his arms away from the officers.  Officer Nail tripped Mr. Lopez and pulled him to the ground.  Officer Mazariegos let go of Mr. Lopez's right arm as the three of them fell to the ground.

Mr. Lopez continued to resist the officers by moving his arms to keep the officers from gaining control of him.  Officer Nail stated that Mr. Lopez tried to put him in a headlock, punched him in the back of his head several times, and grabbed his outer vest carrier during their struggle.

Officer Nail stated that because he feared Mr. Lopez may try to grab one of the weapons he keeps on his outer vest carrier, he punched Mr. Lopez on his nose, causing it to bleed.  Shortly thereafter, the officers were able to overcome the resistance from Mr. Lopez.  They forced him on to his stomach and they pulled his arms behind his back.  Officer Mazariegos then put handcuffs on Mr. Lopez.  She searched him and then she and Officer Nail put him into the back of her patrol car.

Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ never moved from their seated position on the curb only a few feet away from the struggle between Mr. Lopez and the two officers.

Numerous officers from the San Rafael Police Department responded to the scene.  By the time the additional officers arrived at the scene, Mr. Lopez was already seated in the back of Officer Mazariegos's patrol car.

Officer Nail requested the San Rafael Fire Department respond to the scene to provide medical attention to Mr. Lopez.  Firefighter Lopes provided medical aid to Mr. Lopez.

8

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Corporal O'Con, who was the supervisor for the patrol team on that shift, responded to the scene and he interviewed both Officer Nail and Officer Mazariegos about what had occurred. Corporal O'Con ensured Mr. Lopez received medical attention at the scene and he directed Officer Gamble to transport Mr. Lopez to an area hospital for a medical clearance prior to booking him into the Marin County jail.

Corporal O'Con interviewed Mr. Lopez, Mr. ▓▓▓▓▓▓, and Mr. ▓▓▓▓▓▓ about what occurred between Mr. Lopez and the two officers. Corporal O'Con's interview of the three subjects occurred outside of Miranda and was strictly for the purpose of completing a supervisor's use of force investigation.

Corporal O'Con then assured photographs of the scene had been taken and he left the scene.

Officer Gamble transported Mr. Lopez to the Marin General Hospital where he received treatment for his injuries. He was diagnosed with complaints of pain and injuries to his nose, knees, back and shoulder. While at the hospital, Officer Gamble took photographs of Mr. Lopez's injuries.

Officer Gamble then transported Mr. Lopez to the Marin County Jail where he was booked on the following charges:

- Penal Code Section 69(a), resisting an executive officer – a felony
- Penal Code Section 647(f), public intoxication – a misdemeanor
- Business and Professions Code Section 25662(a), open container of alcohol in public – an infraction
- Penal Code Section 148(a)(1), obstruction of a peace officer – a misdemeanor
- Penal Code Section 243(b), battery on a peace officer – a misdemeanor.

Officer Gamble and Officer Ahlenslager issued citations to Mr. ▓▓▓▓▓▓ and Mr. ▓▓▓▓▓▓ for violation of the City Ordinance prohibiting drinking alcohol in public. They were then released from the scene.

Officer Mazariegos and Officer Nail authored police reports for this incident. Corporal O'Con approved the reports on July 28, 2022.

On August 23, 2022, the Marin County District Attorney's Office requested a continuance in the criminal prosecution of Mr. Lopez because they had not yet reviewed the videos from the two officer's body-worn cameras.

On August 26, 2022, the Marin County District Attorney's Office dismissed the criminal case against Mr. Lopez.

On September 9, 2022, the San Rafael City Attorney Robert Epstein authorized IIC-LLC to conduct an independent administrative personnel investigation to determine if Officer

9

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Mazariegos violated any City or Police Department policy during her detention and subsequent arrest of Mr. Lopez.  Paul Henry conducted this investigation.

All of the San Rafael police officers that responded to this incident were interviewed as part of this administrative investigation.  Additionally, the San Rafael firefighters that responded to this scene to provide medical attention to Mr. Lopez were also interviewed.  All interviews were audio recorded and transcribed.  Only the statements from witnesses that provided evidence for this administrative investigation are summarized in this report.

A forensic audit of Officer Mazariegos's and Officer Nail's cellular telephones was conducted on September 28, 2022.  No evidence related to this administrative investigation was discovered during this inquiry.

On October 5, 2022, the Investigator contacted Mr. Lopez's attorney via email message to arrange for his interview for this administrative investigation.  After several back-and-forth messages, on October 28, 2022, Mr. Charles Dresow wrote that his client did not wish to be interviewed.

## II.    SUMMARY OF FINDINGS

Based on the evidence gathered, the Investigator makes the findings summarized below and discussed at greater length herein.

1.     The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she is alleged to have used excessive force during her detention and arrest of Mr. Lopez on July 27, 2022 is – Unfounded.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting unacceptable behavior toward the public: 12.3(h)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- City of San Rafael Policy prohibiting the establishment of a pattern of violations of city policy: 12.3(o)
- City of San Rafael Policy prohibiting acts inimical to the public: 12.3(q)
- San Rafael Police Policy requiring an officer to intercede when another officer uses excessive force: 300.3.1

10

## ADMINISTRATIVE PERSONNEL INVESTIGATION

- San Rafael Police Policy requiring duty to report excessive force: 300.3.3
- San Rafael Police Policy requiring fair and unbiased use of force: 300.3.4
- San Rafael Police Policy requiring only reasonably necessary force be utilized: 300.4
- San Rafael Police Policy requiring only objectionably reasonable force be used to effect an arrest: 300.4.1
- San Rafael Police Policy prohibiting violation of department policy or procedure: 320.5.1(a)
- San Rafael Police Policy prohibiting violation of any federal, state, local, or administrative law: 320.5.1(c)
- San Rafael Police Policy prohibiting wrongful or unlawful exercise of authority: 320.5.2(b)
- San Rafael Police Policy prohibiting neglect of duty – Efficiency: 320.5.7(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- San Rafael Police Policy prohibiting unreasonable and unwarranted force: 320.5.9(b)
- San Rafael Police Policy prohibiting exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct: 320.5.9(c)
- San Rafael Police Policy prohibiting criminal, dishonest, or disgraceful conduct: 320.5.9(h)
- San Rafael Police Policy prohibiting bias-based policing: 401

2.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she is alleged to have failed to consider alternative tactics to using force and she failed to employ de-escalation techniques during her detention and arrest of Mr. Lopez on July 27, 2022 is – Sustained.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- City of San Rafael Policy prohibiting acts inimical to the public: 12.3(q)
- San Rafael Police Policy requiring officers to consider alternative tactics to using force and to employ de-escalation techniques: 300.4.2
- San Rafael Police Policy prohibiting neglect of duty – Efficiency: 320.5.7(a)

11

## ADMINISTRATIVE PERSONNEL INVESTIGATION

- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- San Rafael Police Policy prohibiting any act that brings discredit to the department: 320.5.8(i)
- San Rafael Police Policy prohibiting any conduct that is unbecoming a member of the department: 320.5.9(m)

3.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she was alleged to have been discourteous and disrespectful toward Mr. Lopez during his detention and arrest on July 27, 2022 is – Not Sustained.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting unacceptable behavior toward the public: 12.3(h)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- City of San Rafael Policy prohibiting acts inimical to the public: 12.3(q)
- San Rafael Police Policy prohibiting violation of department policy or procedure: 320.5.1(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- San Rafael Police Policy prohibiting any act that brings discredit to the department: 320.5.8(i)
- San Rafael Police Policy prohibiting discourteous, disrespectful or discriminatory treatment: 320.5.9(f)
- San Rafael Police Policy prohibiting use of obsene, indecent, profane or derogatory language: 320.5.9(g)
- San Rafael Police Policy prohibiting any conduct unbecoming a member of the department: 320.5.9(m)

4.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she is alleged to have failed to provide medical aid after a use of force incident during her detention and arrest of Mr. Lopez on July 27, 2022 is – Unfounded.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)

12

## ADMINISTRATIVE PERSONNEL INVESTIGATION

- City of San Rafael Policy prohibiting unacceptable behavior toward the public: 12.3(h)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- San Rafael Police Policy requiring medical aid be provided to a subject after a use of force incident when the subject is injured or claims to be injured: 300.7
- San Rafael Police Policy prohibiting neglect of duty – Efficiency: 320.5.7(a)

5.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she is alleged to have failed to accurately and thoroughly document the facts and circumstances of her detention and arrest of Mr. Lopez on July 27, 2022 is – Not Sustained.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- City of San Rafael Policy prohibiting dishonesty or theft: 12.3(n)
- San Rafael Police Policy prohibiting neglect of duty – Efficiency: 320.5.7(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- San Rafael Police Policy prohibiting failure to disclose or misrepresent material facts, or making any false or misleading statement in a report: 320.5.8(a)
- San Rafael Police Policy prohibiting the falsification of any work-related record: 320.5.8(b)
- San Rafael Police Policy prohibiting giving false or misleading statements to a supervisor in connection with any investigation: 320.5.8(c)
- San Rafael Police Policy prohibiting providing untruthful or false statements: 320.5.8(d)
- San Rafael Police Policy prohibiting any act that brings discredit to the department: 320.5.8(i)
- San Rafael Police Policy prohibiting an officer from concealing or distorting facts of any incident and making a false report orally or in writing: 322.1.1

6.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when she is alleged to

13

## ADMINISTRATIVE PERSONNEL INVESTIGATION

have failed to conduct a thorough investigation into the incident that led to the arrest of Mr. Lopez on July 27, 2022 is – Sustained.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- San Rafael Police Policy prohibiting neglect of duty – Efficiency: 320.5.7(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)

7.  The allegation against Officer Mazariegos that she violated the following San Rafael Police Department and City of San Rafael Policies when he is alleged to have brought discredit to the San Rafael Police Department is – Sustained.

- City of San Rafael Policy prohibiting negligence of duty: 12.3(a)
- City of San Rafael Policy prohibiting inability, refusal, or failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting unacceptable behavior toward the public: 12.3(h)
- City of San Rafael Policy prohibiting violation of city policy: 12.3(l)
- City of San Rafael Policy prohibiting acts inimical to the public: 12.3(q)
- San Rafael Police Policy prohibiting any act that brings discredit to the department: 320.5.8(i)
- San Rafael Police Policy prohibiting discourteous, disrespectful or discriminatory treatment: 320.5.9(f)
- San Rafael Police Policy prohibiting use of obsene, indecent, profane or derogatory language: 320.5.9(g)
- San Rafael Police Policy prohibiting any conduct unbecoming a member of the department: 320.5.9(m)

## III.  INVESTIGATIVE PROCEDURE

The evidence consisted of witness interviews, relevant documents and body-worn camera videos. All interviews conducted during this investigation were audio-recorded and transcribed. Witnesses were reminded to provide truthful statements, and San Rafael Police witnesses were given an Administrative Admonishment before their interviews.  Officer Mazariegos, Officer Nail, and Corporal O'Con were provided a

14

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Lybarger Admonishment and a Miranda waiver. The following people were interviewed as part of this investigation:

1. Witness Officer Ahlenslager on October 17, 2022.
2. Witness Officer Chiu on October 17, 2022.
3. Witness Officer Gamble on October 17, 2022.
4. Witness Officer Schraeder on October 26, 2022.
5. Witnesses Firefighter Gordon on October 26, 2022.
6. Witness Fire Captain Northern on October 26, 2022.
7. Witness Firefighter Taylor on October 26, 2022.
8. Witness Firefighter Lopes on November 17, 2022.
9. Witness Firefighter Hagberg on December 1, 2022.
10. Subject Corporal O'Con on January 11, 2023.
11. Witness Officer Nail on January 13, 2023.
12. Witness Officer Mazariegos on January 17, 2023.

The following documents were reviewed and relied upon as part of this investigation:

1. San Rafael Police Department Report #22-05221.
2. San Rafael Police Department Use of Force Analysis Form.
3. San Rafael Fire Department Patient Care Report.
4. Corporal O'Con Body-Worn Camera Audit.
5. Officer Nail Body-Worn Camera Audit.
6. Officer Mazariegos Body-Worn Camera Audit.
7. Photographs of Mr. Lopez and of the scene.
8. Computer Aided Dispatch Report #2207270089.
9. Memorandum from Lieutenant Holton to Officer Nail.
10. Memorandum from Lieutenant Holton to Officer Mazariegos.
11. Memorandum from Lieutenant Holton to Captain Leon.
12. Email communications from Lieutenant Holton to Captain Leon
13. Medical records from Marin General Hospital
14. Memorandum documenting forensic search of the officer's cellular telephones
15. Email communication from attorney Mr. Dresow
16. Memorandum from Lieutenant Eberle

## IV.   APPLICABLE POLICIES

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

      a. Negligence of duty.

15

## ADMINISTRATIVE PERSONNEL INVESTIGATION

e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

h. Unacceptable behavior toward the general public or fellow employees or officers of the City.

l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

n. Dishonesty or theft.

o. Establishment of a pattern of violations of any City policy or rules and regulations over an extended period of time in which a specific incident in and of itself would not warrant disciplinary action, however, the cumulative effect would warrant such action.

q. Other acts inimical to the public service.

San Rafael Police Department Policy Manual

300 – Use of Force

300.3.1 Duty to Intercede

Any officer present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, shall, when in a position to do so, intercede (as defined by Government Code § 7286) to prevent the use of unreasonable force.

300.3.3 Duty to Report Excessive Force

Any officer who observes a law enforcement officer or an employee use force that potentially exceeds what the officer reasonably believes to be necessary shall immediately report these observations to a supervisor (Government Code § 7286(b)).

300.3.4 Fair and Unbiased Use of Force

Officers are expected to carry out their duties, including the use of force, in a manner that is fair and unbiased (Government Code § 7286(b)). See the Bias-Based Policing Policy for additional guidance.

300.4 Use of Force

16

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a).

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance (Government Code § 7286(b)).

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the approved or authorized tools, weapons, or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

300.4.1 Use of Force to Effect an Arrest

Any peace officer may use objectively reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance. Retreat does not mean tactical repositioning or other de-escalation techniques (Penal Code § 835a).

300.4.2 Alternative Tactics – De-Escalation

17

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

De-escalation is a fundamental principle of how we conduct police work. Taking no action, passively monitoring a situation, or bringing in partners such as a mobile crisis unit may be the most reasonable response to a situation, particularly those involving mental health crises. This policy manual refers to the importance of de-escalation in multiple sections. See, in particular, the Crisis Intervention Incidents Policy.

As time and circumstances reasonably permit, and when community and officer safety would not be compromised, officers should consider actions that may increase officer safety and may decrease the need for using force such as:

> (a) Summoning additional resources that are able to respond in a reasonably timely manner.

> (b) Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

> (c) Employing other tactics that do not unreasonably increase officer jeopardy.

In addition, when reasonable, officers should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)). Such alternatives may include but are not limited to:

> (a) Attempts to de-escalate a situation.

> (b) If reasonably available, the use of crisis intervention techniques by properly trained personnel.

300.6 Reporting the Use of Force

Any use of force by a member of this department shall be documented promptly, completely, and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances.

18

## ADMINISTRATIVE PERSONNEL INVESTIGATION

300.7 Medical Considerations

Once it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident (Government Code § 7286(b)).

SRPD Policy 320 – Standards of Conduct

320.5.1 Laws, Rules and Orders

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

(c) Violation of federal, state, local or administrative laws, rules or regulations.

320.5.2 Ethics

(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose.

320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

320.5.8 Performance

(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

(b) The falsification of any work-related records, making misleading entries or statements with the intent to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document.

19

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(c) Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department –related business.

(d) Being untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members.

(i) Any act on-- or off--duty that brings discredit to this department.

320.5.9 Conduct

(a) Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution or discipline under this policy.

(b) Unreasonable and unwarranted force to a person encountered or a person under arrest.

(c) Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

(f) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

(g) Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

(h) Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

(m) Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

SRPD Policy 322 – Report Preparation

322.1.1 Report Preparation

Employees shall not suppress, conceal or distort the facts of any reported incident, nor shall any employee make a false report orally or in writing.

20

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

SRPD Policy 401 – Bias-Based Policing

    401.3 Bias-Based Policing Prohibited

    Bias-based policing is strictly prohibited.


## V.    TIMELINE OF EVENTS

Upon reviewing the materials and the information provided by the City of San Rafael, IIC-LLC created the following general timeline:

**07/27/22**    Officer Mazariegos contacts Julio Jimenez Lopez, ███████████ █████████, and ██████████████████ on Windward Way to investigate a potential violation of a City Ordinance, open alcoholic container in public. Officer Nail is dispatched to assist Officer Mazariegos.

    During the incident, Officer Mazariegos and Officer Nail attempt to restrain Mr. Lopez in handcuffs. Mr. Lopez resists the officer's attempts to put him in handcuffs, necessitating the use of force against Mr. Lopez.

    Corporal O'Con, the on-duty supervisor for the day, responds to the scene.

    Mr. Lopez sustains injuries during the incident. He is treated at the scene by the San Rafael Fire Department. Mr. Lopez is transported to an area hospital for a medical clearance and is then booked at the Marin County Jail for various charges.

**08/23/22**    Officer Mazariegos and Officer Nail appear at the Marin County Superior Court in response to a subpoena regarding the criminal prosecution of Mr. Lopez. The assigned Deputy District Attorney asks for and obtains a continuance from the court because she had not yet reviewed the videos from the officer's body-worn cameras.

**08/26/22**    The Marin County District Attorney's Office dismisses the criminal case against Mr. Lopez and notifies the San Rafael Police Department of their decision.

**09/08/22**    City Attorney Robert Epstein contacts IIC-LLC to inquire about our availability to conduct an independent administrative personnel investigation.

**09/09/22**    Investigator Paul Henry is authorized to conduct this investigation.

21

## ADMINISTRATIVE PERSONNEL INVESTIGATION

**10/17/22**   IIC-LLC interviews Officer Ahlenslager, Officer Chiu, and Officer Gamble.

**10/26/22**   IIC-LLC interviews Officer Schraeder, Firefighter Gordon, Fire Captain Northern, and Firefighter Taylor.

**11/17/22**   IIC-LLC interviews Firefighter Lopes.

**12/01/22**   IIC-LLC interviews Firefighter Hagberg.

**01/11/22**   IIC-LLC interviews Corporal O'Con.

**01/13/22**   IIC-LLC interviews Officer Nail.

**01/17/22**   IIC-LLC interviews Officer Mazariegos.

**03/29/23**   The investigation is completed.

## VI.   EVIDENCE, ANALYSIS, FINDINGS

In weighing the evidence, the general standard of proof was applied.  An incident was found to have occurred if the preponderance of the evidence obtained during the investigation supported that conclusion – i.e., that it was more likely than not that an event happened. Credibility determinations were made where appropriate.

The following definitions apply to the findings contained in this report:

**Sustained**: The alleged misconduct is found to have occurred and, where applicable, to have violated any applicable rule or policy.

**Not Sustained**: the alleged misconduct could neither be proved nor disproved, given the existing evidence.

**Exonerated**: The alleged conduct was found to have occurred, however, the conduct either was appropriate under the circumstances or was not found to constitute a violation of applicable policy.

**Unfounded**: The investigation revealed conclusively the alleged act did not occur.

> **ALLEGATION 1**: Officer Mazariegos used excessive during her detention and arrest of Mr. Lopez on July 27, 2022.

> **1. Witness Officer Nail's Summary Statement**

22

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Nail stated that he has worked at the San Rafael Police Department for just over three years, and he said he has five years of total law enforcement experience.  He is a Field Training Officer (FTO) for the department.

Officer Nail described the area where this incident occurred as a high crime rate area of town.  He stated there have been shootings, stabbings, and thefts in the area and there have been problems with people congregating and drinking alcohol in public.  Officer Nail said there have been requests from community members who live in the area for extra police patrol.  Officer Nail said that the Street Crimes Unit of the department has been "heavily dedicated to dealing with people drinking" in this area along with the rest of the area of town known as the Canal District.  Additionally, the patrol officers have been asked by the department's administration to make patrolling in this area of town a priority.

He confirmed that many of the residents in this area of town are Hispanic.

Officer Nail said that drinking alcohol in public is a violation of a City Ordinance.  He said these violations are treated as infractions, similar to a traffic ticket.  He confirmed that absent another criminal charge, a person would not be taken into custody for this type of violation.  He said that an officer could also choose to warn a person about this violation and not issue a citation.

Officer Nail said he had conducted many investigations for drinking alcohol in public and he said this is a nightly problem in this area of town.

Officer Nail said he recorded this incident on his body-worn camera.  The Investigator showed him the video prior to beginning his interview for this administrative investigation.

Officer Nail confirmed that he responded to the scene of Officer Mazariegos's arrest on July 27, 2022, a little before 7:00 pm.  He said he was dispatched to assist Officer Mazariegos and he said that he could hear her tell someone to sit down several times when she was talking on her radio.  He said he thought he needed to respond quickly but he did not activate his overhead lights and siren as he drove to the location.

Officer Nail's initial observations upon his arrival at the scene were that Officer Mazariegos was talking with three Hispanic subjects who were all seated on the curb. He said Officer Mazariegos was speaking in Spanish and he believed the situation "was escalating".  He believed that Mr. Lopez was arguing with her.

Officer Nail said there were fifteen or twenty beer bottles on the ground near the three subjects.  Officer Nail assumed the three of them had drank all of the beer from the empty bottles that were around them.  Though, he confirmed that typically the people who congregate and drink in this area do not clean up after themselves and that some

23

### ADMINISTRATIVE PERSONNEL INVESTIGATION

of the beer bottles could have been there from a previous day.  He did not know if there were other people in the area.

Officer Nail believed that Officer Mazariegos was conducting a drinking in public or public intoxication investigation.  He does not speak Spanish but understood that Officer Mazariegos had told Mr. Lopez to sit down and she asked for identification from all three of the subjects.  Officer Mazariegos alternated between speaking Spanish and English and he said that Mr. Lopez seemed to understand English.  He spoke to Mr. Lopez in English and Mr. Lopez seemed to understand what he said.

Officer Nail said that Mr. Lopez stood up and tried to explain that he needed to stand to get his wallet out of his pants pocket.  However, he said that as Mr. Lopez was explaining this, his wallet was already in his hand.  "So, and he was still chirping, like chirping, for lack of a better term, back at her and not doing what she was asking him to do."

Officer Nail said that based on what he had observed he believed that Mr. Lopez was intoxicated to the point of being unable to care for himself.  He said that Mr. Lopez had red and watery eyes, his movements were sluggish, and he was "clearly unable to follow Officer Mazariegos's commands".  Officer Nail said that Mr. Lopez was "unable to make rash decisions".

> *Investigator: Now, what did you say to Mr. Lopez?*
>
> *Officer Nail: Uh, I told him to sit down.*
>
> *Investigator: Okay.  I think what you said was, "Hey, sit the fuck down!"*
>
> *Officer Nail: Correct.*
>
> *Investigator: Why did you say it that way?*
>
> *Officer Nail: Because he clearly was not listening to Officer Mazariegos ask him and the way she was telling him was not working.  So, in an attempt to prevent us from having to go hands on with him, I escalated a little bit to emphasize to him that, hey we are serious.*
>
> *Investigator: Why did you choose to use profanity?*
>
> *Officer Nail: Because not (using) profanity was not working.*
>
> *Investigator: And so, you felt it was necessary to talk to him in that way?*
>
> *Officer Nail: Yes.*

24

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Nail was asked a hypothetical question about whether or not he would speak to a "business man" in downtown San Rafael in the same way.  He said that if he was acting like Mr. Lopez, then yes, he would speak to him in the same manner.

When asked if talking in this manner is typical for him, Officer Nail said he believed it was a good "middle ground" to de-escalate the situation to prevent the officers from having to put their hands on the subject.

Officer Nail was asked how the same command, "Sit the fuck down", could both escalate and de-escalate a situation.  He explained that initially the command may escalate the situation, but when the subject sits down, the situation is de-escalated.

> *Investigator: Did Mr. Lopez's socioeconomic status have anything to do with the way you talked with him?*
>
> *Officer Nail: No.*
>
> *Investigator: Do you think it was at all rude or discourteous to talk with him that way?*
>
> *Officer Nail: No.*

Officer Nail admitted that this way of talking with Mr. Lopez was ineffective and that it did not calm the situation.  Mr. Lopez responded to Officer Nail by telling him he did not have to talk to him like that.  Officer Nail said Mr. Lopez's response was unreasonable because he should have simply sat down.

Officer Nail described his demeanor as stern, but he did not believe he was confrontational.  When Mr. Lopez sat back down, he repeated several times, "I know, I know".  Officer Nail asked him, "You know what!?"  The Investigator asked Officer Nail what he meant by this, and Officer Nail said simply, "I didn't know what he knew."

> *Investigator: Do you think your demeanor and the way that you talked with Lopez, did it escalate or de-escalate the situation?*
>
> *Officer Nail: I don't think it had a bearing on it either way.*

Officer Nail stated that his telling Mr. Lopez to sit down was a form of an alternate tactic to using force on him.  Officer Nail added that there were three suspects and only two police officers at the scene.  He said that with the traffic at that time of day, it would take time for other officers to arrive at the scene if they were requested.  He believed these facts contributed to the need to put Mr. Lopez in handcuffs.

Officer Nail admitted that he could have explained to Mr. Lopez why it was necessary for him to sit down but he said he did not think of this option.

25

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Nail said he was familiar with the common policing practice of contact and cover. He explained that the term refers to one officer doing all of the talking with a subject(s), while the other officer maintains a level of alert to ensure the safety of both officers.  He said his role while on this call for service was to provide cover for Officer Mazariegos.

When asked why he chose to engage with Mr. Lopez, Officer Nail said it was because Mr. Lopez had refused to follow her direction.  He added that Mr. Lopez had failed to show Officer Mazariegos respect.  He believed that because Officer Mazariegos is a Hispanic female, it is common for Hispanic male subjects to not give her the respect she deserves.  He said that he has had to step in on other occasions to make a suspect follow her direction.

Officer Nail said that he believed Mr. Lopez was a threat to their safety.  He explained that he felt this way because Mr. Lopez kept standing up.  They were in a high crime rate area, and they did not know if he was armed with a weapon.  He said that even though he had his wallet in his hand, Mr. Lopez kept reaching toward and grabbing at his pockets.

> *Investigator:  Had he done anything that would lead you to believe he might be violent?*
>
> *Officer Nail: Yes.*
>
> *Investigator: What had he done that leads you to believe he might be violent?*
>
> *Officer Nail: Not following commands and continuing to stand up.*

Officer Nail admitted that he had not observed any other signs that Mr. Lopez could be violent, such as a fighting stance and balled up fists.  He admitted that his primary concern was Mr. Lopez's refusal to stay seated on the curb.

Officer Nail said there was no other option available to them other than putting Mr. Lopez into handcuffs.  When questioned further, Officer Nail admitted they could have told him to sit down again, they could have explained why they wanted him to sit down, and they could have explained that they needed to search him to ensure he was not a danger to them.

Officer Nail believed that he and Officer Mazariegos decided simultaneously to put Mr. Lopez into handcuffs.  He said he was unaware at that time that one of Mr. Lopez's friends had a pair of garden sheers on his belt.  He admitted that both he and Officer Mazariegos were exposed to increased danger of attack by Mr. Lopez's friends when they were struggling to put Mr. Lopez into handcuffs.

Officer Nail said that at the time they decided to put Mr. Lopez into handcuffs, he was not under arrest and was only being detained.  He said he did not explain to Mr. Lopez

26

that he was not under arrest because he was the cover officer, and it was the responsibility of Officer Mazariegos to tell him this.

Officer Nail said he was not angry with Mr. Lopez when he refused to stay seated and when he told him (Nail) not to talk with him in the way that he did. He said his feelings toward Mr. Lopez did not play a role in any of the decisions he made or the actions he took.

Officer Nail said that he grabbed on to Mr. Lopez's left wrist and elbow, while Officer Mazariegos grabbed his right arm. He said that Mr. Lopez immediately began to struggle to pull his arm away from him.

Officer Nail decided that it would be better to control Mr. Lopez if he was on the ground. He said he used a "leg sweep" takedown to get him to the ground. He said he put his right leg in front of Mr. Lopez. He then pulled Mr. Lopez over his leg while simultaneously turning his body to force Mr. Lopez to fall to the ground. He said that both of them fell to the ground.

He said that as they were falling, he noticed that Mr. Lopez was going to fall to the ground on top of one of the empty beer bottles. He said he swiped the bottle away with his hand, but when he did this, he fell further toward the pavement than he had intended.

Officer Nail said he still had hold of Mr. Lopez's left wrist as he tried to gain separation between the two of them. He was on Mr. Lopez's left side, and they were on their hands and knees while on the ground. Officer Nail said it was at this time that he felt Mr. Lopez "grab on to the back of my neck". He said he felt Mr. Lopez wrap his right arm around his neck and apply pressure. He assumed that he was trying to put him in a headlock. He said he tucked his chin down toward his chest and pushed Mr. Lopez's right arm away from his head.

Officer Nail said he tried to grab on to Mr. Lopez and because they were moving, his arm went over the top of Mr. Lopez's head. He said they both began to move to his right as they continued to struggle while on the ground. He said that at this point Mr. Lopez either punched him in the back of his head several times or he tried to grab his head for the second time. He could not specifically see what Mr. Lopez was doing because he had his chin tucked down toward his chest but he felt Mr. Lopez "colliding" with the side of his head. He said that Mr. Lopez had to be using his right hand because he still had hold of his left arm.

Officer Nail said they ended up against his (Lopez's) truck. He felt Lopez grabbing at his outer vest carrier. He said he let go of Mr. Lopez's left arm because he felt they were in a "stalemate". He tried to pull Mr. Lopez to the ground on his stomach. Officer Nail said he was unable to pull him to the ground. He said Mr. Lopez had his left hand on the ground to brace himself and his right hand was still grabbing at his outer vest carrier.

27

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Nail said he used a "personal body weapon" and he punched Mr. Lopez one time in the face. He said his intention was to make Mr. Lopez let go of his vest. He said the punch was effective and Mr. Lopez let go of his vest. Officer Nail said he was then able to push Mr. Lopez to the ground on his stomach and he and Officer Mazariegos then pulled his arms out from underneath him and they put him into handcuffs.

Officer Nail said that at no time during the struggle did Mr. Lopez comply with them. He said Mr. Lopez struggled against them until they put him in handcuffs. It was Officer Mazariegos that applied the handcuffs. He said even after being handcuffed, Mr. Lopez tried to kick his legs out. Officer Nail put his right shin on top of the back of Mr. Lopez's legs to prevent him from kicking.

Officer Nail said that once Mr. Lopez was in handcuffs, he asked dispatch to send medical aid. He said the San Rafael Fire Department arrived and provided medical aid to Mr. Lopez.

When asked why he punched Mr. Lopez, Officer Nail said the following: there were two more threats (Lopez's friends) behind them, the longer the struggle lasted the more likely one of Mr. Lopez's friends could try to intercede, and the help that would be provided by the other responding officers was still several minutes away.

Officer Nail was reminded that he wrote in his report that he punched Mr. Lopez because Mr. Lopez had grabbed his outer vest carrier and Officer Nail said that was correct.

Officer Nail said he had no idea what Officer Mazariegos was doing during their struggle because he was focused on Mr. Lopez, who was between him and Officer Mazariegos, and he could not see her.

When asked why he did not tell Corporal O'Con about Mr. Lopez attempting to put him into a headlock when he first briefed him on what occurred, Officer Nail said that he simply did not think of the headlock at that time.

Officer Nail confirmed he activated his body-worn camera upon his arrival at the scene and recorded his interactions with Mr. Lopez. He said he reviewed the video before he authored his police report about this incident.

Officer Nail was asked why he turned his body-worn camera off when Corporal O'Con first arrived and began to speak with him. He said they do not typically record "tactical conversations" on their cameras. When asked what tactical conversation he had with Corporal O'Con, Officer Nail simply stated, "I was always instructed that's when you turn it off."

Officer Nail confirmed that he had conversations with Corporal O'Con about what occurred during the incident that were not recorded on his body-worn camera.

28

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Nail said Mr. Lopez was arrested by Officer Mazariegos and was initially charged with a felony count of resisting arrest and drunk in public. He said that he was aware that the District Attorney's Office declined to prosecute Mr. Lopez.

> *Investigator: Is there anything you would do differently today if you could do it over?*
>
> *Officer Nail: No.*

### 2. Witness Corporal O'Con's Summary Statement

Corporal O'Con stated that he has five years of sworn law enforcement experience and he has been a corporal with the San Rafael Police Department for just over one year.

He stated that corporals with the San Rafael Police Department serve as a senior officer in charge in the absence of a sergeant. He stated that when a sergeant is present on the patrol team a corporal handles a beat and responds to police calls for service. He confirmed that during the times when he supervises the patrol team, he is expected to fulfill all of the supervisory duties of a sergeant.

He stated that at the time of this incident, he was assigned to patrol team three, the weekday graveyard shift. He said that Sergeant Cleland was the sergeant on the patrol team. On the day of this incident, Sergeant Cleland was off work and he was acting in the capacity of the supervisor for the shift.

Corporal O'Con stated that the area of town where this incident occurred is known as the Canal District. He said that patrol officers have been asked by the police department's administration to provide extra patrol in this area of town. He described the area as having a higher crime rate than other areas of town. He said the area is populated by mostly Hispanic people with lower income.

Corporal O'Con stated that a common problem in this area of town is people congregating outside while drinking alcohol. He said there are often complaints from nearby residents about noise and drinking in public.

Corporal O'Con said that drinking in public is a violation of a City Ordinance and is treated as an infraction.

Corporal O'Con confirmed that he responded to the scene of an arrest by Officers Mazariegos and Nail on July 27, 2022, at approximately 1900 hours, on Windward Way. He believed he was already driving in their direction when he heard their request for emergency assistance. He stated that upon his arrival at the scene, he believed the

29

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Fire Department was already on scene.  He could not remember what officers were present.

Corporal O'Con confirmed that he was the supervisor at this scene, and he stated that no other San Rafael Police supervisors responded to this scene.

He said that he interviewed both Officer Mazariegos and Officer Nail to get a better understanding of what took place.  He did not record his interview with Officer Mazariegos on his body-worn camera, but he recorded a portion of his interview with Officer Nail.  The Investigator asked why he did not record the entire interview with the two officers and Corporal O'Con said that he typically does not record these types of interviews.  He cited "tactical" considerations.  "But that's a guesstimate right now.  I don't know what was in my mindset at the time."

Corporal O'Con said that Officer Nail told him there was a brief struggle between the two officers and Mr. Lopez while they were trying to put him in a restrained detention (detained in handcuffs, but not under arrest).  Mr. Lopez was uncooperative.  Officer Nail took Mr. Lopez to the ground, and he punched Mr. Lopez once in his face.  Officer Nail and Officer Mazariegos were able to overcome the resistance from Mr. Lopez and they put him in handcuffs.

Corporal O'Con said that he could not remember if Officer Nail was talking directly to him, or if he was talking to another officer, when he (Nail) said that Mr. Lopez tried to put him in a headlock.  Corporal O'Con was asked if he was concerned that Officer Nail did not tell him that Mr. Lopez tried to put him in a headlock when they discussed the incident and he said he did not remember if he had any concern.  He said he intended to review the video from his body-worn camera to clarify what occurred.

Corporal O'Con said he could not remember what Officer Mazariegos told him about the incident.  However, he believed that the statements from both officers were consistent with each other.

Corporal O'Con said he had an administrative responsibility to conduct a use of force investigation.  He interviewed Mr. Lopez and he interviewed Mr. ████████ and Mr. ████████ as part of his use of force investigation.  He recorded all three of these interviews on his body-worn camera.  He did not advise them of their Miranda rights.

Corporal O'Con said that he could see that Mr. Lopez had an injury to his nose, though it was no longer bleeding.  He described Mr. Lopez as calm, polite, and willing to answer his questions.  He wanted to provide his side of what happened and appeared to be as detail oriented as he was capable.

Corporal O'Con said he could smell a slight odor of alcohol and he said that Mr. Lopez showed signs of intoxication, or at least that he had been consuming alcohol.  Corporal O'Con said he was having difficulty remembering all of his observations, but he believed Mr. Lopez had red and watery eyes and his speech was slurred slightly.

30

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Corporal O'Con could not remember if he asked either of Mr. Lopez's two friends how much alcohol Mr. Lopez had consumed.

Corporal O'Con confirmed that Mr. ▉▉▉▉▉ and Mr. ▉▉▉▉▉ were released from the scene with citations for drinking alcohol in public.

Corporal O'Con could not remember when he reviewed the videos from Officer Nail's and Officer Mazariegos's body-worn cameras. He said that he believed he looked at the videos before he approved their reports, but he was not certain. Corporal O'Con then said that he recalled looking at Officer Nail's video on his (Nail's) cellular telephone.

Corporal O'Con said he could not remember if he could observe Mr. Lopez strike Officer Nail or his attempt to put him in a headlock when he viewed the videos of the two officers. (O'Con had just watched the videos at the beginning of this administrative interview)

Later, Corporal O'Con said he did not see anything in either of the officer's videos that was inconsistent with what he read in their reports, though he acknowledged that he did not see Mr. Lopez hit Officer Nail in the back of the head or try to put him in a headlock while reviewing their videos. He said that given their close proximity and that there were times in the video where the screen was black, it was likely these things occurred during those time periods.

Corporal O'Con could not remember if he had any follow up conversation with either Officer Nail or Officer Mazariegos after he reviewed their body-worn camera videos.

While Corporal O'Con could not state definitively that he reviewed the videos from Officer Nail and Officer Mazariegos's body-worn cameras prior to approving their reports, he said that not doing so could create a problem for the Police Department and a problem for the investigation. He said that any discrepancy with a written report and the video of the incident would reflect poorly on the officers and the Department. He confirmed that it is a supervisor's responsibility to ensure this does not occur.

> *Investigator: Did you see anything in the videos that caused you any concern?*
>
> *Corporal O'Con: Nothing really at the time.*

Corporal O'Con said that he did not question Officer Nail about his assertions that Mr. Lopez punched him in the back of the head several times and tried to put him in a headlock. When asked if there was a reason he did not question Officer Nail about this, given these details were not part of their original conversation, and they could not be seen on the videos, Corporal O'Con said, "Those are his independent observations and beliefs of how the incident took place." Corporal O'Con added that body-worn camera

31

## ADMINISTRATIVE PERSONNEL INVESTIGATION

videos do not always capture the entirety of what occured during an incident. He also said that it was common that an officer may remember additional details about a use of force incident moments or hours after the event.

Corporal O'Con said he directed the officers to review their body-worn camera videos prior to writing their reports and he told them to ensure their reports were accurate.

When asked if he felt it was appropriate that Officer Nail told Mr. Lopez to "sit the fuck down", Corporal O'Con said that perhaps the profanity could have been eliminated. But he said Mr. Lopez was not complying with their order to stay seated and talking to him sternly seemed appropriate.

When asked if he believed it was rude or discourteous toward Mr. Lopez when Officer Nail told him to sit the fuck down, Corporal O'Con said Officer Nail was "direct".

> Investigator: So, you did not think it was rude or discourteous?
>
> Corporal O'Con: *I believe it was -- it was -- could have been avoided and not used. But I believe that the statement, like we're talking about, was appropriate, the actual statement to sit down.*
>
> *Investigator: Okay. So, I'm trying to get a yes or no answer from you. Was it rude or discourteous toward Lopez when Nail told him to sit the fuck down?*
>
> *Corporal O'Con: Can I take a second?*
>
> *Investigator: Sure. You want a break?*
>
> *Corporal O'Con: Yes, please.*
>
> *Investigator: So, when we took our break, I was asking you if you believe Officer Nail was rude and/or discourteous toward Lopez when he said sit the fuck down.*
>
> *Corporal O'Con: Uh, uh, and to r -- you were asking me for a simple yes or no answer. And I think that statement is -- or that question is loaded to have more -- like my belief based on that and, uh, rude and discourteous, like, uh, uh –*
>
> *Investigator: So, why don't you give me either yes or no and then whatever explanation you want to provide?*
>
> *Corporal O'Con: Okay. Uh, no, because I believe -- I-I don't believe it was necessary to use, uh, a swear word during that situation. But that's the decision he made at the time.*

32

## ADMINISTRATIVE PERSONNEL INVESTIGATION

*And I don't believe that situation, that-that one swear word guided the whole situation and deteriorated just on -- based alone just saying the F word to somebody. I believe he was giving him a direct order. And that-that enunciated the-the -- like that he needed to comply with that order at that time.*

Corporal O'Con admitted that Mr. Lopez did not like being talked to like that from Officer Nail, but he pointed out that the more significant factor was that Mr. Lopez was failing to comply with their direction to him. When asked, Corporal O'Con said he did not believe that Officer Nail telling Mr. Lopez to "sit the fuck down" had anything to do with making the situation worse or more tense. "I don't believe it caused any change…"

Corporal O'Con said he agreed with the officer's decision to put Mr. Lopez into handcuffs, and he believed it was necessary based on his refusal to follow the officer's commands.

*Investigator: Your use of force policy requires officers to attempt to de-escalate a situation to avoid having to use force. Did you see anything from Officer Nail which would lead you to believe he tried to de-escalate the situation?*

*Corporal O'Con: I believe so. I believe his use of just that jargon alone, he used a different tactic outside of what Officer Mazariegos was using…*

*Corporal O'Con: He used a tactic of being, uh, more direct and more stern. Yes.*

Corporal O'Con said that when Mr. Lopez continued to disobey the officer's orders, they switched to a different tactic by placing him in handcuffs. "And so, those were all, to me, de-escalatory like tactics used to gain further control."

*Investigator: Is it your opinion and your statement that, when Officer Nail said sit the fuck down, that was an attempt to de-escalate the situation?*

*Corporal O'Con: I believe it was a version of his belief at the time to de-escalate the situation.*

When asked if Officer Mazariegos employed any tactic to de-escalate the situation, Corporal O'Con said that she gave Mr. Lopez numerous commands.

When asked if either of the officers used any alternate tactic to avoid using force, Corporal O'Con said, "I just don't quite understand alternative tactics. They used the tactics that they believed that they had to use at that necessary time."

33

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

### 3. Summary of Officer Nail's Body-worn Camera Video

Officer Nail's body-worn camera video is approximately 10 minutes and 34 seconds in length.  The video begins with Officer Nail driving to the scene.

Timestamp 00:30
Officer Nail arrives on scene and activates his body-worn camera.

Timestamp 00:35
Officer Nail walks up to Officer Mazariegos, who is talking in Spanish with Mr. Lopez, Mr. ████████, and Mr. ████████.  The subjects are sitting on the curb.

Timestamp 00:52
Officer Mazariegos and Mr. Lopez are speaking to each other in Spanish.  Mr. Lopez smiles and Officer Mazariegos tells him, "It's not funny".

Timestamp 01:06
Officer Mazariegos asks them if they have identification.

Timestamp 01:11
Mr. Lopez stands up.  Mr. ████████ and Mr. ████████ remain seated.  Mr. ████████ takes his wallet out of his pants pocket while remaining seated.  Mr. ████████ does not move.

Timestamp 01:16
Mr. Lopez removes his wallet from his front, left pants pocket.  Officer Nail states, "Hey, sit the fuck down!"

Timestamp 01:18
Mr. Lopez, who is standing, turns to face Officer Nail and states, "Hey, you don't have to talk to me."  Officer Nail then states, "Then you're going into handcuffs!"

Timestamp 01:20
Mr. Lopez squats down on his heels.  Officer Nail steps closer to Mr. Lopez.  Officer Mazariegos states, "Well, I told you to sit down."  Mr. Lopez states, "I know, I know."  Officer Nails states, "You know what!?"  Mr. Lopez states, "Yes."  Officer Mazariegos states, "Take out your ID," as Mr. Velazquez hands her his identification.

Timestamp 01:28
Officer Mazariegos repeats, "Take out your ID dude."  Mr. Lopez states, "I know, I know, I know."  He explains that he has to stand to take out his identification.  Mr. Lopez then stands again.  Officer Nail tells him to sit down.  Officer Mazariegos raises her voice and tells Mr. Lopez several times to sit down.  Mr. Lopez refuses to sit down and continues to explain that he must stand to get his identification out.

34

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Timestamp 01:36
Officer Mazariegos states "Okay." Both officers step toward Mr. Lopez. Officer Mazariegos grabs Mr. Lopez's right wrist with her right hand. Officer Nail grabs Mr. Lopez's left wrist with his right hand. Mr. Lopez has his identification in his right hand and his wallet in his left hand. Mr. Lopez resists by attempting to pull both of his arms away from the officers.

Timestamp 01:39
Officer Nail forces Mr. Lopez to the ground by pulling him over his extended leg.

Timestamp 01:42
Mr. Lopez and Officer Nail are on their knees. Officer Nail still has hold of Mr. Lopez's left wrist. Officer Nail swings his right arm in the direction of Mr. Lopez's head. It is not clear if this is an attempt to put Mr. Lopez into a headlock or an attempt to punch him. Officer Nail's right hand goes over the top of Mr. Lopez's head. Officer Mazariegos is on the other side of Mr. Lopez, between Mr. Lopez and his pickup truck. Her hands can not be seen at this point in the video. Mr. Lopez is still holding his wallet in his hand. Mr. Lopez is resisting the officer's attempts to control him by pulling his arms away from the officers. Officer Mazariegos yells at him to stop.

Timestamp 01:44
Mr. Lopez is forced to a seated position. He is still holding his wallet in his hand. Officer Mazariegos appears to be between Mr. Lopez and his pickup truck. Officer Mazariegos's back appears to be touching Mr. Lopez's pickup truck. Officer Nail's right hand appears to be grabbing hold of the back of Mr. Lopez's neck and he is pulling forward.

Timestamp 01:45
Officer Nail lets go of Mr. Lopez's neck with his right hand and he then makes a fist while cocking his arm away from Mr. Lopez. Officer Nail punches Mr. Lopez in the face, apparently striking him on the nose.

Timestamp 01:46
Officer Nail's left hand is on the back of Mr. Lopez's right shoulder and his right hand is on the back of Mr. Lopez's neck and head. Officer Mazariegos's left hand can be seen between Officer Nail's hands on Mr. Lopez's right shoulder. Officer Mazariegos is still holding Mr. ⬛⬛⬛ identification in her left hand. Mr. Lopez is in a seated position, facing the curb and he is leaning forward. Mr. Lopez is still holding his wallet in his left hand. Officer Nail yells for Mr. Lopez to get on the ground.

Timestamp 01:48
The officers force Mr. Lopez forward toward the pavement. Mr. Lopez's forehead appears to contact the pavement. His nose is bleeding.

Timestamp 01:49 – 02:02

35

## ADMINISTRATIVE PERSONNEL INVESTIGATION

No images can be seen on Officer Nail's body-worn camera video because his camera lens is up against Mr. Lopez's body.

Timestamp 01:58
Officer Mazariegos tells Mr. Lopez in Spanish, multiple times, to put his hands behind his back. She raises her voice as she continues to tell Mr. Lopez in Spanish to put his hands behind his back.

Timestamp 02:04
Mr. Lopez is partially on his stomach and on his left side on the pavement. His nose is bleeding. His left arm is bent at the elbow with his left hand above the ground near his right shoulder. Officer Nail appears to pull Mr. Lopez's right arm toward him, causing Mr. Lopez to rotate his body slightly. He is still partially on his stomach and partially on his left side.

Timestamp 02:07 – 02:11
No images can be seen on Officer Nail's body-worn camera video because his camera lens is up against Mr. Lopez's body. Mr. Lopez states in Spanish that he has not done anything. He then repeats himself in English, stating that he has not done anything.

Timestamp 02:13
Officer Nail appears to continue to struggle to gain control of Mr. Lopez's right arm and pull it behind his back. Officer Nail yells, "Put your hands behind your fucking back!" Mr. Lopez continues to insist he has not done anything wrong.

Timestamp 02:15
Mr. Lopez is still partially on his stomach and partially on his left side. Officer Nail's left hand has hold of Mr. Lopez's upper right arm. Officer Nail's right hand has hold of Mr. Lopez's right wrist. Officer Nail appears to be attempting to pull Mr. Lopez to his right, forcing his stomach against the pavement. Mr. Lopez's left arm is under his body. There is blood on the pavement from Mr. Lopez's nose. Officer Mazariegos is kneeling behind Mr. Lopez on his left side. Both of her hands are on Mr. Lopez's back and she appears to be assisting Officer Nail by forcing Mr. Lopez to his right to put his stomach fully on the pavement. Officer Mazariegos yells at Mr. Lopez, in Spanish, to put his hands behind his back. She then asks in Spanish if he understands her. Mr. Lopez continues to insist he has not done anything wrong.

Timestamp 02:17
Mr. Lopez is forced to his stomach. Officer Nail pulls Mr. Lopez's right arm behind his back. Officer Mazariegos continues to struggle to gain control of Mr. Lopez's left arm.

Timestamp 02:22
Officer Mazariegos gains control of Mr. Lopez's left arm and pulls it behind his back. Mr. Lopez states that he has not done anything. Officer Mazariegos states, "I told

36

## ADMINISTRATIVE PERSONNEL INVESTIGATION

you to fucking sit down." Mr. Lopez repeats numerous times that he has not done anything.

Timestamp 02:27
Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮▮ can be seen in the video sitting in their original places before the struggle with Mr. Lopez began.

Timestamp 02:36
Officer Mazariegos has her handcuffs in her left hand and she tells Mr. Lopez to stop moving his hand. Mr. Lopez insists he has not done anything. Officer Mazariegos tells him she told him to sit down and he did not sit down.

Timestamp 02:41
Officer Mazariegos applies the handcuffs to Mr. Lopez, first to his left wrist, then to his right wrist.

Timestamp 02:47
Officer Mazariegos informs dispatch that Mr. Lopez has been detained in handcuffs.

Timestamp 02:51
Officer Nail asks dispatch to send the Fire Department to provide medical aid to Mr. Lopez.

Timestamp 02:59
Officer Mazariegos double locks the handcuffs.

Timestamp 03:33
Mr. Lopez tries to turn onto his right side. Officer Nail uses his right hand, and he pushes Mr. Lopez back down onto his stomach. Officer Mazariegos tells Mr. Lopez to stop moving and she assists Officer Nail with pushing Mr. Lopez back down onto his stomach.

Timestamp 04:10
Mr. Lopez is rolled onto his right side as Officer Mazariegos begins to search him.

Timestamp 04:23
Officer Nail tells Mr. Lopez to stand and he assists him by pulling him up by his left arm. Both officers walk Mr. Lopez to Officer Mazariegos's patrol car.

Timestamp
04:45
The officers put Mr. Lopez into the back of the patrol car.

37

CONFIDENTIAL                    COSR (Lopez) 000898

ADMINISTRATIVE PERSONNEL INVESTIGATION

### 4. Summary of Officer Mazariegos's Body-worn Camera Video

Officer Mazariegos's body-worn camera video is approximately 15 minutes and 01 second in length. The video begins with Officer Mazariegos driving on Windward Way.

Timestamp 00:21
Officer Mazariegos arrives on scene and activates her body-worn camera. Mr. Lopez is standing, facing his pickup truck, on the driver's side, between the open door of the truck and the cab of the truck. Mr. ▇▇▇▇ and Mr. ▇▇▇▇ are standing on the sidewalk behind the truck.

Timestamp 00:35
Officer Mazariegos has walked toward the three subjects. She tells Mr. ▇▇▇▇ and Mr. ▇▇▇▇, first in English, and then in Spanish, to put their beer bottles down. Mr. Lopez has turned to face Officer Mazariegos and is looking at her through his open driver's side window.

Timestamp 00:40
Officer Mazariegos asks all three subjects in Spanish to sit on the curb. She repeats her command several times. Mr. Lopez is the first of the three to respond and he begins to walk toward the curb. He is looking at a cellular telephone in his left hand. He closes the driver's side door as he begins to walk to the curb.

Timestamp 00:46
Officer Mazariegos notifies dispatch of her location and asks for a "routine" backup officer. Mr. Lopez has stopped walking and he asks her several times where she wants him to sit. Officer Mazariegos raises her voice, speaks more sternly, and tells him in Spanish to sit down. She points at the curb.

Timestamp 00:51
Mr. Lopez sits down on the curb. Mr. ▇▇▇▇ and Mr. ▇▇▇▇ squat down where they were standing. Officer Mazariegos states, "Right here", several times. She repeats in Spanish for them to sit down where she is pointing. Mr. ▇▇▇▇ and Mr. ▇▇▇▇ then walk to the curb, and they sit to the left of Mr. Lopez.

Timestamp 01:00
Officer Mazariegos asks, "What are you doing?" Mr. Lopez is smiling at her. Mr. ▇▇▇▇ and Mr. ▇▇▇▇ also appear to be smiling, though their faces are less clear. Mr. Lopez states, "Nothing."

Timestamp 01:03
Officer Mazariegos points out all of the empty beer bottles and cans. Mr. Lopez states, "I know." Mr. Lopez continues to smile at Officer Mazariegos.

38

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Timestamp 01:09
Officer Mazariegos asks the subjects if they know they are not supposed to drink alcohol in public. Mr. Lopez responds, "Yes." Officer Mazariegos asks, "Then why are you guys drinking outside in public?"

Timestamp 01:22
Mr. Lopez states, "I don't have nothing to say." Officer Mazariegos states, "You don't have nothing to say? You're just out here drinking, and you think it's funny?" Mr. Lopez states, "No, it's not funny."

Timestamp 01:30 – 02:45
Officer Mazariegos and Mr. Lopez have a conversation about why Mr. Lopez and his two friends are in that particular area drinking beer. Their conversation is in Spanish. Officer Mazariegos stated, in her interview for this investigation, that Mr. Lopez told her they are hard workers and just want to enjoy a beer after work. He explained that if they drink near their apartment the neighbors complain. Officer Mazariegos explains there are other options, such as going to a restaurant.

Timestamp 02:46
Officer Mazariegos asks if the subjects have identification. Mr. Lopez begins to stand up. Mr. ▓▓▓▓▓ and Mr. ▓▓▓▓▓▓ remain seated. Mr. ▓▓▓▓▓▓ appears to take out his identification from his wallet. Mr. ▓▓▓▓▓ does not appear to move.

Timestamp 02:52
Officer Mazariegos tells Mr. Lopez to sit down. Mr. Lopez appears to feel his pockets as he looks for his identification.

Timestamp 02:55
Officer Nail, who can not be seen on Officer Mazariegos's body-worn camera video, states, "Hey, sit the fuck down!"

Timestamp 02:57
Mr. Lopez looks at Officer Nail, who still can not be seen on Officer Mazariegos's video, and he states, "Hey, you don't have to talk to me." Officer Mazariegos states, "Well, I told you to sit down." Mr. Lopez squats down on his heels.

Timestamp 03:03
Mr. Lopez states two times, "I know." Officer Nail states, "You know what!?" Mr. Lopez then states, "Yes."

Timestamp 03:08
Mr. Lopez sits down. Officer Mazariegos asks him several times to "take out your ID". She raises her voice and speaks more sternly. Mr. Lopez tries to explain that he understands she wants his identification but that he has to stand up to get it.

39

CONFIDENTIAL                    COSR (Lopez) 000900

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Timestamp 03:11
Mr. Lopez stands again.  His wallet is in his left hand.  He is trying to explain that he has to stand to take his identification out of his wallet.  Officer Mazariegos states three times for Mr. Lopez to sit down.  The last time she raises her voice.  Mr. Lopez does not sit down.

Timestamp 03:15
Officer Mazariegos grabs Mr. Lopez's right elbow with her left hand.  Mr. ████████'s identification is still in her left hand.  Officer Nail is on Mr. Lopez's left side.  His hands cannot be seen at this point in Officer Mazariegos's video.

Timestamp 03:18
Officer Nail is kneeling down on the left side of Mr. Lopez.  Mr. Lopez is dragged to the ground by Officer Nail.  Mr. Lopez lands on the pavement on both of his knees.  Officer Mazariegos loses her grip of Mr. Lopez's right elbow.

Timestamp 03:19
Officer Nail is on his knees on the left side of Mr. Lopez, who is also on his knees.  Officer Mazariegos is behind Mr. Lopez.  Both of her hands are on Mr. Lopez's back.  She is still holding Mr. ████████'s identification.

Timestamp 03:20
Officer Nails right hand swings over the top of Mr. Lopez's head.  Mr. Lopez ducks and comes up as Officer Nail passes by him due to his momentum.  Officer Mazariegos is behind Mr. Lopez and she tells him to stop.  Both of her hands are on Mr. Lopez's back.

Timestamp 03:22
Mr. Lopez grabs hold of Officer Nail's outer vest carrier in the area of his left shoulder.  Mr. Lopez's identification is still in his right hand.  Officer Mazariegos is still behind Mr. Lopez.  Her hands appear to be near Mr. Lopez's head and neck.

Timestamp 03:24
Officer Nail's hands are on the back of Mr. Lopez's neck and head.  He appears to pull him forward toward the pavement.  Officer Nail tells Mr. Lopez to get on to the ground.

Timestamp 03:27
Officer Nail forces Mr. Lopez from his knees to the ground by pushing him in the back and using his body weight on top of Mr. Lopez.  Mr. Lopez is laying on the ground on his left side.

Timestamp 03:29 – 3:42
No images from Officer Mazariegos's body-worn camera video can be seen because her camera lens was obstructed during the struggle to get Mr. Lopez on to his stomach while on the ground.

40

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Timestamp 03:33
Officer Mazariegos informs dispatch they have "one uncooperative".

Timestamp 03:38
Officer Mazariegos orders Mr. Lopez three times to put his hands behind his back. She yells the command on the third time. Mr. Lopez continues to struggle to keep the officers from pulling his hands behind his back.

Timestamp 03:43
Mr. Lopez is laying on the pavement on his left side. Officer Nail is behind him and on his right side. Officer Mazariegos is behind him and on Mr. Lopez's left side. Her left hand is on the back of Mr. Lopez's left shoulder. The officers continue to struggle to get Mr. Lopez on his stomach.

Timestamp 03:52
Officer Mazariegos orders Mr. Lopez again to put his hands behind his back. Mr. Lopez, while continuing to struggle to keep the officer from pulling his hands behind his back, says that he did not do anything.

Timestamp 03:56
Officer Nail is finally able to pull Mr. Lopez over to his stomach. He has hold of Mr. Lopez's right wrist. Mr. Lopez's left hand is in front of him and angled to his right side. Officer Mazariegos's hands are on Mr. Lopez's back. Officer Mazariegos orders Mr. Lopez again to put his hands behind his back and she asks if he understands her. Mr. Lopez answers that he understands Officer Mazariegos, but he states that he did not do anything.

Timestamp 03:59
Officer Mazariegos grabs hold of Mr. Lopez's left arm with her left hand. She is able to pull his arm behind his back. Officer Nail is then able to pull Mr. Lopez's right arm behind his back.

Timestamp 04:01
Officer Mazariegos states, "I told you to fucking sit down." Mr. Lopez repeats in Spanish that he did not do anything. He then repeats in English several times that he did not do anything.

Timestamp 04:12 – 04:23
Officer Mazariegos puts handcuffs on Mr. Lopez. Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮ are seen sitting in the same positions they were in before the struggle with Mr. Lopez began. Mr. Lopez repeats that he did not do anything. Officer Mazariegos tells him that she told him to sit down and he did not sit down.

Timestamp 04:26
Officer Mazariegos informs dispatch they have "one detained".

41

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Timestamp 04:31
Officer Nail advises dispatch to send the San Rafael Fire Department to provide medical assistance to Mr. Lopez.

Timestamp 04:34
Officer Mazariegos double locks the handcuffs on Mr. Lopez.

Timestamp 05:13
Mr. Lopez tries to move and Officer Mazariegos tells him to stop moving.

Timestamp 05:34
Mr. Lopez appears to be trying to blow out his nose as he lay on the pavement.

Timestamp 05:40
Officer Mazariegos advises Mr. Lopez that medical assistance is on the way.

Timestamp 05:55
Officer Mazariegos searches Mr. Lopez.

Timestamp 06:01
Officer Nail assists Mr. Lopez to his feet.  The officers then walk Mr. Lopez to Officer Mazariegos's patrol car.

Timestamp 06:26
Officer Mazariegos puts Mr. Lopez into the back of her patrol car.


### 5. Summary of Corporal O'Con's Interview with Mr. ▓▓▓▓▓▓

Corporal O'Con asked Mr. ▓▓▓▓▓▓, who had been seated on the curb since Officer Mazariegos directed him to do so, to stand up and walk a few steps away so that the Corporal could interview him.  The interview was conducted in Spanish and was recorded on Corporal O'Con's body-worn camera.  Corporal O'Con did not advise Mr. ▓▓▓▓▓▓ of his Miranda rights.

Corporal O'Con asked Mr. ▓▓▓▓▓▓ what happened.  Mr. ▓▓▓▓▓▓ said they were standing nearby when "she", (Officer Mazariegos), directed them to sit down on the curb.  He said Officer Mazariegos then asked them for their identification and "he came", (Officer Nail).

Mr. ▓▓▓▓▓▓ said that Mr. Lopez then stood up and explained that his identification was in his little pocket.  Mr. ▓▓▓▓▓▓ said the officers grabbed hold of Mr. Lopez, and "they let him fall".  Mr. ▓▓▓▓▓▓ said that Mr. Lopez then "defended himself" and the officers told him not to move.  Mr. ▓▓▓▓▓▓ said that Mr. Lopez was

42

## ADMINISTRATIVE PERSONNEL INVESTIGATION

complying with the officer's demands. He said that Mr. Lopez did not fight with the officers at any time during the incident.

Mr. ▆▆▆▆ said that the officer hit Mr. Lopez in his face with his right hand during the struggle. Mr. ▆▆▆▆ said that Mr. Lopez never struck either of the officers and he did not grab hold of them.

### 6. Summary of Corporal O'Con's Interview with Mr. ▆▆▆▆

Corporal O'Con asked Mr. ▆▆▆▆ to stand and walk a few steps with him so that he could interview him. The interview was conducted in Spanish and was recorded on Corporal O'Con's body-worn camera. Corporal O'Con did not advise Mr. ▆▆▆▆ of his Miranda rights.

Mr. ▆▆▆▆ said that he and Mr. Lopez and Mr. ▆▆▆▆ were drinking beer when they were contacted by the officer. He said they had just got off of work when they arrived in the area to drink their beer.

Mr. ▆▆▆▆ said the officer asked them for identification and Mr. Lopez then stood up to take his wallet out of his pants pocket. He said that Mr. Lopez sat back down and then "they started arguing".

Mr. ▆▆▆▆ said that Mr. Lopez was sitting down when "he", Officer Nail, grabbed him and punched him in the face. Although his statement to Corporal O'Con was not clear, he seemed to indicate that Mr. Lopez resisted the officer's attempts to put him into handcuffs.

Mr. ▆▆▆▆ told Corporal O'Con that Mr. Lopez was moving his hands around to keep the officers from getting ahold of him to put handcuffs on him.

He said that at one point, Mr. Lopez was hit by the male officer. Mr. ▆▆▆▆ then pointed out Officer Nail and said he was the one that hit Mr. Lopez. He said Officer Nail punched Mr. Lopez in the face with his right hand.

Mr. ▆▆▆▆ said he did not see how Mr. Lopez ended up on the ground. He said that when Officer Nail punched Mr. Lopez, he was already on the ground. Mr. ▆▆▆▆ then stated that Mr. Lopez "was already calm" before he was hit by Officer Nail.

Mr. ▆▆▆▆ said that Mr. Lopez never struck the officers and he never tried to grab hold of the officers.

43

## ADMINISTRATIVE PERSONNEL INVESTIGATION

### 7.  Summary of Corporal O'Con's Interview with Mr. Lopez

Corporal O'Con interviewed Mr. Lopez as he sat in the back of the patrol car.  The interview was conducted in Spanish and was recorded on Corporal O'Con's body-worn camera.  Corporal O'Con did not advise Mr. Lopez of his Miranda rights.

Corporal O'Con asked Mr. Lopez what happened and Mr. Lopez said, "They came very, very roughly".  Mr. Lopez said he stood up to take his license out of his wallet and "he threw me down".  Mr. Lopez said that the male officer "hit him" on the nose. He said his nose bled and he had scrapes on his knees.

Mr. Lopez explained that he stood to hand the officer his license and "he thought I was acting wrong".  "So, he threw me there in a blow."

> *Corporal O'Con: Did you understand what they were saying to you?*
>
> *Mr. Lopez: Yes, of course.*
>
> *Corporal O'Con: Do you know that they told you to sit down?*
>
> *Mr. Lopez: Yes, yes, but I, I had to take out my license.*
>
> *Corporal O'Con: But you understood that they told you not to get up? That they told you a lot of times.*
>
> *Mr. Lopez: I understood, no, not a lot of times.  They only told me once.*

During his interview, Mr. Lopez stated several times that he was told to sit down only one time.

Mr. Lopez was a little unclear of the sequence of events, but he seemed to believe that he was punched in the nose by Officer Nail before he was taken to the ground. He did not believe he was ever told to put his hands behind his back.

Mr. Lopez said that he was shocked and scared when he saw the blood coming from his nose.

> *Corporal O'Con: Why didn't you listen to the officers when they told you not to stand up or not to, for you to sit down, or not to, for you to sit down?*
>
> *Mr. Lopez: I stood up.  I stood up (unintelligible).*
>
> *Corporal O'Con: Why didn't you listen when they told you that?*

44

## ADMINISTRATIVE PERSONNEL INVESTIGATION

*Mr. Lopez: I listened.  But they were not listening.  I, I was complying with them, understand me?  I was complying.*

*Mr. Lopez: I was complying.  But the man was there, and the man went directly to me, because I was talking with the lady.  With the policewoman in Spanish.  And I understood.  I understood.  But when he saw that I was taking out, that I got up and took out my wallet, he went after me and beat me.  That was what happened.*

Mr. Lopez told Corporal O'Con that Officer Mazariegos did not do anything to him.  He said that Officer Nail struck him in the face and threw him to the ground.  Mr. Lopez said he never struck either of the officers and he never tried to grab hold of the officers.

Mr. Lopez told Corporal O'Con that he understands English and can speak in English.

He complained of pain to his nose, knees and shoulder.

### 8.  Subject Officer Mazariegos's Summary Statement

Officer Mazariegos said that she has been a police officer with the San Rafael Police Department for two years.  She added that she was off on approved leave for a time and that at the time of this incident she had been working as a solo officer, after having completed the Field Training Program, for four months.

Officer Mazariegos said the area of town where this incident occurred is commonly called the Canal District.  She said the people who live in the area are mostly Hispanic and it is considered a high crime rate area.  She said it is a daily occurrence for people to gather in the area in the afternoons and evenings to socialize and drink alcohol.  Officer Mazariegos said that the police department receives complaints about people drinking in public in this particular area every day.  She said she had been given direction by her supervisor to provide extra patrol in this area of town and to focus specifically on people drinking alcohol in public.

Officer Mazariegos said it is a violation of a City Ordinance to possess and drink alcohol in public.  These violations are treated as an infraction and enforcement action involves giving the subject a citation.

Officer Mazariegos said that typically, when she investigates this type of violation, she contacts the subject, runs their name through dispatch, and if the subject has a history of prior similar violations she will issue the subject a citation.  She said if the subject does not have a history of prior violations she will simply warn the subject and not issue

45

## ADMINISTRATIVE PERSONNEL INVESTIGATION

a citation.  She said the subject's demeanor during their contact is another factor she considers when determining if she will issue a citation.

Officer Mazariegos estimated that in the four months she has worked as a solo officer she has issued five to ten citations and given three warnings.

Officer Mazariegos said she recorded this incident on her body-worn camera.  The Investigator showed her the video prior to beginning her interview for this administrative investigation.

On the day and time of this incident she was patrolling the Canal District and she observed Mr. Lopez and his two friends standing near what turned out to be Mr. Lopez's pickup truck and one of them appeared to be drinking alcohol from a bottle.  She said there were approximately ten other subjects in the general area but not immediately next to Mr. Lopez and his friends.

She said Mr. Lopez was standing near the open driver's side door to the truck and she noticed fifteen to twenty empty beer bottles on the pavement around the three subjects.  She said the beer bottles were from various different brands of beer and they were both twelve ounce and forty ounce bottles.  She said Mr. Lopez's two friends were standing near the back of the truck.

Officer Mazariegos said she came to the conclusion that Mr. Lopez and his two friends had drank the beer from the bottles around them because Mr. Lopez told her that if he knew the police would be coming, they would not have made such a mess. Additionally, Officer Mazariegos said that after she arrested Mr. Lopez, Mr. ██████ and Mr. ████████ told her that they had consumed the beer.



Officer Mazariegos said the first thing she did was direct all three subjects to sit on the curb.  She noticed that Mr. Lopez had a cellular telephone in his hand, and he was the first to respond to her command, which she had given in Spanish.

Officer Mazariegos said that initially, Mr. ████████ and Mr. ███████ just stared at her, then they squatted down where they were standing.  She directed them again to come toward her and sit on the curb.  Mr. Lopez then assisted her by telling them to come over and sit next to him.

Officer Mazariegos is fluent in both English and Spanish.  During the incident, she spoke in both languages.  She said that Mr. Lopez seemed to understand both English and Spanish and he too spoke to her in both languages.

Officer Mazariegos asked the three of them if they knew it was illegal to drink in public. She said Mr. Lopez then "smirked" and she then asked him if he thought this was funny. Officer Mazariegos then had a conversation with Mr. Lopez during which Mr. Lopez said he knew it was illegal for them to drink alcohol in public and she then asked, "Then why are you drinking in public?"  Mr. Lopez explained to Officer Mazariegos that they are

46

## ADMINISTRATIVE PERSONNEL INVESTIGATION

hardworking and that sometimes they want to drink a beer after work. They gather in this area because the people at his apartment building complain when they gather there to drink their beer. This conversation between Officer Mazariegos and Mr. Lopez was in Spanish.

Officer Mazariegos said that she explained there are other places they could go to, such as to a restaurant. During their discussion, Mr. Lopez tried to interrupt her, and she talked over him and told him to listen to her.

Officer Mazariegos said she was raised in the Canal District. She said that in many other countries in Latin America, it is legal to gather on the street to drink alcohol. She said she asked them if they knew it was illegal to drink in public because she thought it was possible they simply did not understand that drinking in public was a violation of their municipal code.

Officer Mazariegos described her own demeanor as "straight forward". She described Mr. Lopez's demeanor as not understanding what she was telling him or making a joke out of what she was telling him. She said he was calm and was trying to explain what they were doing and why they were doing it. "He was kind of trying to prove his point, in a way." Officer Mazariegos said she did not feel disrespected by Mr. Lopez, but she wanted him to understand what she was telling him.

The Investigator asked Officer Mazariegos why she did not try a more low-key approach with Mr. Lopez and his two friends, and why she did not attempt to develop any sort of rapport with them before she began to conduct her investigation. Officer Mazariegos said that she was the only police officer at the scene, and she was contacting three subjects and she thought it was important to her safety to ensure they understood that she was in charge of the situation. She said she had never previously contacted Mr. Lopez or his two friends.

Officer Mazariegos said that at that time she believed that Mr. Lopez was intoxicated. She said he had red and watery eyes and she believed he had an unsteady gait when she told him to walk from the driver's door of his truck to sit down on the curb. Officer Mazariegos also said that Mr. Lopez's speech was slurred.

Officer Mazariegos asked all three subjects for their identification. Mr.  and Mr. ▓▓▓▓▓ stay seated and Mr. ▓▓▓▓▓ took out his wallet. Mr. Lopez stood up and removed his wallet from his front left pants pocket.

Officer Mazariegos told Mr. Lopez to sit down and she said that Officer Nail then told him to sit down. She confirmed that Officer Nail told Mr. Lopez to "sit the fuck down". Officer Mazariegos could not recall if she had ever previously heard Officer Nail use profanity when talking to a subject while on patrol. Officer Mazariegos said she had never used profanity when talking to a subject.

47

## ADMINISTRATIVE PERSONNEL INVESTIGATION

When asked if the department has a policy that prohibits using profanity, Officer Mazariegos said yes and added, "Well, we've got to respect everybody."

Officer Mazariegos said that at the time, she did not think anything of Officer Nail's use of profanity with Mr. Lopez.

> *Investigator: When Nail says, "Hey, sit the fuck down", did you feel you were in control of the situation?*
>
> *Officer Mazariegos: I felt like I still was.  Yes.*
>
> *Investigator: Did you feel you needed Officer Nail's help to get Lopez to comply?*
>
> *Officer Mazariegos: Uh, no.*
>
> *Investigator: Do you think it was rude or discourteous toward Lopez when Nail told him to sit the fuck down?*
>
> *Officer Mazariegos: Um, yeah.*

Officer Mazariegos did not believe anything she had said or done was rude or discourteous toward Mr. Lopez.

Officer Mazariegos confirmed that Officer Nail telling Mr. Lopez to "sit the fuck down" was ineffective.  She said he squatted down and then stood back up.

When asked if Mr. Lopez's reaction to Officer Nail telling him to sit down was reasonable, Officer Mazariegos said he should have sat down and stayed seated.

> *Investigator: How would you describe Nail's demeanor at this time?*
>
> *Officer Mazariegos: I don't know.*
>
> *Investigator: I would describe it as confrontational.  Would you agree or disagree?*
>
> *Officer Mazariegos: Partially agree.*

Officer Mazariegos said she was familiar with the police tactic of contact and cover. She said the cover officer's responsibility is to ensure the safety of both officers during an encounter with a subject, while the contact officer talks with the subject and makes the decisions about how a situation will be handled.  Officer Mazariegos said Officer Nail had never previously stepped in and took over how a subject was being delt with by her.

48

## ADMINISTRATIVE PERSONNEL INVESTIGATION

When asked if she considered Mr. Lopez a threat to her safety, Officer Mazariegos said she was concerned about why he kept standing up and she said she was concerned that the many beer bottles on the ground could be used as a weapon. She said that is why she thought it would be safer to detain him in handcuffs. Although she said that Mr. Lopez had not done anything to this point to indicate he could be violent.

Officer Mazariegos said she would not release an uncooperative subject with a warning.

Officer Mazariegos said it was her decision to put Mr. Lopez into handcuffs. She said Mr. ▮▮▮▮ and Mr. ▮▮▮▮ stayed seated on the curb as she and Officer Nail struggled to put Mr. Lopez into handcuffs. She admitted that she and Officer Nail were exposed to increased risk of attack from Mr. Lopez's two friends during their struggle with Mr. Lopez. She discovered later that one of them had a pair of garden sheers on his belt.

Officer Mazariegos said that at the time she decided to put handcuffs on Mr. Lopez, he was not under arrest. She was only going to restrain him in handcuffs. She said because of his resistance, she did not explain to Mr. Lopez that he was not under arrest.

Once she decided to restrain Mr. Lopez in handcuffs, she grabbed his right arm while Officer Nail grabbed his left arm. Mr. Lopez immediately began to pull his arms away from them to prevent them from moving his hands behind his back.

Officer Mazariegos said that Officer Nail put his right leg in front of Mr. Lopez's left leg and pulled Mr. Lopez over the top of his leg causing all of them to fall to the ground.

Officer Mazariegos said Mr. Lopez pulled his hand away from her as they were falling to the ground. She said Mr. Lopez never tried to hit or strike her and he never tried to grab hold of her. She said that during their struggle, Mr. Lopez was predominately facing Officer Nail.

> *Investigator: Did you see Lopez put his arm around Officer Nail's neck?*

> *Officer Mazariegos: No. His arm was flailing around. I don't know if he was flailing, punching, whatever it was. That's what I saw. I didn't physically see him trying to wrap his hand around Officer Nail.*

Officer Mazariegos did not know if Officer Nail still had hold of Mr. Lopez's left arm at this time.

Officer Mazariegos said when they fell, she thought Mr. Lopez and Officer Nail "kind of fell on me". She said that during this part of the struggle, her back was against Mr. Lopez's truck and she was pinned against the truck by Mr. Lopez and Officer Nail.

49

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Mazariegos said she moved to get away from Mr. Lopez's truck and she tried to grab Mr. Lopez's right hand but he was moving it around to keep her from getting hold of it. She did not know if Mr. Lopez was trying to strike Officer Nail or if he was simply trying to keep her from grabbing him. Similarly, she said she did not know if Mr. Lopez was actively fighting with them or just trying to keep from being handcuffed.

Officer Mazariegos said Mr. Lopez grabbed Officer Nail's outer vest carrier with his right hand. She said it appeared to her that Officer Nail had a blank stare on his face at this point. Officer Nail then punched Mr. Lopez in the face. Mr. Lopez let go of Officer Nail and they were then able to force him to the ground onto his stomach.

Initially, Mr. Lopez had his hands underneath him as he lay on his stomach. Officer Mazariegos ordered him several times in Spanish to put his hands behind his back. She said she and Officer Nail were eventually able to pull his hands out from underneath him and she put handcuffs on him.

Officer Mazariegos said that Mr. Lopez never complied with the commands he was given until after he was handcuffed.

Officer Mazariegos said no other force was used against Mr. Lopez.

Officer Mazariegos said she and Officer Nail put Mr. Lopez into the back of her patrol car after he had been put in handcuffs. Later, she and Officer Gamble moved Mr. Lopez into the back of Officer Gamble's patrol car. She did not remember if she smelled an odor of alcohol from the back of her car or on Mr. Lopez's breath when she moved him into the other patrol car.

Officer Mazariegos said Mr. Lopez complained of pain to his back, knees and face and she said he was bleeding from his nose. She said they requested the San Rafael Fire Department to respond to the scene to provide medical aid to Mr. Lopez.

She said that Mr. Lopez was eventually transported to the Marin General Hospital for a medical clearance and then to the jail.

Officer Mazariegos said that Corporal O'Con responded to the scene and she briefed him on what happened. She said she did not record her conversation with Corporal O'Con on her body-worn camera. When asked why she turned off her body-worn camera she said she did not remember why she turned it off.

She confirmed that the first time she requested additional officers to respond to the scene was when they were already struggling with Mr. Lopez.

50

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

### 9. Credibility Assessment

It is important to note that before making a determination regarding the facts as alleged, the credibility of each witness was considered. In evaluating witness' credibility, many factors were considered, including possible bias or motivation to lie, the ability of a witness to recall information, the specificity of the information provided, whether the information provided was consistent with prior statements made by the witness and/or statements made by other witnesses, and the inherent plausibility of the information provided.

The statement from Officer Nail strains credibility. He answered the questions that were posed to him but stated that he was not rude or discourteous toward Mr. Lopez when he told him to "sit the fuck down". Additionally, Officer Nail stated that he did not believe this statement to Mr. Lopez had any negative consequence on the outcome of this incident. When in fact, it appears to the Investigator that this statement from Officer Nail was a clear precursor to the subsequent physical struggle between Mr. Lopez and the two officers.

Additionally, Officer Nail stated that he did not believe his demeanor was confrontational toward Mr. Lopez. The Investigator found that Officer Nail telling Mr. Lopez to "sit the fuck down!" and subsequently stepping toward Mr. Lopez and stating, "You know what!?", in response to Mr. Lopez saying, "I know", was in fact a challenge to Mr. Lopez.

The statement from Corporal O'Con also strains credibility. While stating that Officer Nail could have chosen not to use profanity, he refused to state that Officer Nail telling Mr. Lopez to "sit the fuck down" was, in fact, rude and discourteous toward him. Additionally, Corporal O'Con stated that he did not believe this statement from Officer Nail increased the tension in this incident when it appeared to the Investigator that Mr. Lopez clearly took offense to the way Officer Nail spoke to him.

Mr. Charles Dresow, the attorney for Mr. Lopez, Mr. ████████, and Mr. ████████, declined to make his clients available for this administrative investigation. While the Investigator would like to have interviewed these subjects, the Investigator does not believe their unwillingness to provide a statement negatively impacted this administrative investigation. There are certainly questions for these subjects that went unasked by Officer Mazariegos and Corporal O'Con. However, the videos from the incident itself and the available evidence related to this incident were sufficient for the Investigator to reach his conclusions.

Corporal O'Con's interviews of the three subjects, which occurred outside of a Miranda waiver and were not part of the criminal investigation, were included in this administrative investigation. The Investigator found that, in general, the statements obtained by Corporal O'Con from Mr. Lopez, Mr. ████████, and Mr. ████████ were credible. The Investigator noted several discrepancies between the statements from

**CONFIDENTIAL**

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Mr. Lopez, Mr. ████████, and Mr. ████████ and what can be viewed in the videos from the officer's body-worn cameras.  However, the Investigator does not believe these subjects intended to provide untruthful statements.

One such discrepancy was Mr. Lopez insisting that he was told only one time to sit down by the two officers.  However, he was told several times to sit down by Officer Mazariegos and Officer Nail as can be confirmed in the videos from their body-worn cameras.

The statement from Officer Mazariegos was credible.  She was professional and appeared to answer all of the questions that were posed to her to the best of her ability.  Officer Mazariegos admitted that she believed Officer Nail was rude and discourteous toward Mr. Lopez when he told him to "sit the fuck down".

## 10. Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos used excessive force during her arrest of Mr. Lopez on July 27, 2022.  The conclusions are based on the totality of the available evidence.  All of the statements obtained for this administrative investigation, the relevant documents, and videos from the involved officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Officer Mazariegos did not use excessive force when she detained and then arrested Mr. Lopez on July 27, 2022.

Officer Mazariegos was on routine patrol in the Canal District of the City of San Rafael.  As she drove down Windward Way she observed Mr. Lopez, Mr. ████████, and Mr. ████████ standing near a pickup truck that belonged to Mr. Lopez.  Mr. Lopez was standing outside his open driver's side door while Mr. ████████ and Mr. ████████ were standing near the back of the truck on the sidewalk.

Officer Mazariegos was not specific, but during her interview for this administrative investigation, she said she observed that one of them was drinking a beer.  Her body-worn camera video revealed that both Mr. ████████ and Mr. ████████ had beer bottles in their hands.

Officer Mazariegos stated that people standing around in the area drinking alcohol is a common complaint from residents in this area of town.  She decided to stop to talk with the subjects to investigate a City Ordinance violation for drinking alcohol in public.

Officer Mazariegos advised dispatch of her location and requested a "routine back" from another officer.  Officer Nail was dispatched to assist Officer Mazariegos.

52

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Mazariegos is fluent in Spanish, and she talked with the three subjects in both Spanish and English.  Mr. Lopez also appeared to understand both Spanish and English.  During the encounter, he spoke both Spanish and English and when asked questions in English, he answered in English.

Officer Mazariegos ordered Mr. ████████ and Mr. ████████ to put down their beer bottles and she ordered all three of them to sit on the curb.  Officer Mazariegos's orders to the subjects turned this investigatory stop into a detention, in that they were not free to leave the area.  The legal justification for this detention was Officer Mazariegos's investigation of a City Ordinance violation.

Officer Mazariegos gave them the direction to sit on the curb numerous times as they were slow to follow her direction.  Mr. Lopez appeared to ask Officer Mazariegos where she wanted him to sit several times as she talked on her radio, informing dispatch of her location.  Officer Mazariegos raised her voice slightly and her demeanor became more stern as she pointed to the curb and repeated her command for him to sit down.

Mr. Lopez was the first to comply with her order.  He walked from the driver's door of his pickup truck to the curb, and he sat down.  Mr. ████████ and Mr. ████████ initially squatted down where they were standing but moved to the curb and sat down at Officer Mazariegos's direction.

Officer Mazariegos told the Investigator that she can either issue a citation for drinking alcohol in public or she can simply warn the subject about the City Ordinance and not issue a citation.  She stated that she based this decision on the subject's prior history with the police department and their demeanor during the contact.  She also stated that many of the subjects that live in this area of town are from Central America where it is common to drink alcohol in public.  Accordingly, she said she typically asks the subject if they are aware of the City Ordinance prohibiting consumption of alcohol in public.

Officer Mazariegos's demeanor was stern and somewhat confrontational.  She began by asking the three subjects what they were doing, and she pointed out the numerous empty beer bottles and cans in the immediate area.  She asked them if they knew it was illegal to drink alcohol in public and Mr. Lopez answered her stating, "Yes."

Officer Mazariegos and Mr. Lopez then had a conversation that lasted several minutes during which they discussed why they were in the area drinking alcohol.

Officer Mazariegos asked for identification from all three subjects.  Her legal justification for demanding identification was her detention of the subjects and subsequent City Ordinance violation investigation.

Mr. ████████ remained seated and retrieved his wallet and identification.  Mr. ████████ did not move.  Mr. Lopez stood up and patted his pockets, apparently looking for his wallet.

53

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Mazariegos told Mr. Lopez to sit down.  Mr. Lopez began to explain that he needed to stand to retrieve his identification.  Mr. Lopez removed his wallet from his left front pants pocket during this discussion.

Officer Mazariegos's legal justification for requiring Mr. Lopez to remain seated was her detention of him and his two friends and subsequent City Ordinance violation investigation.  Police officers may order a subject to sit on a curb if the subject is being detained for an investigation when the officer can articulate a concern for their safety or the safety of others.  Officer Mazariegos stated that she was conducting an investigation into a City Ordinance violation and she was concerned Mr. Lopez may try to flee the area or fight with her and Officer Nail.  She also pointed out that there were three subjects being detained and only two officers on the scene.  For these reasons, she stated it was important to her that Mr. Lopez sit down and remain seated during her investigation.

When Mr. Lopez did not immediately sit back down, Officer Nail, who had arrived to assist Officer Mazariegos, stated to Mr. Lopez, "Hey, sit the fuck down!"

Mr. Lopez took offense to the manner Officer Nail spoke to him and the two of them had a brief conversation during which Officer Nail continued to confront Mr. Lopez by telling him he was "going in handcuffs".

Mr. Lopez took out his identification from his wallet and held his identification and wallet in each hand.  Officer Mazariegos ordered him several additional times to give her his identification.  Mr. Lopez failed to hand over his identification and he continued to try to explain that he had to stand to retrieve his identification.

Mr. Lopez stood up again.  Officer Mazariegos and Officer Nail appeared to decide simultaneously to restrain Mr. Lopez in handcuffs.

Putting a subject in handcuffs does not necessarily mean the subject is under arrest.  A person may be restrained in handcuffs, and still not be under arrest, when an officer has a legal justification to detain the person and when the officer can articulate a concern for their safety or the safety of the subject.  Both Officer Mazariegos and Officer Nail stated in their interviews for this administrative investigation that they were concerned that Mr. Lopez had refused to follow the direction of Officer Mazariegos to stay seated and to provide his identification.  Additionally, both officers expressed a concern that Mr. Lopez may try to flee the area or assault one or both police officers.

After reviewing the officer's body-worn camera videos, the Investigator does not believe that Mr. Lopez had exhibited any sign that he may run from the area or may assault the officers.  However, the Investigator does find that Mr. Lopez had refused to follow lawful orders to stay seated and to provide his identification to Officer Mazariegos. Accordingly, the Investigator concludes that putting Mr. Lopez into handcuffs, in what is called a "restrained detention" was within department policy and the law.

54

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Mazariegos grabbed on to Mr. Lopez's right arm near his elbow.  Officer Nail used both of his hands to take control of Mr. Lopez's left arm.

Mr. Lopez immediately began to attempt to pull his arms away from the officers.  He struggled against the officers to prevent them from moving his hands behind his back.

Officer Nail stated that he used a "leg sweep takedown" against Mr. Lopez, causing him to fall to the pavement.  It appeared to the Investigator that the technique he used was more similar to a trip.  Officer Nail put one of his legs near Mr. Lopez and then he pulled Mr. Lopez over his leg, causing all three of them to fall to the pavement on their hands and knees.

A police officer is legally justified to take a subject to the ground to assist with handcuffing when the subject has been legally detained and are resisting being put in handcuffs.  The Investigator finds that Mr. Lopez had been legally detained and was resisting the officers efforts to put handcuffs on him.  Accordingly, the Investigator finds that forcing Mr. Lopez to the ground was within department policy and the law.

Officer Mazariegos and Officer Nail continued to struggle to control Mr. Lopez while they were on the ground.  Officer Nail stated that Mr. Lopez's resistance evolved from resisting being put into handcuffs to actively fighting against him.  He wrote in his report, and stated during his interview, that Mr. Lopez tried to put him into a headlock, and he struck him in the back of his head several times.

During this portion of the incident, Mr. Lopez and the two officers were on the pavement.  Officer Nail had hold of Mr. Lopez's left arm, but he did not have control of it as Mr. Lopez continued to try to pull his arm away from the officer.  Officer Mazariegos lost control of Mr. Lopez's right arm.  She stated that when the three of them first went to the pavement, she was pinned against Mr. Lopez's vehicle by Mr. Lopez and Officer Nail.

It appeared to the Investigator that Officer Nail attempted to punch Mr. Lopez but missed as his right hand swung over the top of Mr. Lopez's head.  Shortly after this, Mr. Lopez grabbed on to the upper left portion of Officer Nail's outer vest carrier.

Officer Nail stated that he feared that Mr. Lopez may attempt to take control of one of the weapons he kept on his vest carrier.  These weapons were his Taser, OC spray, and collapsible baton.

Fearing that Mr. Lopez may try to take control of one of these weapons to use against him and Officer Mazariegos, Officer Nail punched Mr. Lopez one time in the face, striking him on the nose.

Mr. Lopez was injured and began to bleed profusely.

55

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Mr. Lopez let go of Officer Nail's outer vest carrier and shortly after that the officers were able to force him on to his stomach and put him in handcuffs. This was accomplished by using brute force and body weight to overcome Mr. Lopez's resistance.

No other weapons or force was used against Mr. Lopez to overcome his resistance and put him into handcuffs.

The fact that Mr. Lopez grabbed Officer Nail's outer vest carrier can be confirmed on Officer Mazariegos's body-worn camera video.

A police officer may punch a subject, typically called in law enforcement, a personal body weapon, when the subject is actively resisting the officer's efforts to detain him and when the officer can articulate a justifiable threat to their safety or the safety of another. Officer Nail stated that he believed Mr. Lopez's resistance had elevated from resisting being put into handcuffs to actively fighting against him and Officer Mazariegos. Further, Officer Nail stated that Mr. Lopez had grabbed his outer vest carrier and he feared that Mr. Lopez may try to take one of the weapons he carries on his vest carrier and subsequently use the weapon against him and/or Officer Mazariegos. Accordingly, he used a personal body weapon and struck Mr. Lopez one time in the face to gain his compliance and overcome his resistance.

The Investigator finds that Officer Nail's punch to Mr. Lopez's face was within policy and the law.

There is no evidence to support a conclusion that Officer Mazariegos's actions were motivated by any bias or animus toward Mr. Lopez's Hispanic descent. Officer Mazariegos is Hispanic and a fluent Spanish speaker. She stated that she grew up in the Canal District of San Rafael. She asked Mr. Lopez and his two friends if they knew it was illegal to drink alcohol in public in the City of San Rafael. She stated that she asked this question because it is common to drink alcohol in public in Latin America and she believed Mr. Lopez and his friends may not have been aware of their City Ordinance.

### Summary

Officer Mazariegos's detention of Mr. Lopez and his two friends for an investigation of a City Ordinance violation was within department policy.

Officer Mazariegos ordering Mr. Lopez and his two friends to sit down on the curb was within department policy.

Officer Mazariegos demanding identification from Mr. Lopez and his two friends was within department policy.

56

## ADMINISTRATIVE PERSONNEL INVESTIGATION

When Mr. Lopez refused to follow Officer Mazariegos's orders to remain seated and to provide his identification, the officers decided to restrain Mr. Lopez in handcuffs. This action was within department policy.

When Mr. Lopez resisted the officer's attempts to restrain him in handcuffs, Officer Nail took Mr. Lopez to the ground in order to overcome his resistance. This action was within department policy.

When Mr. Lopez grabbed on to Officer Nail's outer vest carrier, Officer Nail feared that he may gain access to one of the weapons he keeps on his person. Fearing that Mr. Lopez may take one of his weapons away from him, Officer Nail punched Mr. Lopez one time in the face. This action was within department policy.

Mr. Lopez was taken into custody shortly after Officer Nail punched him. The only force used against Mr. Lopez was the officer's hands and body weight. No other force was used and none of the officer's less than lethal weapons were used against Mr. Lopez.

The Investigator finds the force used against Mr. Lopez was not excessive, improper, or against department policy. Additionally, as the force used against Mr. Lopez was within policy, Officer Mazariegos had no duty to intercede against Officer Nail or to report Officer Nail for any violation of the department's use of force policy.

The Investigator finds that while within department policy, this use of force may have been avoided. The incident was handled poorly by both officers. Neither officer tried to develop any level of rapport with Mr. Lopez. Officer Nail's use of profanity was unnecessary and objectionable. To be clear, it was Mr. Lopez's actions that led to the necessity to use force. However, had the officers conducted themselves more professionally, Mr. Lopez may have never resisted the officer's directions to him.

The Investigator also finds it troubling that portions of Corporal O'Con's discussions with Officer Nail and Officer Mazariegos about the facts and circumstances that led to the use of force against Mr. Lopez were not captured on their body-worn camera videos.

Not recording these interviews raises suspicion about what the officers may have said to Corporal O'Con about what occurred. To eliminate this suspicion, and to provide full transparency, consideration should be given to change this practice. Similar interviews should be video recorded in the future.

These conclusions are supported by the available evidence.

### 11. Findings Upon Alleged Policy Violations

Officer Mazariegos  was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

57

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

<u>City of San Rafael Personnel Rules and Regulations</u>

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

      a. Negligence of duty.

      e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

      h. Unacceptable behavior toward the general public or fellow employees or officers of the City.

      l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

      o. Establishment of a pattern of violations of any City policy or rules and regulations over an extended period of time in which a specific incident in and of itself would not warrant disciplinary action, however, the cumulative effect would warrant such action.

      q. Other acts inimical to the public service.

<u>San Rafael Police Department Policy Manual</u>

300 – Use of Force

      300.3.1 Duty to Intercede

      Any officer present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, shall, when in a position to do so, intercede (as defined by Government Code § 7286) to prevent the use of unreasonable force.

      300.3.3 Duty to Report Excessive Force

      Any officer who observes a law enforcement officer or an employee use force that potentially exceeds what the officer reasonably believes to be necessary shall immediately report these observations to a supervisor (Government Code § 7286(b)).

      300.3.4 Fair and Unbiased Use of Force

58

**CONFIDENTIAL**              COSR (Lopez) 000919

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officers are expected to carry out their duties, including the use of force, in a manner that is fair and unbiased (Government Code § 7286(b)). See the Bias-Based Policing Policy for additional guidance.

300.4 Use of Force

Officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a).

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance (Government Code § 7286(b)).

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the approved or authorized tools, weapons, or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

300.4.1 Use of Force to Effect an Arrest

Any peace officer may use objectively reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to

59

## ADMINISTRATIVE PERSONNEL INVESTIGATION

self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance. Retreat does not mean tactical repositioning or other de-escalation techniques (Penal Code § 835a).

SRPD Policy 320 – Standards of Conduct

320.5.1 Laws, Rules and Orders

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

(c) Violation of federal, state, local or administrative laws, rules or regulations.

320.5.2 Ethics

(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose.

320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

320.5.9 Conduct

(a) Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law enforcement agency or that may result in criminal prosecution or discipline under this policy.

(b) Unreasonable and unwarranted force to a person encountered or a person under arrest.

(c) Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

(h) Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

60

## ADMINISTRATIVE PERSONNEL INVESTIGATION

SRPD Policy 401 – Bias-Based Policing

> 401.3 Bias-Based Policing Prohibited
>
> Bias-based policing is strictly prohibited.

As set forth above, the Investigator finds that Officer Mazariegos's use of force was within policy and did not violate the above policies of the San Rafael Police Department and the City of San Rafael during her detention and arrest of Mr. Lopez on July 27, 2022.

### These allegations are Unfounded

> **Allegation 2:** Officer Mazariegos failed to consider alternative tactics to using force and she failed to employ de-escalation techniques during her arrest of Mr. Lopez on July 27, 2022.

### 1.  Witness Officer Nail's Summary Statement

Officer Nail stated that upon his arrival it appeared to him that Mr. Lopez was being argumentative with Officer Mazariegos.  He said that it appeared to him that Mr. Lopez's behavior was "escalating".

Officer Nail said that Mr. Lopez stood up when Officer Mazariegos asked for his identification.  He said that he refused to stay seated and continued to explain that he needed to stand to retrieve his wallet, even though his wallet was already in his hand.

Officer Nail said that he told Mr. Lopez to sit down.  When asked, he confirmed that he, in fact, told him to "sit the fuck down".

> *Investigator: Okay.  I think what you said was, "Hey, sit the fuck down."*
>
> *Officer Nail: Correct.*

Officer Nail explained that he believed it was necessary to talk to Mr. Lopez in the manner he did because he was not listing to the direction from Officer Mazariegos.  He said he believed it was necessary to "escalate" the situation to keep from having to "go hands on" with Mr. Lopez.

61

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Later, during his interview for this administrative investigation, Officer Nail stated that he believed his telling Mr. Lopez to "sit the fuck down" was a tactic to de-escalate the situation.

When asked how the same command could both escalate and de-escalate a situation, Officer Nail said the command may escalate the situation initially, but then de-escalate the situation when Mr. Lopez sat down.

Officer Nail admitted this way of talking with Mr. Lopez was ineffective and that it did not calm the situation. Mr. Lopez responded to Officer Nail by telling him he did not have to talk to him like that. When asked if Mr. Lopez's response to him was reasonable, Officer Nail said, "No", he should have sat down.

Officer Nail said he was stern, but he did not believe he was confrontational. When Mr. Lopez sat back down, he repeated several times, "I know, I know". Officer Nail asked him, "You know what!?" The Investigator asked Officer Nail what he meant by this, and Officer Nail said simply, "I didn't know what he knew."

> *Investigator: Do you think your demeanor and the way that you talked with Lopez, did it escalate or de-escalate the situation?*
>
> *Officer Nail: I don't think it had a bearing on it either way.*

Additionally, Officer Nail stated that his telling Mr. Lopez to sit down was a form of an alternate tactic to using force on him. Officer Nail added that there were three suspects and only two police officers at the scene. He said that with the traffic at that time of day it would take time for other officers to arrive at the scene if they were requested. He believed these facts contributed to the need to put Mr. Lopez in handcuffs.

The Investigator asked if it would have been a better tactic not to put Mr. Lopez into handcuffs with the facts as he had just described them. Officer Nail said no, because they did not know if Mr. Lopez was armed it was necessary to go "hands on" and put him into handcuffs.

When asked, Officer Nail admitted that he could have explained to Mr. Lopez why it was necessary for him to sit down but he said he did not think of this option.

Officer Nail said he believed Mr. Lopez was a threat to their safety. He explained that he felt this way because Mr. Lopez kept standing up. They were in a high crime rate area, and they did not know if he was armed with a weapon. He said that even though he had his wallet in his hand, Mr. Lopez kept reaching toward and grabbing at his pockets.

> *Investigator: Had he done anything that would lead you to believe he might be violent?*

62

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

*Officer Nail: Yes.*

*Investigator: What had he done that leads you to believe he might be violent?*

*Officer Nail: Not following commands and continuing to stand up.*

Officer Nail admitted he had not observed any other signs that Mr. Lopez could be violent, such as a fighting stance and balled up fists. He admitted that his primary concern was Mr. Lopez's refusal to stay seated on the curb.

Officer Nail said there was no other option available to them other than putting Mr. Lopez into handcuffs. When questioned further, Officer Nail admitted they could have told him to sit down again, they could have explained why they wanted him to sit down, and they could have explained that they needed to search him to ensure he was not a danger to them.

Officer Nail believed that he and Officer Mazariegos decided simultaneously to put Mr. Lopez into handcuffs. He said he was unaware at that time that one of Mr. Lopez's friends had a pair of garden sheers on his belt. He admitted that both he and Officer Mazariegos were exposed to increased danger of attack by Mr. Lopez's friends when they were struggling to put Mr. Lopez into handcuffs.

Officer Nail said that at the time they decided to put Mr. Lopez into handcuffs he was not under arrest, he was only being detained. He said he did not explain to Mr. Lopez that he was not under arrest and that he was only being detained because he was the cover officer, and it was the responsibility of Officer Mazariegos to tell him this.

### 2. Witness Corporal O'Con's Summary Statement

When asked if he felt it was appropriate that Officer Nail told Mr. Lopez to "sit the fuck down", Corporal O'Con said that perhaps the profanity could have been eliminated. But he said Mr. Lopez was not complying with their order to stay seated and talking to him sternly seemed appropriate.

Corporal O'Con admitted that Mr. Lopez did not like being talked to in that manner from Officer Nail, but he pointed out that the more significant factor was that Mr. Lopez was failing to comply with their direction to him. When asked, Corporal O'Con said he did not believe that Officer Nail telling Mr. Lopez to "sit the fuck down" had anything to do with making the situation worse or more tense. "I don't believe it caused any change…"

Corporal O'Con said he agreed with the officer's decision to put Mr. Lopez into handcuffs, and he believed it was necessary based on his refusal to follow the officer's commands.

63

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

*Investigator: Your use of force policy requires officers to attempt to de-escalate a situation to avoid having to use force.  Did you see anything from Officer Nail which would lead you to believe he tried to de-escalate the situation?*

*Corporal O'Con: I believe so.  I believe his use of just that jargon alone, he used a different tactic outside of what Officer Mazariegos was using…*

*Corporal O'Con: He used a tactic of being, uh, more direct and more stern.  Yes.*

Corporal O'Con said that when Mr. Lopez continued to disobey the officer's orders, they switched to a different tactic by placing him in handcuffs.  "And so, those were all, to me, de-escalatory like tactics used to gain further control."

*Investigator: Is it your opinion and your statement that, when Officer Nail said "sit the fuck down", that was an attempt to de-escalate the situation?*

*Corporal O'Con: I believe it was a version of his belief at the time to de-escalate the situation.*

When asked if Officer Mazariegos employed any tactic to de-escalate the situation, Corporal O'Con said that she gave Mr. Lopez numerous commands.

When asked if either of the officers used any alternate tactic to avoid using force, Corporal O'Con said, "I just don't quite understand alternative tactics.  They used the tactics that they believed that they had to use at that necessary time."

### 3.  Subject Officer Mazariegos's Summary Statement

Officer Mazariegos said the first thing she did was direct all three subjects to sit on the curb.  She noticed that Mr. Lopez had a cellular telephone in his hand, and he was the first to respond to her command to sit down, which she had given in Spanish.

Officer Mazariegos said she tried to engage the subjects in conversation and it was Mr. Lopez that did all of the talking among the three subjects.  She asked them if they were aware it is illegal to drink alcohol in public and she stated that many people in the Hispanic community are unaware of this City Ordinance.

Officer Mazariegos described her demeanor as "straight forward" during her conversation with Mr. Lopez.  She said he seemed not to understand what she was telling him and he seemed to be making a joke out of what she was telling him.

Officer Mazariegos said that initially, she was the only police officer on scene, and she had contacted three subjects drinking alcohol.  She said that for this reason, she felt it

64

was important that they understood that she was in charge of the situation. She said this was the reason she did not try a more low-key approach with them.

Officer Mazariegos confirmed the first thing Officer Nail said, after he arrived on scene, was "Hey, sit the fuck down!" to Mr. Lopez. Officer Mazariegos could not recall if she had ever previously heard Officer Nail use profanity when talking to a subject while on patrol. Officer Mazariegos said she had never used profanity when talking to a subject.

When asked if the department has a policy that prohibits using profanity, Officer Mazariegos said yes and added, "Well, we've got to respect everybody."

Officer Mazariegos confirmed that she felt it was discourteous of Officer Nail to use profanity with Mr. Lopez and she confirmed that it did not calm the situation. Although, she said she believed that his use of profanity did not escalate the situation.

She believed that she was in control of the situation and that it was unnecessary for Officer Nail to speak with Mr. Lopez.

Officer Mazariegos confirmed that Officer Nail telling Mr. Lopez to "sit the fuck down" was ineffective. She said he squatted down and then stood back up.

Officer Mazariegos believed that her telling Mr. Lopez to sit down was a tactic to de-escalate the situation.

Officer Mazariegos believed that putting Mr. Lopez into handcuffs was an alternative tactic to using force on him.

She said she never considered explaining to Mr. Lopez why it was important for him to sit down and stay seated. She said she did not consider doing a "pat down search" of Mr. Lopez instead of handcuffing him. She said she did not consider moving the beer bottles or moving the subjects away from the beer bottles to decrease the potential an empty beer bottle could be used as a weapon.

When asked if she considered Mr. Lopez a threat to her safety, Officer Mazariegos said she was concerned about why he kept standing up and she said she was concerned that the many beer bottles on the ground could be used as a weapon. She said that is why she thought it would be safer to detain him in handcuffs. Although she said that Mr. Lopez had not done anything to this point to indicate he could be violent.

Officer Mazariegos said an angry demeanor is one indicator she might look for to anticipate a subject may be violent toward her. The Investigator offered her several other possible indicators such as an angry stare and clenched fists and she said she had not seen any of those indicators from Mr. Lopez.

Officer Mazariegos said it was her decision to put Mr. Lopez into handcuffs. She said Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ stayed seated on the curb as she and Officer Nail

65

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

struggled to put Mr. Lopez into handcuffs. She admitted that she and Officer Nail were exposed to increased risk of attack from Mr. Lopez's two friends during their struggle with Mr. Lopez. She discovered later that one of them had a pair of garden sheers on his belt.

Officer Mazariegos said that at the time she decided to put handcuffs on Mr. Lopez, he was not under arrest. She was only going to restrain him in handcuffs. She said because of his resistance, she did not explain to Mr. Lopez that he was not under arrest.

### 4. Credibility Assessment

The statement from Officer Nail strains credibility. He stated that his telling Mr. Lopez to "sit the fuck down" was a tactic to de-escalate the situation. The Investigator finds it unfathomable how Officer Nail could believe raising his voice, speaking harshly with profanity, while moving closer to a subject could possibly be interpreted as a de-escalation tactic. Additionally, Officer Nail stated that his speaking to Mr. Lopez in that manner had no effect on creating the necessity to put Mr. Lopez into handcuffs.

The statement from Corporal O'Con also strains credibility. Corporal O'Con refused to state that it was inappropriate for Officer Nail to tell Mr. Lopez to "sit the fuck down". He refused to acknowledge that Officer Nail talking with Mr. Lopez in this manner contributed to the necessity to put Mr. Lopez into handcuffs.

The statement from Officer Mazariegos was credible. She appeared to answer the questions that were posed to her truthfully and to the best of her ability. She admitted that she believed Officer Nail was discourteous toward Mr. Lopez.

### 5. Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos failed to consider alternative tactics to using force and she failed to employ de-escalation techniques during her arrest of Mr. Lopez on July 27, 2022. The conclusions are based on the totality of the available evidence. The statements from Officer Nail, Corporal O'Con, and Officer Mazariegos, as well as the videos from the officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Officer Mazariegos failed to consider alternative tactics to using force and failed to employ de-escalation techniques during her detention and arrest of Mr. Lopez.

66

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Mazariegos contacted Mr. Lopez, Mr. ███████, and Mr. ███████ to investigate a possible violation of a City Ordinance.  The violation is treated as an infraction and is one of the lowest level enforcement actions a police officer can engage in.  In fact, a subject in violation of this City Ordinance is given a citation and not taken into custody and not booked at the county jail.  It is similar to a traffic infraction.

Officer Mazariegos's demeaner was stern and somewhat confrontational upon her initial contact with the three subjects.  Her first words to the subjects were to order Mr. ███████ and Mr. ███████ to put down beer bottles they had in their hands and then she ordered all three subjects to sit down on the curb.  Mr. Lopez asked Officer Mazariegos a question and she repeated her order for him to sit on the curb two times, raising her voice slightly and increasing the sternness in her voice on the second command.

After Mr. ███████ and Mr. ███████ joined Mr. Lopez on the curb, Officer Mazariegos asked them what they were doing and she commented on the amount of empty beer bottles on the ground.  Officer Mazariegos then asked them if they knew it was illegal to drink alcohol outside and in public.  When Mr. Lopez responded "yes" she then stated in a challenging manner, "Then why are you guys drinking outside and in public?"

Officer Mazariegos's demeanor was stern, confrontational and officious.

Mr. Lopez was smiling, and Officer Mazariegos then stated, "You don't have nothing to say?  You're just out here drinking, and you think it's funny?"

Mr. Lopez gave Officer Mazariegos an explanation about why they were in that location drinking beer, while Officer Mazariegos explained that it was illegal and there were other options for locations they could drink their beer.  This part of their conversation was in Spanish.

During this back and forth conversation, Mr. Lopez smiled.  Officer Mazariegos stated in English, "No!  It's not funny."

Officer Mazariegos asked for identification from all three subjects and Mr. Lopez stood up from the curb to retrieve his wallet from his front left pants pocket.  Officer Mazariegos told him in Spanish to sit down and give her his identification.

Mr. Lopez did not immediately sit down and he began to explain that he had to stand to retrieve his identification.

Officer Nail, who had arrived on the scene a few moments beforehand, then stated, "Hey!  Sit the fuck down!"  Officer Nail's demeanor was stern, officious, and confrontational.

Mr. Lopez, who had been focused on Officer Mazariegos, turned to face Officer Nail and stated, "Hey, you don't have to talk to me."  He did not raise his voice or change his

67

## ADMINISTRATIVE PERSONNEL INVESTIGATION

demeanor.  He appeared to object to the manner in which Officer Nail told him to sit down.

Officer Nail stepped forward, toward Mr. Lopez, and stated, "Then you're going in handcuffs."

Officer Mazariegos then stated, in an apparent explanation to Mr. Lopez's objection to Officer Nail, "Well, I told you to sit down."

Officer Nail was now only a few feet from Mr. Lopez.  Mr. Lopez sat down and stated, "I know, I know."  Officer Nail then stated, "You know what!?"

Mr. Lopez, in an apparent attempt to de-escalate the confrontation with Officer Nail, stated in a softer voice, "Yes, yes."

Officer Mazariegos continued to direct Mr. Lopez to take out his identification while Mr. Lopez continued to attempt to explain that he needed to stand to retrieve his identification.  His wallet was in his hand and he was in the process of taking his identification out of his wallet as he explained that he needed to stand to comply with Officer Mazariegos's direction.

Mr. Lopez stood up again and continued to explain that he needed to stand to comply with Officer Mazariegos's order.  Officer Mazariegos continued to order Mr. Lopez to sit down, raising her voice as she did so.

At this point, Officer Mazariegos grabbed Mr. Lopez's right elbow while Officer Nail took hold of his left arm.  Mr. Lopez resisted the officer's efforts to put handcuffs on him by trying to pull his arms away from the officers.

Officer Nail pulled Mr. Lopez over his extended leg, causing all three of them to fall to the pavement.  During the struggle, Mr. Lopez grabbed hold of the upper left portion of Officer Nail's outer vest carrier.  Officer Nail punched Mr. Lopez one time in the face, causing him to let go of Officer Nail's vest carrier.

The officers were able to overcome Mr. Lopez's resistance and put handcuffs on him.

Once Mr. Lopez began his physical resistance, he never complied with any of the orders to stop resisting and to put his hands behind his back until he was forced to do so.

The force used to detain and arrest Mr. Lopez consisted of the officer's hands, personal body weapons (Officer Nail's punch), and body weight.  No other tools or weapons were deployed against Mr. Lopez.

The order to Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮ from Officer Mazariegos to put down their beer bottles was reasonable and appropriate.  Her order to the subjects to sit on the

68

## ADMINISTRATIVE PERSONNEL INVESTIGATION

curb is understandable, given there were three subjects, and she was the lone police officer on the scene.

However, Officer Mazariegos's demeanor was stern, challenging, and officious.  She did not attempt to develop rapport with the subjects.  Her questions to the subjects did not appear to be for the purpose of gaining information or voluntary compliance with a City Ordinance, but instead appeared to be intended to be a challenge to the subjects. Officer Mazariegos appeared to take offense to Mr. Lopez smiling at her when she asked him why he was drinking alcohol in public.  She stated several times, "No, it's not funny."

Alternatives to the manner Officer Mazariegos conducted this investigation include:

- Softening her demeanor
- Engaging the subjects in genuine dialog instead of the challenging way she asked her questions
- Attempting to build rapport with the subjects
- Attempting to gain their voluntary compliance with the City Ordinance by explaining to them the number of complaints the police department receives for subjects drinking in this area
- Given the type of investigation she was conducting, she could have chosen not to ask the subjects to sit on the curb
- Explaining to Mr. Lopez why it was important he remain seated on the curb
- Explaining to Mr. Lopez that she wanted to conduct a pat search to ensure he was not armed with a weapon
- Allowing Mr. Lopez to complete his explanation for why he stood up
- Once Mr. Lopez had his identification in his hand, Officer Mazariegos could have simply asked him to hand it to her
- She should have told Officer Nail to lower his level of aggression toward Mr. Lopez

The Investigator finds the necessity to use force against Mr. Lopez was caused by the actions of Mr. Lopez.  However, the demeanor of Officer Mazariegos and Officer Nail contributed to Mr. Lopez's refusal to follow Officer Mazariegos's directions.

The Investigator finds that it was Mr. Lopez, not the officers, that attempted to de-escalate this situation, first when he smiled at Officer Mazariegos when she asked her challenging questions, and then when he sat down and stated "I know.  I know" and "yes" after Officer Nail told him to "sit the fuck down!" and asked, "You know what!?".

Both Officer Nail and Officer Mazariegos stated they were familiar with the law enforcement tactic of contact and cover.  Officer Mazariegos was the contact officer.  It was her responsibility to talk with the subjects, pat search them for weapons, and

69

## ADMINISTRATIVE PERSONNEL INVESTIGATION

determine how the incident would be resolved.  It was Officer Nail's responsibility to provide cover and ensure Officer Mazariegos's safety.  This is best accomplished by not engaging with the subjects.  When Officer Nail told Mr. Lopez to "sit the fuck down", Officer Mazariegos stated, "Well, I told you to sit down".  Taken together with both officer's officious demeanor, this caused the situation to escalate and become more contentious.

Officer Mazariegos should have told Officer Nail that she had control of the situation and that he should limit his involvement to providing cover.  However, the Investigator understands it is unlikely an officer with four months of solo policing experience is going to make such a statement to a veteran senior officer.

The Investigator finds that Officer Mazariegos failed to consider and employ alternative tactics to using force against Mr. Lopez and she failed to attempt to de-escalate the situation to mitigate the necessity of having to use force against Mr. Lopez.

This conclusion is supported by the available evidence.


### 6. Findings Upon Alleged Policy Violations


Officer Mazariegos  was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

> a. Negligence of duty.

> e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

> l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

> q. Other acts inimical to the public service.

San Rafael Police Department Policy Manual

300 – Use of Force

70

## ADMINISTRATIVE PERSONNEL INVESTIGATION

300.4.2 Alternative Tactics – De-Escalation

De-escalation is a fundamental principle of how we conduct police work. Taking no action, passively monitoring a situation, or bringing in partners such as a mobile crisis unit may be the most reasonable response to a situation, particularly those involving mental health crises. This policy manual refers to the importance of de-escalation in multiple sections. See, in particular, the Crisis Intervention Incidents Policy.

As time and circumstances reasonably permit, and when community and officer safety would not be compromised, officers should consider actions that may increase officer safety and may decrease the need for using force such as:

(a) Summoning additional resources that are able to respond in a reasonably timely manner.

(b) Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c) Employing other tactics that do not unreasonably increase officer jeopardy.

In addition, when reasonable, officers should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)). Such alternatives may include but are not limited to:

(a) Attempts to de-escalate a situation.

(b) If reasonably available, the use of crisis intervention techniques by properly trained personnel.

SRPD Policy 320 – Standards of Conduct

320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out

71

## ADMINISTRATIVE PERSONNEL INVESTIGATION

proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

320.5.8 Performance

(i) Any act on-- or off--duty that brings discredit to this department.

320.5.9 Conduct

(m) Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

As set forth above, the Investigator finds that Officer Mazariegos violated the above policies of the San Rafael Police Department and the City of San Rafael when she failed to consider alternative tactics to using force against Mr. Lopez and when she failed to de-escalate the situation during her detention and arrest of Mr. Lopez.

**These allegations are Sustained**

**Allegation 3:** Officer Mazariegos's conduct was discourteous and disrespectful toward Mr. Lopez during his detention and arrest on July 27, 2022.

### 1. Subject Officer Mazariegos's Summary Statement

Officer Mazariegos spoke to the subjects in both English and Spanish.  When she talked with them, it was Mr. Lopez that answered for the three subjects.  He too spoke in both English and Spanish.

Officer Mazariegos asked the subjects if they were aware of the City Ordinance making it a violation to drink alcohol in public.  She said that she asked this question because the subjects were Hispanic and she is aware that it is common to drink alcohol in public in many Latin American countries.

Officer Mazariegos said that Mr. Lopez "smirked" at her, and she then asked if he thought her question was funny.  Mr. Lopez told her he knew it was illegal to drink alcohol in public and she then asked him why, if he knew it was illegal, was he drinking alcohol in public.  Her demeanor was confrontational, and her question was more of a challenge to Mr. Lopez than a true attempt to seek information.  She said that Mr. Lopez explained that they were hard workers and that they enjoy drinking a beer after work.

72

## ADMINISTRATIVE PERSONNEL INVESTIGATION

He told her they get into trouble if they drink alcohol outside near their apartment, so they gather in this area to drink their beer.

Officer Mazariegos explained that there were other options, such as going to a restaurant.  During their discussion, Mr. Lopez tried to interrupt her, and she talked over him and told him to listen to her.

Officer Mazariegos described her own demeanor as "straight forward".  She described Mr. Lopez's demeanor as not understanding what she was telling him or making a joke out of what she was telling him.  She said he was calm and was trying to explain what they were doing and why they were doing it.  "He was kind of trying to prove his point, in a way."

Officer Mazariegos said she did not feel disrespected by Mr. Lopez, but she wanted him to understand what she was telling him.

When Officer Mazariegos asked for his identification, Mr. Lopez stood up.  She told him to sit down several times and when he did not immediately sit down, Officer Nail stated, "Hey, sit the fuck down!".

Officer Mazariegos said she had never used profanity when talking with a subject.

Officer Mazariegos said she was aware of the department policy prohibiting using profanity and the requirement to treat the public respectfully.

Mr. Lopez objected to the manner in which Officer Nail told him to sit down and Officer Mazariegos stated, "Well, I told you to sit down."

Officer Mazariegos said that Officer Nail's use of profanity did not have an impact on her, and she said she did not think anything of it at the time.

> *Investigator: Do you think it was rude or discourteous toward Lopez when Nail told him to sit the fuck down?*

> *Officer Mazariegos: Um, yeah.*

Officer Mazariegos did not believe anything she had said or done was rude or discourteous toward Mr. Lopez.


### 2. Credibility Assessment


The Investigator found the statement from Officer Mazariegos was credible.  She answered the questions that were posed to her, and her answers appeared to be truthful and forthcoming.

73

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

### 3. Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos's conduct was rude and discourteous toward Mr. Lopez during her contact with him on July 27, 2022.  The conclusions are based on the totality of the available evidence.  The statement from Officer Mazariegos, as well as the videos from the officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, there is insufficient evidence to conclude Officer Mazariegos's conduct was, or was not, rude and discourteous toward Mr. Lopez during her contact with him on July 27, 2022.

Officer Mazariegos contacted Mr. Lopez, Mr. ⬛⬛⬛⬛, and Mr. ⬛⬛⬛⬛ to investigate a possible violation of drinking alcohol in public.  She ordered Mr. ⬛⬛⬛⬛ and Mr. ⬛⬛⬛⬛ to put down their beer bottles and she directed all three subjects to sit on the curb.

Officer Mazariegos's demeanor was stern.  She did not ask for compliance with her directions, she demanded it.  She wanted them to understand that she was in control of the situation.

Officer Mazariegos asked the subjects if they knew it was illegal to drink alcohol in public and when Mr. Lopez said he was aware of the law, she asked, "Then why are you guys drinking outside in public?"  Her question appeared to be a challenge toward Mr. Lopez rather than an inquiry.

Mr. Lopez responded by telling her he had nothing to say.  Officer Mazariegos then stated, "You don't have nothing to say?  You're just out here drinking and you think it's funny?"

Mr. Lopez and Officer Mazariegos had a conversation in Spanish that lasted several minutes about why they were drinking their beer in this particular area.  During their conversation, Officer Mazariegos, in English, stated again that it was not funny.

Officer Mazariegos asked all three subjects for their identification.  Mr. Lopez stood to retrieve his wallet from his front left pants pocket.  Officer Mazariegos told Mr. Lopez to sit down and when he did not immediately sit down, Officer Nail stated, "Hey!  Sit the fuck down!"

Mr. Lopez turned toward Officer Nail and stated, "Hey, you don't have to talk to me."

74

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Mazariegos stated, in an apparent explanation for the way Officer Nail spoke to him, "Well, I told you to sit down."

Mr. Lopez sat down but then stood up again when Officer Mazariegos asked for his identification. The officers then decided to restrain Mr. Lopez in handcuffs.

During the struggle to put handcuffs on Mr. Lopez, Officer Mazariegos told him to stop, and she told him in Spanish several times to put his hands behind his back. She then asked in Spanish if he understood her, and Mr. Lopez said yes, but that he had not done anything as he continued to struggle against the officers.

Officer Mazariegos responded by stating two times, "I told you to fucking sit down." Mr. Lopez repeated several times that he had not done anything. Officer Mazariegos stated, "I told you to sit down, and you don't sit down."

The Investigator finds that Officer Mazariegos's demeanor when she first contacted the subjects was officious but not a violation of policy. She had a justified reason for contacting the subjects, for ordering two of them to put down their beer bottles, and for ordering all three of them to sit on the curb.

Her questions to Mr. Lopez before she asked for his identification were challenging in nature rather than true attempts to seek information. However, this too does not amount to a violation of policy.

Officer Mazariegos's use of profanity was unprofessional. However, when put in the context that she was at the end of a physical struggle with Mr. Lopez to put him into handcuffs, it is understandable. The Investigator finds that her use of profanity was unintentional.

The Investigator finds that Officer Mazariegos could have employed a more low-key approach. She could have attempted to gain rapport with the subjects, and she could have been less challenging toward Mr. Lopez when she asked her questions.

The Investigator finds there is insufficient evidence to sustain or exonerate Officer Mazariegos for the allegation that she was rude and discourteous toward Mr. Lopez during this incident.

These conclusions are supported by the available evidence.

### 4. Findings Upon Alleged Policy Violations

Officer Mazariegos  was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

75

## ADMINISTRATIVE PERSONNEL INVESTIGATION

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

    a. Negligence of duty.

    e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

    h. Unacceptable behavior toward the general public or fellow employees or officers of the City.

    l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

    q. Other acts inimical to the public service.

San Rafael Police Department Policy Manual

SRPD Policy 320 – Standards of Conduct

    320.5.1 Laws, Rules and Orders

        (a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

    320.5.7 Efficiency

        (b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

    320.5.8 Performance

        (i) Any act on-- or off--duty that brings discredit to this department.

    320.5.9 Conduct

        (f) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

76

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(g) Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

(m) Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

As set forth above, the Investigator finds there is insufficient evidence to conclude Officer Mazariegos violated the above policies of the San Rafael Police Department and the City of San Rafael when she detained and then arrested Mr. Lopez on July 27, 2022.

**Allegation 4:** Officer Mazariegos failed to provide medical attention to Mr. Lopez after having used force to affect his arrest on July 27, 2022.

### 1. Witness Officer Nail's Summary Statement

Officer Nail said that once Mr. Lopez was in handcuffs, he asked dispatch to send medical aid. He said the San Rafael Fire Department arrived and provided medical attention to Mr. Lopez.

### 2. Witness Firefighter Lopes's Summary Statement

Firefighter Lopes said he has worked at the San Rafael Fire Department for over ten years. He said he was working overtime on the day of this incident and that he was working as an Engineer/Paramedic at Station 52. He confirmed that he provided medical aid to Mr. Lopez.

Firefighter Lopes said that Mr. Lopez was seated in the back of a patrol car upon his arrival. He had dried blood on his face, and he was alert, conscious, breathing, and talking. He said Mr. Lopez was "totally coherent, not confused, and not altered".

Firefighter Lopes said Mr. Lopez complained of pain to his nose, back, knees, and his ankles. He said that at the time of his evaluation, Mr. Lopez's nose was no longer bleeding. Firefighter Lopes said he "palpated" Mr. Lopez's nose and did not find anything abnormal and did not feel any obvious fracture to his nose.

Firefighter Lopes said that he did not observe any symptoms consistent with a concussion on Mr. Lopez, though he stated this type of diagnosis is typically done by a doctor.

77

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Firefighter Lopes said he did not smell any odor of alcohol on Mr. Lopez, nor did he smell any odor of alcohol from within the patrol car. He did not believe that Mr. Lopez's speech was slurred. Firefighter Lopes said he never asked Mr. Lopez if he had been drinking alcohol because he was able to answer all of his questions appropriately. He said he talked with Mr. Lopez in English and he answered him in English. He did not believe Mr. Lopez had any difficulty understanding him.

Later, during the interview, Firefighter Lopes clarified his statement that he did not smell an odor of alcohol on Mr. Lopez. He said that he "did not recall" smelling alcohol on the person of Mr. Lopez or from within the patrol car.

Firefighter Lopes said that Mr. Lopez never told him what happened and never told him that he was punched in the face.

### 3. Witness Corporal O'Con's Summary Statement

When asked to describe his responsibilities at this scene, Corporal O'Con stated that the first thing he did was to determine if anyone had been hurt during the incident and if they needed medical attention. He said the Fire Department was on scene and they were attending to Mr. Lopez.

Once it was determined that Mr. Lopez's injuries did not require emergency transportation to the hospital by ambulance, he directed Officer Gamble to transport him to the hospital for a medical clearance.

### 4. Witness Officer Gamble's Summary Statement

Officer Gamble said that Corporal O'Con directed her to transport Mr. Lopez to the hospital for a medical clearance. She said that while driving him to the hospital, she could smell an odor of alcohol on Mr. Lopez's breath. "I did believe him to be intoxicated." When asked, Officer Gamble said she did not have an opinion about the level of Mr. Lopez's intoxication because she did not perform an evaluation on him. She said he walked slowly between the two patrol cars, but she did not think he had any difficulty with his balance, and he did not appear unsteady on his feet.

Officer Gamble described Mr. Lopez's injuries as a bloody nose and complaint of pain to his right shoulder. She believed that she was told at the hospital that he did not suffer a bone fracture to his nose. Mr. Lopez also complained of pain to one of his knees.

78

## ADMINISTRATIVE PERSONNEL INVESTIGATION

While at the hospital, Officer Gamble took photographs of the areas that Mr. Lopez complained were injured.  She could not recall if she uploaded the photographs to their evidence storage system or if she forwarded the photographs to Officer Nail.

### 5.  Subject Officer Mazariegos's Summary Statement

Officer Mazariegos said Mr. Lopez complained of pain to his back, knees and face and she said he was bleeding from his nose.  She said they requested the San Rafael Fire Department respond to the scene and they treated Mr. Lopez.

She said that Mr. Lopez was eventually transported to the Marin General Hospital for a medical clearance prior to being booked at the jail.

### 6.  Credibility Assessment

The statements from the witnesses were credible.  They answered the questions that were posed to them and appeared forthcoming and honest.

The statement from Officer Mazariegos was also credible.  Her answers to the questions that were posed to her were consistent with the answers from the witnesses and consistent with what could be seen in the videos from the officer's body-worn cameras.

### 7.  Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos failed to ensure Mr. Lopez was provided medical attention after force was used during his detention and arrest.  The conclusions are based on the totality of the available evidence.  The statements from the witnesses and the videos from the officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Mr. Lopez was provided medical attention after his arrest by Officer Mazariegos and Officer Nail.

Almost immediately after Mr. Lopez was put in handcuffs, Officer Nail requested through Dispatch that the San Rafael Fire Department be dispatched to the scene to provide medical attention to Mr. Lopez.

79

### ADMINISTRATIVE PERSONNEL INVESTIGATION

A fire engine and an ambulance from the San Rafael Fire Department responded to the scene. They were staffed by four firefighters and a fire captain. All of them are also paramedics.

Firefighter Lopes provided medical aid to Mr. Lopez. He stated that Mr. Lopez was seated in the back of a patrol car upon his arrival. He could see dried blood on Mr. Lopez's face and on his clothing. He stated that Mr. Lopez's nose was no longer bleeding.

Mr. Lopez complained of pain to his nose, back, knees and ankles. Firefighter Lopes stated that he "palpated" Mr. Lopez's nose and did not find anything abnormal and did not feel any obvious fracture to his nose.

Firefighter Lopes also said he did not observe the common symptoms of a concussion on Mr. Lopez. Specifically, Firefighter Lopes said that Mr. Lopez was alert, conscious, and able to understand and answer all of his questions.

Based on his complaints of pain, Firefighter Lopes determined that Mr. Lopez should be evaluated at a hospital but did not need to be transported by ambulance. Corporal O'Con directed Officer Gamble to transport Mr. Lopez to the Marin General Hospital to obtain a medical clearance.

The Investigator finds that Mr. Lopez was provided medical attention, both at the scene of his arrest, and at an area hospital.

This conclusion is supported by the available evidence.

### 8. Findings Upon Alleged Policy Violations

Officer Mazariegos was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

    a. Negligence of duty.

    e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

80

## ADMINISTRATIVE PERSONNEL INVESTIGATION

l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

San Rafael Police Department Policy Manual

300 – Use of Force

300.7 Medical Considerations

Once it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident (Government Code § 7286(b)).

Policy 320 – Standards of Conduct

320.5.7 Efficiency

(a) Neglect of duty.

As set forth above, the Investigator finds that Officer Mazariegos ensured that Mr. Lopez was provided medical attention after his detention and arrest and did not violate the above policies of the San Rafael Police Department and the City of San Rafael.

**This allegation is Unfounded**

**Allegation 5:** Officer Mazariegos's police report, documenting her arrest of Mr. Lopez on July 27, 2022, failed to accurately reflect the facts and circumstances of his arrest.

### 1. Summary of San Rafael Police Report #22-05221

Officer Mazariegos authored a report documenting her arrest of Mr. Lopez. Officer Nail submitted a supplemental report which was attached to the original report written by Officer Mazariegos. Corporal O'Con signed the report as the approving supervisor. His signature is dated July 28, 2022.

Summary of Officer Mazariegos's written report

On July 27, 2022, at approximately 1853 hours, Officer Mazariegos contacted Mr. Lopez, Mr. ▮▮▮▮▮, and Mr. ▮▮▮▮▮ on Windward Way. Mr. ▮▮▮▮▮ had an

81

## ADMINISTRATIVE PERSONNEL INVESTIGATION

open beer in his hand.  There were numerous empty beer bottles on the ground around the three subjects.

Officer Mazariegos communicated with all three subjects, primarily in Spanish.  Mr. Lopez spoke both English and Spanish.

Officer Mazariegos asked the subjects if they knew it is illegal to drink alcohol in public.  She wrote that between the three subjects, Mr. Lopez was primarily doing most of the talking.

Officer Mazariegos wrote that she believed all three subjects were under the influence of alcohol.

Officer Mazariegos directed all three subjects to sit on the curb and then asked them for identification.  Mr. Lopez stood up and explained that he needed to stand to get his identification.  "Officer Nail then told Jimenez (Lopez) again to sit down or he would be placed in handcuffs."  "Shortly after, I gave Jimenez (Lopez) the same commands again to sit down.

Officer Mazariegos wrote that after Mr. Jimenez (Lopez) stood for the third time, she decided to detain him in handcuffs.  "I feared that Jimenez's (Lopez) lack of cooperation was a precursor to him fleeing the area or attempting to engage in a physical altercation with Officer Nail or me."  Officer Mazariegos wrote that because there were only two officers at the scene and they were dealing with three subjects, it was imperative that they gain control of the situation by placing Mr. Jimenez (Lopez) in handcuffs.

Officer Mazariegos grabbed Mr. Jimenez's (Lopez) right arm while Officer Nail grabbed his left arm.  Mr. Jimenez (Lopez) tensed his body and began to move his arms to prevent them from putting handcuffs on him.

Due to Mr. Jimenez's (Lopez) continuing resistance, Officer Nail put his right leg in front of Mr. Jimenez (Lopez), and he then pulled him to the ground over his leg.  All three of them fell to the ground.  Officer Mazariegos lost control of Mr. Jimenez's (Lopez) right arm and he swung his arm around to keep her from gaining control of it. Officer Mazariegos told Mr. Jimenez (Lopez) to stop.

Mr. Jimenez (Lopez) had hold of Officer Nail's outer vest carrier which contained his OC spray, collapsible baton, and taser.  Officer Nail then punched Mr. Jimenez (Lopez) in his face.

At this point, Mr. Jimenez (Lopez) was on the ground with his hands tucked underneath him.  Officer Mazariegos gave Mr. Jimenez (Lopez) commands to put his hands behind his back approximately five times.  The officers were then able to pull Mr. Jimenez's (Lopez) hands behind his back while Officer Mazariegos put handcuffs on him.

82

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Mazariegos searched Mr. Jimenez (Lopez) and then she and Officer Nail put him in the back of her patrol car.

Officer Mazariegos wrote that Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ told her that the empty beer bottles on the ground, near them, belonged to them. She wrote that she directed Officer Gamble and Officer Ahlenslager to issue citations to both of them for drinking alcohol in public.

Officer Mazariegos wrote that she believed that Mr. Jimenez (Lopez) was under the influence of alcohol to the point of being unable to care for himself, a violation of Penal Code Section 647(f), because he was unable to follow her instructions and he decided to fight with the police.

Officer Mazariegos arrested Mr. Jimenez (Lopez) on the following charges:

- PC 647(f) – Drunk in public
- PC 148(a)(1) – Resisting arrest
- PC 69(a) – Obstructing an Executive Officer
- PC 243(b) – Battery on a Peace Officer
- BP 25620(a) – Open container of alcohol in public

The San Rafael Fire Department responded to the scene and provided medical attention to Mr. Jimenez (Lopez). Officer Gamble transported Mr. Jimenez (Lopez) to the Marin General Hospital for a medical clearance and she then transported him to the jail.

Summary of Officer Nail's written report

Officer Nail wrote that he responded to the scene to assist Officer Mazariegos. When he arrived, he saw that Officer Mazariegos had contacted three subjects and they were all seated on the curb. He observed numerous empty beer bottles on the ground near the three subjects.

Officer Nail wrote that he noticed that Mr. Lopez displayed objective signs of alcohol intoxication.

Officer Nail wrote that Officer Mazariegos was talking with the three subjects, and it appeared to him that Mr. Lopez was arguing with Officer Mazariegos. Mr. Lopez stood up several times and each time Officer Mazariegos told him to sit back down. When Mr. Lopez stood again, Officer Nail told him, in English, to sit down or he would be placed in handcuffs. "Lopez acknowledged my commands and got into a squat position." When Mr. Lopez stood again, he and Officer Mazariegos decided to put him in handcuffs.

83

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Nail took control of Mr. Lopez's left arm while Officer Mazariegos grabbed his right arm. Mr. Lopez tensed up and pulled his arms toward his chest. Officer Nail then pulled Mr. Lopez over his leg to the ground.

Officer Nail wrote that once on the ground, Mr. Lopez escalated his behavior from resisting their efforts to handcuff him to actively fighting with him. According to Officer Nail, Mr. Lopez tried to put him (Nail) into a headlock. Officer Nail wrote that Mr. Lopez put his right arm around his neck and began to squeeze. Officer Nail tucked his chin toward his chest and pushed Mr. Lopez away from him, "forcing his arm off the back of my neck". "When Lopez lost control of my head, he began to swing his right hand at my head, striking me several times on the left side and back of my head."

Officer Nail wrote that Mr. Lopez grabbed hold of his outer vest carrier and he feared that Mr. Lopez could gain control of one of the weapons he keeps on his vest. Officer Nail then punched him one time in the face. At this point, according to Officer Nail, Mr. Lopez stopped his attack. He and Officer Mazariegos were able to push Mr. Lopez on to his stomach and were eventually able to put him into handcuffs.

### 2. Subject Officer Mazariegos's Summary Statement

Officer Mazariegos said she reviewed the video from her body-worn camera before she wrote her police report. She did not look at Officer Nail's video.

Officer Mazariegos was asked why she wrote in the summary portion of her written report that Mr. Lopez tried to put Officer Nail into a headlock, but she did not describe when or how this occurred in the body of her narrative or in the section of her report titled use of force. She said that because she did not observe Mr. Lopez try to put Officer Nail into a headlock, she told Officer Nail to include this information in his written supplemental report which would be added to her report.

When asked about the statement in her police report that she feared Mr. Lopez may try to run or fight with her, she said she based this on his refusal to follow her command to stay seated on the curb.

Officer Mazariegos was asked by the Investigator about the various charges for which Mr. Lopez was arrested. She said she wanted to charge him for PC 69, felony resisting arrest, because he tried to put Officer Nail into a headlock. She said she wanted to charge him with PC 647(f), drunk in public, because she believed that he was intoxicated to the point of being unable to care for his own safety. When asked further about this, Officer Mazariegos repeated that she believed Mr. Lopez was unsteady on his feet, and that he had slurred speech and red and watery eyes.

84

## ADMINISTRATIVE PERSONNEL INVESTIGATION

*Investigator: Had Lopez cooperated with you and stayed seated on the curb, would you have released him on a citation?*

*Officer Mazariegos: Most likely, yes.*

*Investigator: And you wrote that Lopez not following your instructions and fighting with the police was evidence that he was unable to care for himself.  Is this correct?*

*Officer Mazariegos: Uh, yes.  I mean, he couldn't follow simple commands…*

*Investigator: Is it your opinion that not cooperating with the police and consuming alcohol is, in and of itself, evidence of 647f?*

*Officer Mazariegos: Could be.*

When asked about the investigative steps she took to support the charges she requested, Officer Mazariegos said she relied on what Officer Nail told her and her observations of the empty beer bottles on the ground, her observations of Mr. Lopez, and his refusal to follow her directions.

### 3. Credibility Assessment

The statement from Officer Mazariegos was credible.  She answered the questions that were posed to her, and she appeared honest and forthcoming.

### 4. Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos failed to accurately document in her written police report that facts and circumstances that led to the arrest of Mr. Lopez.  The conclusions are based on the totality of the available evidence.  The statement from Officer Mazariegos, her written report, and the videos from the officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, there is insufficient evidence to determine whether or not Officer Mazariegos's police report was an accurate description of the facts and circumstances that led to the arrest of Mr. Lopez.

It should be noted that a written report is intended to be a summary of the officer's recollection of the incident.  It is not as accurate as a video from a body-worn camera.

85

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Mazariegos's report accurately reflects her own actions and is a generally accurate reflection of Officer Nail's actions.  She neglected to include in her report the fact that Officer Nail told Mr. Lopez to "sit the fuck down".

Officer Mazariegos's description of Mr. Lopez's, Mr. ███████s, and Mr. ███████s actions is also generally accurate.

Her report accurately described the facts and circumstances that led to the necessity to use force to detain and then arrest Mr. Lopez.

Among the charges Officer Mazariegos arrested Mr. Lopez for was Penal Code Section 647(f), public intoxication.  The California Penal Code states, in part, that a person is guilty of public intoxication when they are in public and are under the influence of alcohol or drugs, and are unable to exercise care for their own safety or the safety of others.

Officer Mazariegos wrote that Mr. Lopez displayed the objective signs of intoxication.  She wrote that he had red and watery eyes.  She wrote that she observed that Mr. Lopez was unsteady on his feet as he walked from the driver's side of his vehicle to the curb as she had ordered.  However, upon review of the video from her body-worn camera, the Investigator did not observe that Mr. Lopez was unsteady on his feet as he walked.

Officer Mazariegos wrote that Mr. Lopez's speech was slurred.  He spoke to Officer Mazariegos in both English and Spanish.  He appeared to understand and speak English without difficulty.  Upon review of Officer Mazariegos's body-worn camera video, the Investigator could not detect that Mr. Lopez's speech was slurred.

Firefighter Lopes stated that he did not detect an order of alcohol from Mr. Lopez, and he did not believe his speech was slurred.  Officer Gamble, however, stated that she did smell alcohol on the person of Mr. Lopez, though she said she did not observe that he was unsteady on his feet.

Officer Mazariegos stated, in her interview for this administrative investigation, that fighting with the police was evidence, in and of itself, of being intoxicated to the point of being unable to care for his wellbeing.  This opinion is not supported by the law.

Additionally, Officer Mazariegos stated that had Mr. Lopez cooperated with her investigation and followed her directions, she likely would have issued him a citation for drinking alcohol in public and released him at the scene as she did his two friends.

The evidence as depicted in Officer Mazariegos's body-worn camera video, along with her statement that she likely would have released Mr. Lopez with a citation had he cooperated, calls into question whether or not Mr. Lopez was too intoxicated to care for himself as required by Penal Code Section 647(f).

86

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

The Investigator recognizes that Officer Mazariegos's firsthand observations of Mr. Lopez are a better source of evidence than a third party watching a video. Accordingly, the evidence as to whether Officer Mazariegos's police report accurately described Mr. Lopez's state of sobriety is inconclusive.

## 5. Findings Upon Alleged Policy Violations

Officer Mazariegos was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

>    a. Negligence of duty.
>
>    e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.
>
>    l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.
>
>    n. Dishonesty or theft.

San Rafael Police Department Policy Manual

SRPD Policy 300 – Use of Force

>    300.6 Reporting the Use of Force
>
>    Any use of force by a member of this department shall be documented promptly, completely, and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances.

SRPD Policy 320 – Standards of Conduct

>    320.5.7 Efficiency

87

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

320.5.8 Performance

(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

(b) The falsification of any work-related records, making misleading entries or statements with the intent to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document.

(c) Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department –related business.

(d) Being untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members.

(i) Any act on-- or off--duty that brings discredit to this department.

SRPD Policy 322 – Report Preparation

322.1.1 Report Preparation

Employees shall not suppress, conceal or distort the facts of any reported incident, nor shall any employee make a false report orally or in writing.

As set forth above, the Investigator finds there is insufficient evidence to determine whether or not Officer Mazariegos accurately and fully documented the facts and circumstances of her detention and arrest of Mr. Lopez on July 27, 2022.

**These allegations are Not Sustained**

88

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

**Allegation 6:** Officer Mazariegos failed to conduct a thorough investigation into the incident that led to the arrest of Mr. Lopez on July 27, 2022.

### 1. Subject Officer Mazariegos's Summary Statement

Officer Mazariegos stated that she was patrolling the Canal District of town and that she contacted Mr. Lopez, Mr. ▇▇▇▇▇, and Mr. ▇▇▇▇▇ because she suspected they were drinking alcohol in public, which is a violation of a City Ordinance and is a common complaint from area residents in this area of town.  As she approached the three subjects, she noticed there were numerous empty beer bottles and cans on the pavement near where they were standing.

There were approximately ten other subjects in the area, but they were not immediately near the three subjects she contacted.

Officer Mazariegos ordered all three subjects to sit on the curb near Mr. Lopez's pickup truck.

Mr. Lopez was standing outside near the open driver's side door of his vehicle.  She noted that he was slightly unsteady on his feet as he walked from his vehicle to the curb to sit down.  She also stated that his speech was slurred, and he had red and watery eyes.

Officer Mazariegos stated that because Mr. Lopez failed to stay seated on the curb after having been given numerous commands to sit down, she decided to put him into handcuffs.  She explained that Mr. Lopez was not under arrest at this time, but that she wanted to put him into handcuffs to ensure he would not try to flee the area or fight with her and Officer Nail.

After Mr. Lopez was put in handcuffs, he was put in the back of Officer Mazariegos's patrol car.

Officer Mazariegos directed Officer Ahlenslager and Officer Gamble to issue citations to Mr. ▇▇▇▇▇ and Mr. ▇▇▇▇▇ for the City Ordinance violation of drinking in public. She said she never evaluated their state of sobriety.

Though not documented in her written report, Officer Mazariegos stated that she asked Mr. ▇▇▇▇▇ and Mr. ▇▇▇▇▇ how much alcohol Mr. Lopez had consumed prior to her arrival.  She stated that both of them refused to answer her question.

Officer Mazariegos stated that she likely would have released Mr. Lopez with a citation had he cooperated with her investigation.  She said she never asked Mr. Lopez how many beers he had consumed.

89

## ADMINISTRATIVE PERSONNEL INVESTIGATION

When asked about the investigative steps she took to support the charges she requested, Officer Mazariegos said she relied on what Officer Nail told her and her observations of the empty beer bottles on the ground, her observations of Mr. Lopez, and his refusal to follow her directions.

She said she never tried to interview Mr. Lopez after he was arrested and she did not direct anyone else to interview him. She said that Corporal O'Con interviewed him, but that was part of his use of force investigation and not for the criminal investigation.

She did not conduct an area canvass at the scene to locate additional witnesses and she did not direct any other officer to accomplish this task.

She said she did attempt to interview Mr. ▇▇▇▇▇ and Mr. ▇▇▇▇▇, but the only question she asked them was how much alcohol Mr. Lopez had consumed and they declined to answer her.

Mr. Lopez was arrested for the following charges:

- PC 647(f) – Public intoxication
- PC 148(a)(1) – Obstructing/delaying an investigation
- PC 69(a) – Obstructing/delaying an executive officer
- PC 243(b) – Batter on a peace officer
- BP 25620(a) – Open container of alcohol in public

  *Investigator: Is it your opinion that not cooperating with the police and consuming alcohol is, in and of itself, evidence of 647f?*

  *Officer Mazariegos: Could be.*

### 2. Credibility Assessment

The Investigator found the statement from Officer Mazariegos was credible. She answered all of the questions that were posed to her, and she appeared to answer them honestly.

### 3. Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos failed to conduct a thorough investigation into the circumstances of Mr.

90

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Lopez's detention and arrest.  The conclusions are based on the totality of the available evidence.  The statements from the witnesses and the videos from the officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Officer Mazariegos failed to conduct a thorough investigation of this incident.

Officer Mazariegos did not conduct, nor did she instruct another officer to conduct an area canvass to locate additional witnesses to this use of force incident.  Officer Mazariegos was aware there were a number of other subjects in the area when she arrived on scene.  She should have instructed one of the other officers who responded to the scene to seek out additional witnesses and interview them.  These interviews should have been recorded on the officer's body-worn camera and their statements should have been summarized in Officer Mazariegos's police report.

Officer Mazariegos should have instructed one of the other responding officers to interview Mr. ██████████ and Mr. ██████████ as part of her criminal investigation regarding what they witnessed during the detention and arrest of Mr. Lopez.  Mr. ██████████ and Mr. ██████████ should have been read their Miranda rights to ensure their statements were voluntary and their interviews should have been recorded on the officer's body-worn camera.  Their statements should have been summarized in Officer Mazariegos's police report.

Mr. ██████████ and Mr. ██████████ were interviewed outside of Miranda by Corporal O'Con.  However, these interviews were strictly for the purpose of Corporal O'Con's administrative use of force investigation.  Mr. ██████████ told Corporal O'Con that Mr. Lopez was moving his arms around to keep the officers from putting handcuffs on him.  This statement could have added valuable confirmation to what Officer Mazariegos and Officer Nail said occurred during the incident.

Officer Mazariegos should have ensured that Mr. Lopez was read his Miranda rights and given an opportunity to provide a statement for the criminal investigation.  This interview should have been recorded on the officer's body-worn camera and his statement should have been summarized in Officer Mazariegos's police report.

The Investigator believes, based on the video evidence, there is a lack of evidence to support a charge of PC 647(f).  A subject who is found guilty of public intoxication must be so intoxicated as to be unable to care for their own wellbeing.  While Mr. Lopez most certainly had been drinking alcohol, the Investigator questions whether or not his speech was slurred, as was reported, and whether or not he was unsteady on his feet, as was reported, to the point of being unable to care for his own safety.

Officer Mazariegos should have taken steps to determine Mr. Lopez's blood alcohol level (BAC).  He could have been asked to blow into a PAS device (Preliminary Alcohol Screening).  Officer Gamble could have obtained from the hospital his BAC.

91

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Mr. Lopez's BAC would have been valuable evidence for both Officer Mazariegos's criminal investigation and for Corporal O'Con's administrative use of force investigation.

Officer Mazariegos should have directed Officer Gamble to obtain a medical waiver from Mr. Lopez so that the police department could obtain a copy of his medical records related to the treatment for his injuries from this incident.

Officer Mazariegos is a new police officer.  She had only completed the police department's Field Training Program four months prior to this incident.  She should have been given guidance on the necessary investigative steps for this investigation by a supervisor or one of the senior officers at the scene.

These conclusions are supported by the available evidence.

### 4. Findings Upon Alleged Policy Violations

Officer Mazariegos was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

- a. Negligence of duty.

- e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

- l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

San Rafael Police Department Policy Manual

Policy 320 – Standards of Conduct

320.5.7 Efficiency

(a) Neglect of duty.

92

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

As set forth above, the Investigator finds that Officer Mazariegos violated the above policies when she failed to conduct a thorough investigation into this incident.


**These allegations are Sustained**


**Allegation 7:** Officer Mazariegos's conduct during the detention and arrest of Mr. Lopez on July 27, 2022, brought discredit to the San Rafael Police Department.


### 1. Summary of ABC News Stories

On September 1, 2022, ABC channel 7 news in the San Francisco Bay Area ran a story detailing the use of force incident and arrest of Mr. Lopez by Officer Mazariegos and Officer Nail.  The incident was described in the story as a "violent take down by police".  Reporter Dan Noyes covered the story.  During the news broadcast, Dan Noyes stated that Mr. Lopez's attorney and "police experts" told him the incident should not have occurred, that the officers used excessive force, and that one of the officers lied in an official report about the incident.  Dan Noyes stated that Mr. Lopez suffered a broken nose and a concussion as a result of the officer's use of force against him.

Video from the officer's body-worn cameras was shown during the story.  Portions of the struggle to detain and arrest Mr. Lopez were highlighted, including Officer Nail punching Mr. Lopez in the nose and his subsequent injury, as depicted by the blood on the ground and on his face.

Dan Noyes interviewed Roger Clark, who according to Dan Noyes, is a nationally recognized "police practices expert".  Mr. Clark is said to have told Dan Noyes that Officer Nail used excessive force and that Officer Mazariegos overreacted to a minor infraction involving an open container of beer.

Mr. Lopez's attorney, Charles Dresow, told Dan Noyes that Mr. Lopez did not attempt to put Officer Nail into a headlock, and he told him that Mr. Lopez never struck Officer Nail on the back of his head.  Mr. Dresow stated that after reviewing the officer's videos from their body-worn cameras, the Marin County District Attorney's Office dismissed the criminal charges against Mr. Lopez.

93

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

On the following day, September 2, 2022, ABC News ran another story of the incident, reporting that Officer Nail and Officer Mazariegos were put on Administrative Leave.  The ABC News story once again featured the videos from the officer's body-worn cameras.

### 2.  Summary of Lieutenant Eberle's Memorandum

Between September of 2022 and March of 2023, Lieutenant Eberle and the San Rafael Police Department received hundreds of telephone calls seeking information, interviews, and commenting on the "corrupt" San Rafael Police Department.

Lieutenant Eberle received over 85 voicemail messages commenting on the incident and not one call had positive information about the officers or the department. During one such voicemail message, Lieutenant Eberle's family was threatened with violence.

Records staff and Call Taker Specialists also received hundreds of calls from people commenting on the incident.  The callers were often angry and irate.  Examples of some of the comments from callers include, "Go suck a dick", and "You should take a gun to your head and pull the trigger".  Additionally, the callers often made references to sexual assault to degrade the call takers.

Lieutenant Eberly personally witnessed call takers break down into tears because of the abuse they received.  One call taker stated that she experienced severe depression, and another call taker took several days off of work following the verbal abuse and harassment she received while taking calls about the incident.

As a result of the two stories by ABC News, numerous other print and television media outlets ran stories about the incident.  Some of these media outlets include, KTVU, Telemundo 48, KPIX 5, KRON 4, ABC 7 Chicago, KCBS Radio, the Marin Independent Journal, the San Jose Mercury News, the San Rafael Patch, the San Francisco Chronicle, and the Pacific Sun.  Lieutenant Eberle even received a media request from the United Kingdom.

Additionally, Lieutenant Eberle received requests from several college universities seeking information so that the incident could be discussed in their social justice classes.

City Council meetings were overrun with community members commenting on the incident.  Three separate protest marches occurred in the City during which speeches were given expressing fear of the San Rafael Police Department.

### 3.  Substantive Factual Findings

94

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

The following are the Investigator's conclusions regarding the allegation that Officer Mazariegos's conduct brought discredit to the San Rafael Police Department.  The conclusions are based on the totality of the available evidence.  The statements from the two officers, their written reports, the videos from the officer's body-worn cameras, the Memorandum authored by Lieutenant Eberle, and the available evidence were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Officer Mazariegos's conduct brought discredit to the San Rafael Police Department.

Officer Mazariegos was rude and discourteous to Mr. Lopez.  Her demeanor was stern, challenging and officious.

Officer Mazariegos failed to de-escalate the situation with Mr. Lopez and she failed to consider alternative tactics to using force.  She failed to attempt to develop rapport with Mr. Lopez and she challenged him with her demeanor and questions.

On September 1, 2022, and again on September 2, 2022, ABC News Channel 7 in the San Francisco Bay Area ran stories about this incident.  The officer's body-worn camera videos were featured prominently during the story by Dan Noyes, including Officer Nail's punch to Mr. Lopez's face.  Also featured prominently was the injury to Mr. Lopez's nose and face as was depicted by the blood on the ground and on his face.

Dan Noyes interviewed Roger Clark, who according to the story, is a nationally recognized "police practices expert".  Dan Noyes reported that Mr. Clark told him Officer Nail used excessive force and Officer Mazariegos overreacted to a minor infraction involving an open container of beer.

Mr. Lopez's attorney, Mr. Dresow, told Dan Noyes that Mr. Lopez never attempted to put Officer Nail into a headlock, and he never punched him in the back of his head.  He stated that Officer Nail lied in his official police report when he wrote these things occurred.

In the September 2, 2022 news story, ABC News reported that the officers had been put on Administrative Leave.

Between September of 2022 and March of 2023, Lieutenant Eberle and the San Rafael Police Department received hundreds of telephone calls seeking information, interviews, and commenting on the "corrupt" San Rafael Police Department.

Lieutenant Eberle received over 85 voicemail messages commenting on the incident and not one call had positive information about the officers or the department.  During one such voicemail message, Lieutenant Eberle's family was threatened with violence.

95

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Records staff and Call Taker Specialists also received hundreds of angry calls from people commenting on the incident.  The callers were often irate.  Examples of some of the comments from callers include, "Go suck a dick", and "You should take a gun to your head and pull the trigger".  Additionally, the callers often made references to sexual assault to degrade the call takers.

Lieutenant Eberly witnessed call takers break down into tears because of the abuse they received.  One call taker stated that she experienced severe depression, and another call taker took several days off of work following the verbal abuse and harassment she received while taking calls about the incident.

As a result of the two stories by ABC News, numerous other print and television media outlets ran stories about the incident.  Some of these media outlets include, KTVU, Telemundo 48, KPIX 5, KRON 4, ABC 7 Chicago, KCBS Radio, the Marin Independent Journal, the San Jose Mercury News, the San Rafael Patch, the San Francisco Chronicle, and the Pacific Sun.  Lieutenant Eberle even received a media request from the United Kingdom.

Additionally, Lieutenant Eberle received requests from several college universities seeking information so that the incident could be discussed in their social justice classes.

City Council meetings were overrun with community members commenting on the incident.  Three separate protest marches occurred in the City during which speeches were given expressing fear of the San Rafael Police Department.

Officer Mazariegos's actions were directly responsible for the negative attention received by the San Rafael Police Department.  Her actions are being discussed in university settings, police departments, district attorney's offices, and in social justice settings all over the country.

The people who have seen the television and print media coverage of this incident, who are unfamiliar with the quality of the San Rafael Police Department, have had their perceptions of the department perhaps forever tarnished.

These conclusions are supported by the available evidence.

### 4. Findings Upon Alleged Policy Violations

Officer Mazariegos was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

City of San Rafael Personnel Rules and Regulations

96

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

      a. Negligence of duty.

      e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

      h. Unacceptable behavior toward the general public or fellow employees or officers of the City.

      l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

      q. Other acts inimical to the public service.

San Rafael Police Department Policy Manual

SRPD Policy 320 – Standards of Conduct

      320.5.8 Performance

            (i) Any act on-- or off--duty that brings discredit to this department.

      320.5.9 Conduct

            (f) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

            (g) Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

            (m) Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

**These allegations are Sustained**

97

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

**VII.   CONCLUSION**

Based on the foregoing, the allegation that Officer Mazariegos used excessive force during her detention and arrest of Mr. Lopez on July 27, 2022 is unfounded.

The allegation that Officer Mazariegos failed to consider alternate tactics to using force and failed to employ de-escalation techniques during her detention and arrest of Mr. Lopez during this incident is sustained.

The allegation that Officer Mazariegos was rude and discourteous toward Mr. Lopez during this incident is not sustained.

The allegation that Officer Mazariegos failed to provide medical attention to Mr. Lopez after he received injuries during this incident is unfounded.

The allegation that Officer Mazariegos failed to thoroughly and accurately document the facts and circumstances of her detention and arrest of Mr. Lopez in her written police report is not sustained.

The allegation that Officer Mazariegos failed to conduct a thorough investigation into the incident that led to the arrest of Mr. Lopez is sustained.

The allegation that Officer Mazariegos's conduct brought discredit to the San Rafael Police Department is sustained.

**CONFIDENTIAL**                    **COSR (Lopez) 000959**