# EXHIBIT "R"

**Independent Investigative Consultants, LLC**
8800 Lakewood Dr., Suite 356, Windsor, CA 95492
(707) 484-7871
paul@ph-investigations.com
CA. Lic. #187795

# CONFIDENTIAL
# ADMINISTRATIVE INTERNAL AFFAIRS
# INVESTIGATIVE REPORT



## SAN RAFAEL POLICE DEPARTMENT

### THIS IS A CONFIDENTIAL DOCUMENT NOT FOR REVIEW WITHOUT THE PERMISSION OF THE POLICE CHIEF, OR THEIR DESIGNEE

Investigated by:
### PAUL HENRY
### INDEPENDENT INVESTIGATIVE CONSULTANTS, LLC

Integrity ★ Discretion ★ Results

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

# San Rafael Police Department
## Internal Affairs Investigation Report

| INCIDENT TYPE:<br>Standard of Conduct | DATE REPORTED:<br>08/23/2022 | DATE OF INCIDENT:<br>07/27/2022 | FILE NUMBER:<br>22-05 |
|---|---|---|---|

| EMPLOYEE:<br>Oscar O'Con | DIVISION OR ASSIGNMENT:<br>Police Corporal | WORK LOCATION:<br>San Rafael Police Department |
|---|---|---|

| COMPLAINANT:<br>San Rafael Police Department | ADDRESS:<br>1400 Fifth Avenue | |
|---|---|---|
| CITY:<br>San Rafael | STATE:<br>CA | ZIPCODE:<br>94901 |
| HOME TELEPHONE: | WORK OR CONTACT TELEPHONE:<br>(415) 485-3000 | |

SUMMARY:

San Rafael City Attorney, Robert Epstein, requested Independent Investigative Consultants (IIC-LLC) conduct an independent administrative personnel investigation into allegations of misconduct against Corporal O'Con.

Corporal O'Con was alleged to have failed to properly supervise an incident involving a use of force by Officers Nail and Mazariegos on July 27, 2022. Additionally, Corporal O'Con was alleged to have failed to complete a supervisor's Use of Force Analysis Form until specifically directed to do so nearly one month later.

The purpose of the investigation was to determine if Corporal O'Con violated any City or Police Department policies.

| INVESTIGATION CONDUCTED BY:<br>Independent Investigative Consultants, LLC. | DATE ASSIGNED:<br>09/09/2022 | DATE COMPLETED:<br>02/23/23 |
|---|---|---|
| INVESTIGATOR:<br>Paul Henry | SUPERVISOR (S) REVIEW:<br>San Rafael City Attorney and Police Department Administration | |

2

**ADMINISTRATIVE PERSONNEL INVESTIGATION**


**TABLE OF CONTENTS**

Internal Affairs Report

I.      Introduction ..................................................................................6
II.     Summary of Findings .......................................................................8
III.    Investigative Procedure...............................................................10
IV.     Applicable Policies .....................................................................10
V.      Timeline of Events.......................................................................13
VI.     Evidence, Analysis, Findings ......................................................14

**ALLEGATION 1**: Corporal O'Con failed to properly supervise an incident involving a use of force by Officers Nail and Mazariegos on July 27, 2022.

1.      Witness Officer Mazariegos's Summary Statement ......................14
2.      Witness Officer Nail's Summary Statement ...................................19
3.      Witness Firefighter Lopes's Summary Statement ..........................23
4.      Witness Officer Gamble's Summary Statement ............................23
5.      Summary of Corporal O'Con's Interview with Mr. Lopez...............24
6.      Summary of Corporal O'Con's Interview with Mr. ██████.........26
7.      Summary of Corporal O'Con's Interview with Mr. ██████ ..........26
8.      Summary of Corporal O'Con's Body-worn Camera Videos ...........27
9.      Summary of San Rafael Police Report............................................30
10.     Subject Corporal O'Con's Summary Statement ..............................33
11.     Credibility Assessment ................................................................41
12.     Substantive Factual Findings .........................................................43
13.     Findings Upon Alleged Policy Violations ........................................50

**ALLEGATION 2**: Corporal O'Con failed to complete a supervisor's Use of Force Analysis Form until specifically directed to do so by Lieutenant Holton nearly one month after the incident.

1.      Summary of Email Communication from Lieutenant Holton...........53
2.      Subject Corporal O'Con's Summary Statement ..............................53
3.      Credibility Assessment ...................................................................53
4.      Substantive Factual Findings .........................................................54
5.      Findings Upon Alleged Policy Violations ........................................55

VII.    Conclusion ...................................................................................56

■

**Attachments**

- San Rafael Police Department Report #22-05221.

- San Rafael Police Department Use of Force Analysis Form

3

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

- San Rafael Fire Department Patient Care Report
- Corporal O'Con Body-Worn Camera Audit
- Officer Nail Body-Worn Camera Audit
- Officer Mazariegos Body-Worn Camera Audit
- Photographs of Mr. Lopez and of the scene
- Computer Aided Dispatch Report #2207270089
- Memorandum from Lieutenant Holton to Officer Nail
- Memorandum from Lieutenant Holton to Officer Mazariegos
- Memorandum from Lieutenant Holton to Captain Leon
- Email communications from Lieutenant Holton to Captain Leon
- Medical records from Marin General Hospital
- Four Body-worn Camera Videos from Corporal O'Con
- Three Body-worn Camera Videos from Officer Mazariegos
- Body-worn Camera Video from Officer Nail
- Body-worn Camera Video from Officer Ahlenslager
- Body-worn Camera Video from Officer Chiu
- Body-worn Camera Video from Officer Schraeder
- Two Body-worn Camera Videos from Officer Gamble

**Transcripts**

- Witness Officer Ahlenslager
- Witness Officer Chiu
- Witness Officer Gamble
- Witness Officer Schraeder
- Witness Officer Mazariegos
- Witness Officer Nail
- Witness Firefighter Lopes
- Witness Fire Captain Northern
- Witness Firefighter Gordon
- Witness Firefighter Hagberg
- Witness Firefighter Taylor
- Witness Mr. ███████

4

## ADMINISTRATIVE PERSONNEL INVESTIGATION

- Witness Mr. ███████
- Witness Mr. Lopez
- Subject Corporal O'Con

**Advisement Forms**

- Corporal O'Con Notice of Investigation
- Corporal O'Con Administrative Admonishment
- Corporal O'Con Lybarger Admonishment
- Corporal O'Con Miranda Advisement
- Officer Mazariegos Notice of Investigation
- Officer Mazariegos Administrative Admonishment
- Officer Mazariegos Lybarger Admonishment
- Officer Mazariegos Miranda Advisement
- Officer Nail Notice of Investigation
- Officer Nail Administrative Admonishment
- Officer Nail Lybarger Admonishment
- Officer Nail Miranda Advisement
- Officer Ahlenslager Notice of Investigation
- Officer Ahlenslager Administrative Admonishment
- Officer Chiu Notice of Investigation
- Officer Chiu Administrative Admonishment
- Corporal Gamble Notice of Investigation
- Corporal Gamble Administrative Admonishment
- Officer Schraeder Notice of Investigation
- Officer Schraeder Administrative Admonishment

**Electronic Copy of the Investigation**

Thumb drive containing an electronic copy of the entire Administrative Internal Affairs Investigation

5

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

## I.    INTRODUCTION

On July 27, 2022, at approximately 1853 hours, Officer Mazariegos contacted three subjects on Windward Way, in the City of San Rafael.  The subjects were standing near a pickup truck and two of them were holding a bottle of beer.  Officer Mazariegos had been driving through the area when she decided to contact the subjects to determine if they were drinking alcohol in public, a violation of a city ordinance.

Officer Mazariegos contacted Julio Jimenez Lopez, ████████████████████, and ████████████████.  For the purposes of this administrative investigation, the subjects will be referred to as Mr. Lopez, Mr. ███████, and Mr. ███████.

Officer Mazariegos requested a "routine back" through dispatch and Officer Nail was dispatched to assist Officer Mazariegos.

Upon contacting the three male Hispanic subjects, Officer Mazariegos noted there were numerous empty beer bottles on the ground near the three subjects.

Officer Mazariegos directed the subjects to sit on the curb near the pickup truck and she began asking them if they were aware that it is illegal in the City of San Rafael to drink alcohol in public.

Officer Nail arrived to assist Officer Mazariegos as she was speaking with the subjects.

6

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Mazariegos, who is fluent in Spanish, spoke to the subjects in both English and Spanish.  Mr. Lopez and Officer Mazariegos had a conversation about why Mr. Lopez and his two friends were in the area drinking their beer.

Officer Mazariegos asked the subjects to give her their identification.  Mr. ███████ and Mr. ███████ remained seated as they removed their identification from their wallets.  Mr. Lopez stood up to remove his wallet from his pants pocket.  Officer Nail told Mr. Lopez to "sit the fuck down".

Officer Mazariegos directed Mr. Lopez to give her his identification.  Mr. Lopez, who was holding his wallet in his hand, tried to explain that he had to stand to get his identification out of his pants pocket.  Mr. Lopez then stood again.

Officer Mazariegos told Mr. Lopez to sit down several more times but Mr. Lopez remained standing as he tried to explain himself.  Officer Mazariegos then decided to put Mr. Lopez into a restrained detention by putting him in handcuffs.  She grabbed Mr. Lopez's right arm while Officer Nail grabbed Mr. Lopez's left arm.

Mr. Lopez resisted the officer's attempt to put handcuffs on him by trying to pull his arms away from the officers.  Officer Nail tripped Mr. Lopez and pulled him to the ground.  Officer Mazariegos let go of Mr. Lopez's right arm as the three of them fell to the ground.

Mr. Lopez continued to resist the officers by moving his arms to keep the officers from gaining control of him.  Officer Nail stated that Mr. Lopez tried to put him in a headlock, punched him in the back of his head several times, and he grabbed his outer vest carrier during their struggle.

Officer Nail stated that because he feared Mr. Lopez may try to grab one of the weapons he keeps on his outer vest carrier he punched Mr. Lopez on his nose, causing it to bleed.  Shortly thereafter, the officers were able to overcome the resistance from Mr. Lopez.  They forced him on to his stomach and they pulled his arms behind his back.  Officer Mazariegos then put handcuffs on Mr. Lopez.  She searched him and then she and Officer Nail put him into the back of her patrol car.

Mr. ███████ and Mr. ███████ never moved from their seated position on the curb only a few feet away from the struggle between Mr. Lopez and the two officers.

Numerous officers from the San Rafael Police Department responded to the scene.  Officer Nail requested the San Rafael Fire Department respond to the scene to provide medical attention to Mr. Lopez.

Corporal O'Con, who was the supervisor for the patrol team on that shift, responded to the scene and he interviewed both Officer Nail and Officer Mazariegos about what had occurred.  Corporal O'Con ensured Mr. Lopez received medical attention at the scene

7

## ADMINISTRATIVE PERSONNEL INVESTIGATION

and he directed Officer Gamble to transport Mr. Lopez to an area hospital for a medical clearance prior to booking him into the Marin County jail.

Corporal O'Con interviewed Mr. Lopez, Mr. ███████, and Mr. ███████ about what occurred between Mr. Lopez and the two officers.  Corporal O'Con's interview of the three subjects occurred outside of Miranda and was strictly for the purpose of completing a supervisor's use of force investigation.

Corporal O'Con then assured photographs of the scene had been taken and he left the scene.

Mr. Lopez received a medical clearance from the Marin General Hospital.  He was diagnosed with complaints of pain and injuries to his nose, knees, back and shoulder.

Officer Gamble then transported Mr. Lopez to the Marin County Jail where he was booked on the following charges:

- Penal Code Section 69(a), resisting an executive officer – a felony
- Penal Code Section 647(f), public intoxication – a misdemeanor
- Business and Professions Code Section 25662(a), open container of alcohol in public – an infraction
- Penal Code Section 148(a)(1), obstruction of a peace officer – a misdemeanor
- Penal Code Section 243(b), battery on a peace officer – a misdemeanor.

Officer Mazariegos and Officer Nail authored police reports for this incident.  Corporal O'Con approved the reports on July 28, 2022.

Corporal O'Con stated, during his interview for this administrative investigation, that he reviewed Officer Nail's video from his body-worn camera on Officer Nail's cellular telephone on the day of the incident.  An audit of the San Rafael Police Department's Axon body-worn camera system revealed that the first time Corporal O'Con reviewed Officer Mazariegos's and Officer Nail's videos in their evidence storage system was on August 2, 2022, six days after the incident.

On August 23, 2022, the Marin County District Attorney's Office requested a continuance in the criminal prosecution of Mr. Lopez because they had not yet reviewed the videos from the two officer's body-worn cameras.

Also on this same date, Lieutenant Holton discovered that Corporal O'Con had not yet completed the San Rafael Police Department Supervisors Use of Force Analysis Form. She subsequently directed Corporal O'Con to complete the report by the end of his shift.

On August 26, 2022, the Marin County District Attorney's Office dismissed the criminal case against Mr. Lopez.

8

### ADMINISTRATIVE PERSONNEL INVESTIGATION

On September 9, 2022, the City of San Rafael City Attorney Robert Epstein authorized IIC-LLC to conduct an independent administrative personnel investigation to determine if Corporal O'Con violated any City or Police Department policy during his supervision of this incident.  Paul Henry conducted this investigation.

## II.    SUMMARY OF FINDINGS

Based on the evidence gathered, the Investigator makes the findings summarized below and discussed at greater length herein.

1.    The allegation against Corporal O'Con that he violated the following San Rafael Police Department and City of San Rafael Policies during his supervision of an incident involving a use of force by Officer Mazariegos and Officer Nail on July 27, 2022 is – Sustained.

- San Rafael Police Policy requiring a supervisor to determine if an arrested subject may pursue civil litigation: 300.8(g)
- San Rafael Police Policy requiring a supervisor to be reasonably aware of the performance of subordinates and to provide appropriate guidance: 320.3.2(a)
- San Rafael Police Policy prohibiting the violation of any police or City policy: 320.5.1(a)
- San Rafael Police Policy prohibiting neglect of duty: 320.5.7(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- City of San Rafael Policy prohibiting neglect of duty: 12.3(a)
- City of San Rafael Policy prohibiting failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting the violation of any City policy: 12.3(l)
- City of San Rafael Policy prohibiting other acts inimical to public service: 12.3(q)

2.    The allegation against Corporal O'Con that he violated the following San Rafael Police Department and City of San Rafael Policies during his supervision of an incident involving a use of force by Officer Mazariegos and Officer Nail on July 27, 2022 is – Unfounded.

- San Rafael Police Policy requiring a supervisor to respond to the scene of a use of force and obtain the basic facts from the involved officers: 300.8(a)

9

CONFIDENTIAL                    COSR (Lopez) 001060

### ADMINISTRATIVE PERSONNEL INVESTIGATION

- San Rafael Police Policy requiring a supervisor to ensure injured parties are provided medical attention: 300.8(b)
- San Rafael Police Policy requiring a supervisor to obtain a recorded interview with the subject upon whom force was used: 300.8(c)
- San Rafael Police Policy prohibiting violation of federal, state, local or administrative law: 320.5.1(c)

3.  The allegation against Corporal O'Con that he violated the following San Rafael Police Department and City of San Rafael Policies when he failed to complete a supervisor's Use of Force Analysis Form until he was specifically directed to do so by Lieutenant Holton is – Sustained.

- San Rafael Police Policy requiring a supervisor to complete a Use of Force Analysis Form: 300.11
- San Rafael Police Policy prohibiting violation of any department or City policy: 320.5.1(a)
- San Rafael Police Policy prohibiting neglect of duty: 320.5.7(a)
- San Rafael Police Policy prohibiting unsatisfactory work performance: 320.5.7(b)
- City of San Rafael Policy prohibiting neglect of duty: 12.3(a)
- City of San Rafael Policy prohibiting failure to perform work as assigned: 12.3(e)
- City of San Rafael Policy prohibiting violation of any City policy: 12.3(l)

## III.   INVESTIGATIVE PROCEDURE

The evidence consisted of witness interviews, relevant documents and body-worn camera videos. All interviews conducted during this investigation were audio-recorded and transcribed. Witnesses were reminded to provide truthful statements, and San Rafael Police witnesses were given an Administrative Admonishment before their interviews. The following people were interviewed as part of this investigation:

1.  Witness Officer Ahlenslager on October 17, 2022.
2.  Witness Officer Chiu on October 17, 2022.
3.  Witness Officer Gamble on October 17, 2022.
4.  Witness Officer Schraeder on October 26, 2022.
5.  Witnesses Firefighter Gordon on October 26, 2022.
6.  Witness Fire Captain Northern on October 26, 2022.
7.  Witness Firefighter Taylor on October 26, 2022.
8.  Witness Firefighter Lopes on November 17, 2022.

10

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

9.      Witness Firefighter Hagberg on December 1, 2022.
10.     Subject Corporal O'Con on January 11, 2023.
11.     Witness Officer Nail on January 13, 2023.
12.     Witness Officer Mazariegos on January 17, 2023.

The following documents were reviewed and relied upon as part of this investigation:

1.      San Rafael Police Department Report #22-05221.
2.      San Rafael Police Department Use of Force Analysis Form.
3.      San Rafael Fire Department Patient Care Report.
4.      Corporal O'Con Body-Worn Camera Audit.
5.      Officer Nail Body-Worn Camera Audit.
6.      Officer Mazariegos Body-Worn Camera Audit.
7.      Photographs of Mr. Lopez and of the scene.
8.      Computer Aided Dispatch Report #2207270089.
9.      Memorandum from Lieutenant Holton to Officer Nail.
10.     Memorandum from Lieutenant Holton to Officer Mazariegos.
11.     Memorandum from Lieutenant Holton to Captain Leon.
12.     Email communications from Lieutenant Holton to Captain Leon
13.     Medical records from Marin General Hospital


## IV.     APPLICABLE POLICIES

City of San Rafael Personnel Rules and Regulations

12.3 – Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

    a. Negligence of duty.

    e. Inability, unwillingness, refusal or failure to perform work as assigned,
       required or directed.

    l. Violation of any of the provisions of these working rules and
       regulations or departmental rules and regulations.

    q. Other acts inimical to the public service.

San Rafael Police Department Policy Manual

300 – Use of Force

    300.8 Supervisor Responsibilities

11

## ADMINISTRATIVE PERSONNEL INVESTIGATION

A supervisor shall respond to any reported use of force, when the supervisor is reasonably available. The responding supervisor is expected to (Government Code § 7286(b)):

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated.

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her Miranda rights, the following shall apply:

    1. The content of the interview should not be summarized or included in any related criminal charges.

    2. The fact that a recorded interview was conducted should be documented in a property or other report.

    3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(g) Determine if there is any indication that the subject may pursue civil litigation.

    1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

### 300.11 Administrative Review

The supervisor shall attach a completed "Use of Force Analysis Form" to a copy of the associated incident report and route through the chain of command for staff review and recommendations. If the incident involved the use of a Conducted Energy Weapon (CEW), then the supervisor shall complete and attach an "CEW Use Form", along with the Electro Muscular Disruption Technology (EMDT) data download.

### 320 – Standards of Conduct

#### 320.3.2 Supervisor Responsibilities

12

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

(a) Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control.

320.5 Causes for Discipline

The following are illustrative of causes for disciplinary action. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient department service:

320.5.1 Laws, Rules and Orders

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

(c) Violation of federal, state, local or administrative laws, rules or regulations.

320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments

## V.    TIMELINE OF EVENTS

Upon reviewing the materials and the information provided by the City of San Rafael, IIC-LLC created the following general timeline:

**07/27/22**    Officer Mazariegos contacts Julio Jimenez Lopez, ███████████████
███████, and ███████████████████████ on Windward Way to investigate a potential violation of a City Ordinance, open alcoholic container in public. Officer Nail is dispatched to assist Officer Mazariegos.

During the incident, Officer Mazariegos and Officer Nail attempt to restrain Julio Jimenez Lopez in handcuffs.  Mr. Lopez resists the officer's attempts to put him in handcuffs, necessitating the use of force against Mr. Lopez.

Corporal O'Con, the on-duty supervisor for the day, responds to the scene.

13

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Mr. Lopez sustains injuries during the incident.  He is treated at the scene by the San Rafael Fire Department.  Mr. Lopez is transported to an area hospital for a medical clearance and is then booked at the Marin County Jail for various charges.

**08/23/22**    Officer Mazariegos and Officer Nail appear at the Marin County Superior Court in response to a subpoena regarding the criminal prosecution of Mr. Lopez.  The assigned Deputy District Attorney asks for and obtains a continuance from the court because she had not yet reviewed the videos from the officer's body-worn cameras.

Lieutenant Holton discovers that Corporal O'Con has not yet completed a supervisor's Use of Force Analysis Form and she directs him to complete the report.

**08/26/22**    The Marin County District Attorney's Office dismisses the criminal case against Mr. Lopez and notifies the San Rafael Police Department of their decision.

**09/08/22**    City Attorney Robert Epstein contacts IIC-LLC to inquire about our availability to conduct an independent administrative personnel investigation.

**09/09/22**    Investigator Paul Henry is authorized to conduct this investigation.

**10/17/22**    IIC-LLC interviews Officer Ahlenslager, Officer Chiu, and Officer Gamble.

**10/26/22**    IIC-LLC interviews Officer Schraeder, Firefighter Gordon, Fire Captain Northern, and Firefighter Taylor.

**11/17/22**    IIC-LLC interviews Firefighter Lopes.

**12/01/22**    IIC-LLC interviews Firefighter Hagberg.

**01/11/22**    IIC-LLC interviews Corporal O'Con.

**01/13/22**    IIC-LLC interviews Officer Nail.

**01/17/22**    IIC-LLC interviews Officer Mazariegos.

**02/23/23**    The investigation is completed.


## VI.    EVIDENCE, ANALYSIS, FINDINGS

14

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

In weighing the evidence, the general standard of proof was applied.  An incident was found to have occurred if the preponderance of the evidence obtained during the investigation supported that conclusion – i.e., that it was more likely than not that an event happened. Credibility determinations were made where appropriate.

The following definitions apply to the findings contained in this report:

**Sustained**: The alleged misconduct is found to have occurred and, where applicable, to have violated any applicable rule or policy.

**Not Sustained**: the alleged misconduct could neither be proved nor disproved, given the existing evidence.

**Exonerated**: The alleged conduct was found to have occurred, however, the conduct either was appropriate under the circumstances or was not found to constitute a violation of applicable policy.

**Unfounded**: The investigation revealed conclusively the alleged act did not occur.


**ALLEGATION 1**: Corporal O'Con failed to properly supervise an incident involving a use of force by Officers Nail and Mazariegos on July 27, 2022.


**1.  Witness Officer Mazariegos's Summary Statement**


Officer Mazariegos said that she has been a police officer with the San Rafael Police Department for two years.  She added that she was off on approved leave for a time and that at the time of this incident she had been working as a solo officer, after having completed the Field Training Program, for four months.

Officer Mazariegos said the area of town where this incident occurred is commonly called the Canal District.  She said the people who live in the area are mostly Hispanic and it is considered a high crime rate area.  She said that it is a daily occurrence for people to gather in the area in the afternoons and evenings to socialize and drink alcohol.

Officer Mazariegos said it is a violation of a city ordinance to possess and drink alcohol in public.  She said these violations are treated as infractions and that enforcement action involves giving the subject a citation.

Officer Mazariegos said that typically, when she investigates this type of violation, she contacts the subject, runs their name through dispatch, and if the subject has a history of prior similar violations, she will issue the subject a citation.  She said if the subject does not have a history of prior violations, she will often simply warn the

15

## ADMINISTRATIVE PERSONNEL INVESTIGATION

subject and not issue a citation.  She said the subject's demeanor during their contact is another factor she considers when determining if she will issue a citation.

Officer Mazariegos said she recorded this incident on her body-worn camera.

Officer Mazariegos said that on the day and time of this incident she was patrolling the Canal District and that she observed Mr. Lopez, and his two friends, standing near what turned out to be Mr. Lopez's pickup truck.  She said that one of the subjects appeared to be drinking alcohol from a bottle.  There were approximately ten other subjects nearby but not in the immediate area of Mr. Lopez and his friends.

Mr. Lopez was standing near the open driver's side door of his pickup truck and the other two subjects were standing near the back of the truck.  She noticed fifteen to twenty empty beer bottles on the pavement around the three subjects.

Officer Mazariegos said the first thing she did was direct all three subjects to sit on the curb.

Officer Mazariegos is fluent in both English and Spanish.  During the incident she spoke in both languages.  She said that Mr. Lopez seemed to understand both English and Spanish and he too spoke to her in both languages.

Officer Mazariegos asked the three of them if they knew it was illegal to drink in public.  She then had a conversation with Mr. Lopez during which Mr. Lopez said he knew it was illegal for them to drink alcohol in public and he explained why they were in that particular area to drink their beer.

When asked by the Investigator, Officer Mazariegos described her own demeanor as "straight forward".  She described Mr. Lopez's demeanor as not understanding what she was telling him or making a joke out of what she was telling him.  She said he was calm and was trying to explain what they were doing and why they were doing it.

Officer Mazariegos said she believed that Mr. Lopez was intoxicated.  She said he had red and watery eyes and she believed he had an unsteady gait when she told him to walk from the driver's door of his truck to sit down on the curb.  Officer Mazariegos also said that Mr. Lopez's speech was slurred.

Officer Mazariegos asked all three subjects for their identification.  Mr. ▇▇▇▇▇▇ and Mr. ▇▇▇▇▇▇ remained seated as they retrieved their wallets to take out their identification.  Mr. Lopez stood up and removed his wallet from his front left pants pocket.

Officer Nail had arrived on scene, and he told Mr. Lopez to sit down.  Officer Mazariegos confirmed that she heard Officer Nail state to Mr. Lopez, "Hey, sit the fuck down!"  She said Mr. Lopez squatted down and then stood back up.

16

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Mazariegos believed that her telling Mr. Lopez to sit down was a tactic to de-escalate the situation. She did not believe that the way Officer Nail talked with Mr. Lopez did anything to escalate the situation between them and Mr. Lopez.

Officer Mazariegos said it was her decision to put Mr. Lopez into handcuffs and she believed that doing so was an alternative tactic to using force on him.

Officer Mazariegos said that at the time she decided to put handcuffs on Mr. Lopez, he was not under arrest. She was only going to restrain him in handcuffs.

Once she decided to restrain Mr. Lopez in handcuffs, she grabbed his right arm while Officer Nail grabbed his left arm. Mr. Lopez immediately began to pull his arms away from them to prevent them from moving his hands behind his back.

Officer Mazariegos said that Officer Nail put his right leg in front of Mr. Lopez's left leg and pulled Mr. Lopez over the top of his leg causing all of them to fall to the ground.

Officer Mazariegos said Mr. Lopez pulled his right hand away from her as they were falling to the ground. She said Mr. Lopez never tried to hit or strike her and he never tried to grab hold of her. She said Mr. Lopez was facing Officer Nail during their struggle.

> *Investigator: Did you see Lopez put his arm around Officer Nail's neck?*
>
> *Officer Mazariegos: No. His arm was flailing around. I don't know if he was flailing, punching, whatever it was. That's what I saw. I didn't physically see him trying to wrap his hand around Officer Nail.*

Officer Mazariegos said when they fell, she thought Mr. Lopez and Officer Nail "kind of fell on me". She said that during this part of the struggle, her back was against Mr. Lopez's truck, and she was pinned against the truck by Mr. Lopez and Officer Nail.

Officer Mazariegos said she moved to get away from Mr. Lopez's truck and she tried to grab Mr. Lopez's right hand but he was moving it around to keep her from getting hold of it. She did not know if Mr. Lopez was trying to strike Officer Nail or if he was simply trying to keep her from grabbing him. Similarly, she said she did not know if Mr. Lopez was actively fighting with them or just trying to keep from being handcuffed.

Officer Mazariegos said Mr. Lopez grabbed Officer Nail's outer vest carrier with his right hand. Officer Nail then punched Mr. Lopez in the face. Mr. Lopez let go of Officer Nail and they were then able to force him to the ground on his stomach.

Initially, Mr. Lopez had his hands underneath him as he lay on his stomach. Officer Mazariegos ordered him several times in Spanish to put his hands behind his back.

17

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

She said she and Officer Nail were eventually able to pull his hands out from underneath him and she put handcuffs on him.

Officer Mazariegos said that Mr. Lopez never complied with the commands he was given until after he was handcuffed.

She said no other force was used against Mr. Lopez.

Mr. Lopez complained of pain to his back, knees and face and she said he was bleeding from his nose. She said they requested the San Rafael Fire Department to respond to the scene and they provided medical aid to Mr. Lopez.

Officer Mazariegos said that Corporal O'Con responded to the scene, and she briefed him on what happened. She said she did not record her conversation with Corporal O'Con on her body-worn camera. When asked why she turned off her body-worn camera she said she did not remember why she turned it off.

Later, she and Officer Gamble moved Mr. Lopez into the back of Officer Gamble's patrol car. She did not remember if she smelled an odor of alcohol from the back of her car or on Mr. Lopez's breath when she moved him into the other patrol car.

Officer Mazariegos said she reviewed the video from her body-worn camera before she wrote her police report. She did not look at Officer Nail's video. Officer Mazariegos said she did not know if Corporal O'Con looked at her video.

Officer Mazariegos was asked by the Investigator about the various charges for which she arrested Mr. Lopez. She said the charge of PC 69, felony resisting arrest, was based on Officer Nail telling her Mr. Lopez tried to put him into a headlock. She said the charge of PC 647(f), drunk in public, was based on her belief that Mr. Lopez was intoxicated to the point of being unable to care for his own safety.

Officer Mazariegos confirmed that Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮ were released from the scene with citations for drinking alcohol in public.

Officer Mazariegos said she never asked Mr. Lopez how many beers he had consumed. She asked Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮ how many beers Mr. Lopez had consumed when she was issuing them their citations, but they would not tell her.

> *Investigator: Is it your opinion that not cooperating with the police and consuming alcohol is, in and of itself, evidence of 647f?*
>
> *Officer Mazariegos: Could be.*

When asked about the investigative steps she took to support the charges she requested, Officer Mazariegos said she relied on what Officer Nail told her and her

18

**CONFIDENTIAL**                    COSR (Lopez) 001069

### ADMINISTRATIVE PERSONNEL INVESTIGATION

observations of the empty beer bottles on the ground, her observations of Mr. Lopez, and his refusal to follow her directions.

Officer Mazariegos said she never tried to interview Mr. Lopez and she was unaware of any other officer attempting to interview him. She said Corporal O'Con talked with Mr. Lopez, but she said that was for his use of force report and not part of the criminal investigation.

She said she did attempt to interview Mr. ████████ and Mr. ████████, but the only questions she asked them were about how many beers Mr. Lopez had consumed and whether or not the empty beer bottles on the ground belonged to them. She said she did not give them Miranda because they were not under arrest.

Officer Mazariegos said she did not give Officer Gamble any direction with regard to her interactions with Mr. Lopez. She did not remember if she asked her to obtain a medical waiver from him. She did not consider having him blow into a PAS device (Preliminary Alcohol Screening device) while at the scene and she did not ask Officer Gamble to find out what Mr. Lopez's blood alcohol level was while they were at the hospital.

Officer Mazariegos said she did not ask any of the other officers at the scene to conduct an area canvass to determine if there were witnesses that could be interviewed.

### 2. Witness Officer Nail's Summary Statement

Officer Nail stated that he has worked at the San Rafael Police Department for just over three years, and he said he has five years of total law enforcement experience. He said he is a Field Training Officer (FTO) for the department.

Officer Nail described the area where this incident occurred as a high crime rate area of town. He stated there have been shootings, stabbings, and thefts in the area and there have been problems with people congregating and drinking alcohol in public. Officer Nail said there have been requests from community members who live in the area for extra police patrol. Officer Nail said that the Street Crimes Unit of the department has been "heavily dedicated to dealing with people drinking" in this area along with the rest of the area of town known as the Canal District. Additionally, the patrol officers have been asked by the department's administration to make patrolling in this area of town a priority.

19

## ADMINISTRATIVE PERSONNEL INVESTIGATION

He confirmed that many of the residents in this area of town are Hispanic.

Officer Nail said that drinking alcohol in public is a violation of a city ordinance. He said these violations are treated as infractions, similar to a traffic ticket. He confirmed that absent another violation a person would not be taken into custody for this type of violation. He said that an officer could also choose to warn a person about this violation and not issue a citation.

Officer Nail confirmed that he responded to the scene of Officer Mazariegos's arrest on July 27, 2022, a little before 7:00 pm. He said he was dispatched to assist Officer Mazariegos and he said that he could hear her tell someone to sit down several times when she was talking on her radio. He said he thought he needed to respond quickly but he did not activate his overhead lights and siren as he drove to the location.

Officer Nail said that his initial observations upon his arrival at the scene were that Officer Mazariegos was talking with three Hispanic subjects who were all seated on the curb. He said Officer Mazariegos was speaking Spanish and he believed the situation "was escalating". He believed that Mr. Lopez was arguing with her.

Officer Nail said there were fifteen or twenty beer bottles on the ground near the three subjects. He confirmed that typically the people who congregate and drink in this area do not clean up after themselves and that some of the beer bottles could have been there from a previous day. Though, when asked, Officer Nail said he had assumed that the three of them had drank all of the beer from the empty bottles that were around them. He did not know if there were other people in the area.

Officer Nail said he does not speak Spanish but understood that Officer Mazariegos had told Mr. Lopez to sit down, and she asked for identification from all three of the subjects. He said that Officer Mazariegos alternated between speaking Spanish and English and he said that Mr. Lopez seemed to understand English.

Officer Nail said that Mr. Lopez stood up and tried to explain that he needed to stand to get his wallet out of his pants pocket. However, he said that as Mr. Lopez was explaining this, his wallet was already in his hand. "So, and he was still chirping, like chirping, for lack of a better term, back at her and not doing what she was asking him to do."

Officer Nail said that based on what he had observed he believed that Mr. Lopez was intoxicated to the point of being unable to care for himself. He said that Mr. Lopez had red and watery eyes, his movements were sluggish, and he was "clearly unable to follow Officer Mazariegos's commands".

> *Investigator: Now, what did you say to Mr. Lopez?*

> *Officer Nail: Uh, I told him to sit down.*

20

### ADMINISTRATIVE PERSONNEL INVESTIGATION

*Investigator: Okay.  I think what you said was, "Hey, sit the fuck down."*

*Officer Nail: Correct.*

*Investigator: Why did you say it that way?*

*Officer Nail: Because he clearly was not listening to Officer Mazariegos ask him and the way she was telling him was not working.  So, in an attempt to prevent us from having to go hands on with him, I escalated a little bit to emphasize to him that , hey we are serious.*

*Investigator: Why did you choose to use profanity?*

*Officer Nail: Because not (using) profanity was not working.*

*Investigator: And so, you felt it was necessary to talk to him in that way?*

*Officer Nail: Yes.*

Later, Officer Nail said is command to Mr. Lopez was an attempt by him to de-escalate the situation.  Officer Nail was asked how the same command, "Sit the fuck down", could both escalate and de-escalate a situation.  He explained that initially the command may escalate the situation but when the subject sits down the situation is de-escalated.

*Investigator: Do you think it was at all rude or discourteous to talk with him that way?*

*Officer Nail: No.*

Officer Nail admitted that this way of talking with Mr. Lopez was ineffective and that it did not calm the situation.

When Mr. Lopez sat back down, he repeated several times, "I know, I know".  Officer Nail asked him, "You know what!?"  The Investigator asked Officer Nail what he meant by this and Officer Nail said simply, "I didn't know what he knew."  Officer Nail described his demeanor as stern, but he did not believe he was confrontational.

Officer Nail stated that his telling Mr. Lopez to sit down was a form of an alternate tactic to using force on him.  Officer Nail added that there were three suspects and only two police officers at the scene.  He said that with the traffic at that time of day it would take time for other officers to arrive at the scene if they were requested.  He believed these facts contributed to the need to put Mr. Lopez in handcuffs.

Officer Nail said that he believed Mr. Lopez was a threat to their safety.  He explained that he felt this way because Mr. Lopez kept standing up.  They were in a high crime

21

## ADMINISTRATIVE PERSONNEL INVESTIGATION

rate area, and they did not know if he was armed with a weapon. He said that even though he had his wallet in his hand, Mr. Lopez kept reaching toward and grabbing at his pockets.

Officer Nail admitted that he had not observed any other signs that Mr. Lopez could be violent, such as a fighting stance and balled up fists. He admitted that his primary concern was Mr. Lopez's refusal to stay seated on the curb.

Officer Nail said there was no other option available to them other than putting Mr. Lopez into handcuffs. When questioned further, Officer Nail admitted they could have told him to sit down again, they could have explained why they wanted him to sit down, and they could have explained that they needed to search him to ensure he was not a danger to them.

Officer Nail believed that he and Officer Mazariegos decided simultaneously to put Mr. Lopez into handcuffs.

Officer Nail said that at the time they had decided to put Mr. Lopez into handcuffs he was not under arrest, he was only being detained.

Officer Nail said that he grabbed on to Mr. Lopez's left wrist and elbow, while Officer Mazariegos grabbed his right arm. He said that Mr. Lopez immediately began to struggle to pull his arm away from him.

Officer Nail used a "leg sweep" takedown to get him to the ground. He said he put his right leg in front of Mr. Lopez. He then pulled Mr. Lopez over his leg while simultaneously turning his body to force Mr. Lopez to fall to the ground. He said that both of them fell to the ground.
Officer Nail said he still had hold of Mr. Lopez's left wrist as he tried to gain separation between the two of them. He was on Mr. Lopez's left side and they were on their hands and knees while on the ground. Officer Nail said it was at this time that he felt Mr. Lopez grab on to the back of his neck. He said he felt Mr. Lopez wrap his right arm around his neck and apply pressure. He assumed that he was trying to put him in a headlock. He said he tucked his chin down toward his chest and pushed Mr. Lopez's right arm away from his head.

He said that at this point Mr. Lopez either punched him in the back of his head several times or he tried to grab his head for the second time. He could not specifically see what he was doing because he had his chin tucked down toward his chest but he felt Mr. Lopez "colliding" with the side of his head. He said that Mr. Lopez had to be using his right hand because he still had hold of his left arm.

Officer Nail said they ended up against his (Lopez's) truck. He felt Mr. Lopez grabbing at his outer vest carrier.

22

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Officer Nail said he used a "personal body weapon" and he punched Mr. Lopez one time in the face. He said his intention was to make Mr. Lopez let go of his vest. He said the punch was effective and Mr. Lopez let go of his vest. Officer Nail said he was then able to push Mr. Lopez to the ground on his stomach and he and Officer Mazariegos then pulled his arms out from underneath him and they put him into handcuffs.

Officer Nail said that at no time during the struggle did Mr. Lopez comply with them. He said Mr. Lopez struggled against them until they put him in handcuffs.

Officer Nail said that once Mr. Lopez was in handcuffs, he asked dispatch to send medical aid. He said the San Rafael Fire Department arrived and provided medical aid to Mr. Lopez.

When asked why he did not tell Corporal O'Con about Mr. Lopez attempting to put him into a headlock when he first briefed him on what occurred, Officer Nail said that he simply did not think of the headlock at that time.

Officer Nail confirmed he activated his body-worn camera upon his arrival at the scene and recorded his interactions with Mr. Lopez. He said he reviewed the video before he authored his police report about this incident.

Officer Nail was asked why he turned his body-worn camera off when Corporal O'Con first arrived and began to speak with him. He said they do not typically record "tactical conversations" on their cameras. When asked what tactical conversation he had with Corporal O'Con, Officer Nail simply stated, "I was always instructed that's when you turn it off."

### 3. Witness Firefighter Lopes' Summary Statement

Firefighter Lopes said he has worked at the San Rafael Fire Department for over ten years. He said he was working overtime on the day of this incident and that he was working as an Engineer/Paramedic at Station 52. He confirmed that he provided medical aid to Mr. Lopez.

Firefighter Lopes said that Mr. Lopez was seated in the back of a patrol car upon his arrival. He had dried blood on his face, and he was alert, conscious, breathing, and talking. He said Mr. Lopez was "totally coherent, not confused, and not altered".

Firefighter Lopes said Mr. Lopez complained of pain to his nose, his back, his knees, and his ankles. He said that at the time of his evaluation, Mr. Lopez's nose was no longer bleeding. Firefighter Lopes said he "palpated" Mr. Lopez's nose and did not find anything abnormal and did not feel any obvious fracture to his nose.

23

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Firefighter Lopes said that he did not observe any symptoms consistent with a concussion on Mr. Lopez, though he stated this type of diagnosis is typically done by a doctor.

Firefighter Lopes said he did not smell any odor of alcohol on Mr. Lopez, nor did he smell any odor of alcohol from within the patrol car. He did not observe any signs of intoxication, such as slurred speech. Firefighter Lopes said he never asked Mr. Lopez if he had been drinking alcohol because he was able to answer all of his questions appropriately. He said he talked with Mr. Lopez in English and Mr. Lopez answered him in English. He did not believe Mr. Lopez had any difficulty understanding him and communicating with him.

Firefighter Lopes said that Mr. Lopez never told him what happened and never told him that he was punched in the face.

Firefighter Lopes said he told the officer nearest him that based on his assessment, Mr. Lopez needed to be evaluated at the hospital but that there was no need for him to be transported by ambulance.


### 4. Witness Officer Gamble's Summary Statement


Officer Gamble stated that she has been a police officer with the San Rafael Police Department for approximately one year.

Officer Gamble stated that she was dispatched to assist Officer Mazariegos and Officer Nail when they began to struggle with Mr. Lopez. She said Mr. Lopez was seated in the back of a patrol car upon her arrival.

Officer Gamble said she was directed to author a citation for drinking alcohol in public for one of the subjects that was with Mr. Lopez. She said that the subject only spoke Spanish and she thought it was Officer Mazariegos that explained the citation to him. She said she could smell an odor of alcohol on the subject's breath. She said the subject did not seem to have any difficulty understanding Officer Mazariegos's explanation, but she added that she does not speak Spanish.

Officer Gamble said that Corporal O'Con directed her to transport Mr. Lopez to the hospital for a medical clearance. She said that while driving him to the hospital, she could smell alcohol on Mr. Lopez's breath. "I did believe him to be intoxicated." When asked, Officer Gamble said she did not have an opinion about the level of Mr. Lopez's intoxication because she did not perform any sort of evaluation on him. She said he walked slowly between the two patrol cars, but she did not think he had any difficulty with his balance, and he did not appear unsteady on his feet.

**CONFIDENTIAL**                    COSR (Lopez) 001075

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Officer Gamble described Mr. Lopez's injuries as a bloody nose and complaint of pain to his right shoulder.  She believed that she was told at the hospital that he did not suffer a bone fracture to his nose.  Mr. Lopez also complained of pain to one of his knees.

While at the hospital Officer Gamble took photographs of the areas that Mr. Lopez complained were injured.  She could not recall if she uploaded the photographs to their evidence storage system or if she forwarded the photographs to Officer Nail.

When asked, Officer Gamble said she did not read Mr. Lopez his Miranda rights and she did not attempt to interview him.  She did not ask him to sign a medical waiver which would have granted the Police Department access to his medical records for the treatment of his injuries, and she did not attempt to ascertain his blood alcohol content either with a PAS Device or through the hospital's blood test results for Mr. Lopez.

After the interview had concluded, and when the recorder had been turned off, Officer Gamble stated that she had not been directed to do any of those things and she had not thought about it on her own.

After he was cleared from the hospital, she transported Mr. Lopez to the jail where he was booked on the charges identified by Officer Mazariegos.


### 5.  Summary of Corporal O'Con's Interview with Mr. Lopez


Corporal O'Con interviewed Mr. Lopez as he sat in the back of the patrol car.  The interview was conducted in Spanish.  The interview was recorded on Corporal O'Con's body-worn camera.  Corporal O'Con did not advise Mr. Lopez of his Miranda rights.

Corporal O'Con asked Mr. Lopez what happened, and Mr. Lopez said, "They came very, very roughly".  Mr. Lopez said he stood up to take his license out of his wallet and "he threw me down".  Mr. Lopez said that the male officer "hit him" on the nose.  He said his nose bled and he had scrapes on his knees.

Mr. Lopez explained that she stood to hand the officer his license and "he thought I was acting wrong".  "So, he threw me there in a blow."

> *Corporal O'Con: Did you understand what they were saying to you?*

> *Mr. Lopez: Yes, of course.*

> *Corporal O'Con: Do you know that they told you to sit down?*

25

## ADMINISTRATIVE PERSONNEL INVESTIGATION

*Mr. Lopez: Yes, yes, but I, I had to take out my license.*

*Corporal O'Con: But you understood that they told you not to get up? That they told you a lot of times.*

*Mr. Lopez: I understood, no, not a lot of times.  They only told me once.*

During his interview, Mr. Lopez stated several times that he was told to sit down only one time.

Mr. Lopez was unclear of the sequence of events, but he seemed to believe that he was punched in the nose by Officer Nail before he was taken to the ground.  He did not believe he was ever told to put his hands behind his back.

Mr. Lopez said that he was shocked and scared when he saw the blood coming from his nose.

*Corporal O'Con: Why didn't you listen to the officers when they told you not to stand up or not to, for you to sit down, or not to, for you to sit down?*

*Mr. Lopez: I stood up.  I stood up (unintelligible).*

*Corporal O'Con: Why didn't you listen when they told you that?*

*Mr. Lopez: I listened.  But they were not listening.  I, I was complying with them, understand me?  I was complying.*

*Mr. Lopez: I was complying.  But the man was there, and the man went directly to me, because I was talking with the lady.  With the policewoman in Spanish.  And I understood.  I understood.  But when he saw that I was taking out, that I got up and took out my wallet, he went after me and beat me.  That was what happened.*

Mr. Lopez told Corporal O'Con that Officer Mazariegos did not do anything to him. He said he never struck either of the officers and he never tried to grab hold of them.

Mr. Lopez told Corporal O'Con that he understands English and can speak in English.

He complained of pain to his nose, knees and shoulder.

### 6.  Summary of Corporal O'Con's Interview with Mr. ███████

26

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Corporal O'Con asked Mr. ▮▮▮▮▮▮, who had been seated on the curb since Officer Mazariegos directed him to do so, to stand up and walk a few steps away so that the Corporal could interview him.  The interview was conducted in Spanish and was recorded on Corporal O'Con's body-worn camera.  Corporal O'Con did not advise Mr. ▮▮▮▮▮▮ of his Miranda rights.

Corporal O'Con asked Mr. ▮▮▮▮▮▮ what happened.  Mr. ▮▮▮▮▮▮ said they were standing nearby when "she", Officer Mazariegos, directed them to sit down on the curb.  He said Officer Mazariegos then asked them for their identification and "he came", (Officer Nail).

Mr. ▮▮▮▮▮▮ said that Mr. Lopez then stood up and explained that his identification was in his little pocket.  Mr. ▮▮▮▮▮▮ said the officers grabbed hold of Mr. Lopez, and "they let him fall".  Mr. ▮▮▮▮▮▮ said that Mr. Lopez then "defended himself" and the officers told him not to move.  Mr. ▮▮▮▮▮▮ said that Mr. Lopez was complying with the officer's demands.  He said that Mr. Lopez did not fight with the officers at any time during the incident.

Mr. ▮▮▮▮▮▮ said that the officer hit Mr. Lopez in his face with his right hand during the struggle.  Mr. ▮▮▮▮▮▮ said that Mr. Lopez never struck either of the officers and he did not grab hold of them.

### 7.  Summary of Corporal O'Con's Interview with Mr. ▮▮▮▮▮▮

Corporal O'Con asked Mr. ▮▮▮▮▮▮ to stand and walk a few steps with him so that he could interview him.  The interview was conducted in Spanish and was recorded on Corporal O'Con's body-worn camera.  Corporal O'Con did not advise Mr. ▮▮▮▮▮▮ of his Miranda rights.

Mr. ▮▮▮▮▮▮ said that he and Mr. Lopez and Mr. ▮▮▮▮▮▮ were drinking beer when they were contacted by the officer.  He said they had just got off of work when they arrived in the area to drink their beer.

Mr. ▮▮▮▮▮▮ said the officer asked them for identification and Mr. Lopez then stood up to take his wallet out of his pants pocket.  He said that Mr. Lopez sat back down and then "they started arguing".

Mr. ▮▮▮▮▮▮ said that Mr. Lopez was sitting down when "he", Officer Nail, grabbed him and punched him in the face.  Although his statement to Corporal O'Con was not clear, he seemed to indicate that Mr. Lopez resisted the officer's attempts to put him into handcuffs.

Mr. ▮▮▮▮▮▮ told Corporal O'Con that Mr. Lopez was moving his hands around to keep the officers from getting ahold of him to put handcuffs on him.

27

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

He said that at one point, Mr. Lopez was hit by the male officer. Mr. ████ then pointed out Officer Nail and said he was the one that hit Mr. Lopez. He said Officer Nail punched Mr. Lopez in the face with his right hand.

Mr. ████ said he did not see how Mr. Lopez ended up on the ground. He said that when Officer Nail punched Mr. Lopez, he was already on the ground. Mr. ████ then stated that Mr. Lopez "was already calm" before he was hit by Officer Nail.

Mr. ████ said that Mr. Lopez never struck the officers and he never tried to grab hold of the officers.

### 8. Summary of Corporal O'Con's Body-worn Camera Videos

There are four videos from Corporal O'Con's body-worn camera for this incident.

<u>Video #1 is 39 seconds in length.</u> The video begins with Corporal O'Con driving to the scene. The video ends as Corporal O'Con approaches Officer Nail and begins to talk with him. None of the conversation with Officer Nail is recorded on the video

<u>Video #2 is 2 minutes and 19 seconds in length.</u> Corporal O'Con activated his video recorder after he concluded his conversation with Officer Nail. As always, the first 30 seconds of the video from an Axion body-worn camera does not have audio. During this time, it appears, based on Officer Nail's gesturing, that Officer Nail is describing what happened during the arrest of Mr. Lopez.

     00:30 – Corporal O'Con is walking away from Officer Nail. Mr. Lopez is seated in the back of Officer Mazariegos's patrol car. The rear door of the car is open, and Mr. Lopez is being tended to by paramedics from the San Rafael Fire Department. Officer Nail tells the paramedic that he punched Mr. Lopez in the face.

     00:40 – Corporal O'Con approaches Officer Ahlenslager and Officer Chiu who are watching Mr. ████ and Mr. ████. They are seated on the curb in the same location as Officer Mazariegos had directed them to sit.

     00:50 – Corporal O'Con has walked back to Officer Mazariegos's patrol car. The rear door is still open. Mr. Lopez is still seated in the rear seat of the car. The firefighter paramedic is talking with Officer Mazariegos and reporting on Mr. Lopez's apparent injuries and complaints of pain.

     01:00 – Corporal O'Con states to Officer Nail, "So, you punched him and leg swepped him?" Officer Nail tells Corporal O'Con that he took Mr. Lopez to the ground with a leg sweep takedown. Once they were on the ground Mr. Lopez

28

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

grabbed hold of Officer Nail and he then punched Mr. Lopez in the face. Corporal O'Con asks Officer Nail several more questions about what happened during the incident. Officer Nail and Corporal O'Con walk over to the area where the incident took place, near Mr. Lopez's pickup truck, and Officer Nail explains to Corporal O'Con what happened during the incident.

01:22 – Officer Nail tells Corporal O'Con that he "leg sweeped" Mr. Lopez and they both fell to the ground. He states that Mr. Lopez ended up with his back against his pickup truck. He states that they " wrestled", and then Mr. Lopez grabbed hold of his outer vest carrier. Officer Nail states that he then punched Mr. Lopez one time and then they were able to gain control of him.

01:50 – Corporal O'Con talks with Officer Ahlenslager to ensure she has taken photographs of the scene and of the subjects involved in the incident.

02:12 – Corporal O'Con asks Officer Mazariegos to come over to him and speak with him. Corporal O'Con turns off his body-worn camera as he begins his conversation with Officer Mazariegos.

<u>Video #3 is 21 minutes and 38 seconds in length.</u> The video begins with Corporal O'Con apparently talking with Officer Chiu and Officer Schraeder. Officer Nail is standing near Mr. ████████ and Mr. ████████. The firefighters from the San Rafael Fire Department are still on scene and tending to Mr. Lopez. The rear door of Officer Mazariegos's patrol car is open, and Mr. Lopez is seated inside the vehicle.

00:30 – Corporal O'Con approaches Mr. Lopez and asks him questions about what occurred during the incident. A summary of their conversation is provided earlier in this report. Their conversation takes place predominately in Spanish. Mr. Lopez briefly speaks English to Corporal O'Con and tells him that he can speak and understand English. Mr. Lopez is calm and answers all of Corporal O'Con's questions.

05:30 – Corporal O'Con completes his conversation with Mr. Lopez and takes a photograph of him with his cellular telephone.

05:50 – Corporal O'Con walks over to where Mr. ████████ and Mr. ████████ are sitting on the curb. Corporal O'Con states that Officer Gamble will transport Mr. Lopez.

06:00 – Corporal O'Con asks Mr. Lopez's two friends for their names. Mr. ████████ tells Corporal O'Con his name and Corporal O'Con directs him to stand and walk with him a short distance away so that he can interview him. Corporal O'Con's interview with Mr. ████████ is summarized above in this report. Mr. ████████ appears calm and attempts to answer all of Corporal O'Con's questions. Their conversation takes place in Spanish. Corporal O'Con's interview of Mr. ████████ is approximately three minutes in length.

29

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

09:08 – Mr. ███████ walks back and sits down on the curb in the same place he had previously been sitting.  Officer Mazariegos explains to both Mr. ███████ and Mr. ███████ that they will be issued a citation for violation of a City Ordinance, drinking alcohol in public.

10:27 – Corporal O'Con directs Mr. ███████ to stand and walk with him a short distance away to be interviewed.  Corporal O'Con's interview with Mr. ███████ is summarized above in this report.  Mr. ███████ is calm and attempts to answer Corporal O'Con's questions.  Their conversation takes place in Spanish.  Corporal O'Con's interview with Mr. ███████ is approximately five minutes in length.

15:50 – Corporal O'Con walks over to Officer Mazariegos, who appears to be filling out a jail booking form on the hood of a patrol car.  Corporal O'Con confers with Officer Mazariegos on the charges for which Mr. Lopez will be booked into the jail.

17:06 – Corporal O'Con walks back to the area Mr. ███████ and Mr. ███████ are sitting.  They are being watched by Officer Ahlenslager and Officer Chiu.  Corporal O'Con confirms that they will be released with citations for open alcoholic containers in public.  Corporal O'Con directs Officer Nail to confirm with Officer Mazariegos the charges for which Mr. Lopez will be booked into the jail.

19:00 – Corporal O'Con tells Officer Mazariegos that Officer Gamble will transport Mr. Lopez to the hospital for a medical clearance and will then transport him to the jail.  Corporal O'Con directs Officer Mazariegos and Officer Nail to respond to the police department, photograph their injuries, and download the videos from their body-worn cameras.

20:00 – Corporal O'Con directs Officer Ahlenslager to download the photographs she took as soon as possible.

20:50 – Corporal O'Con directs Officer Gamble to document any injuries Mr. Lopez sustained and to photograph them.

<u>Video #4 is 5 minutes and 25 seconds in length.</u>  The video begins with Corporal O'Con standing near Officer Nail and Officer Mazariegos to the rear of Officer Mazariegos's patrol car.  Officer Nail can be seen laughing.  This portion of their conversation was not audio recorded.

00:32 – Corporal O'Con walks to Officer Mazariegos's patrol car, and he opens the rear door to the car.  Corporal O'Con then asks Mr. Lopez a series of medical  and personal questions and he records his answers on a yellow form.  Corporal O'Con's brief interview of Mr. Lopez lasts just over one minute.  Mr. Lopez is calm and answers all of Corporal O'Con's questions.

30

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

03:17 – Corporal O'Con directs Officer Gamble to watch as Officer Mazariegos moves Mr. Lopez from the rear of her patrol car to the rear of Officer Gamble's patrol car.

03:44 – Officer Mazariegos directs Mr. Lopez to get out of her patrol car and she walks him over to Officer Gamble's patrol car as Officer Gamble assists her. Both Officers search Mr. Lopez and then put him into the back seat of Officer Gamble's patrol car. Mr. Lopez is cooperative and does not speak during this time. The video ends after they closed the rear door of the patrol car.

### 9. Summary of San Rafael Police Report #22-05221

Officer Mazariegos authored a report documenting her arrest of Mr. Lopez. Officer Nail submitted a supplemental report which was attached to the original report written by Officer Mazariegos. Corporal O'Con signed the report as the approving supervisor. His signature is dated July 28, 2022.

Summary of Officer Mazariegos's written report

On July 27, 2022, at approximately 1853 hours, Officer Mazariegos contacted Mr. Lopez, Mr. ████████, and Mr. ████████ on Windward Way. Mr. ████████ had an open beer in his hand. There were numerous empty beer bottles on the ground around the three subjects.

Officer Mazariegos communicated with all three subjects, primarily in Spanish. Mr. Lopez spoke both English and Spanish.

Officer Mazariegos asked the subjects if they knew it is illegal to drink alcohol in public. She wrote that between the three subjects, Mr. Lopez was primarily doing most of the talking.

Officer Mazariegos wrote that she believed all three subjects were under the influence of alcohol.

Officer Mazariegos directed all three subjects to sit on the curb and then asked them for identification. Mr. Lopez stood up and explained that he needed to stand to get his identification. "Officer Nail then told Jimenez (Lopez) again to sit down or he would be placed in handcuffs." "Shortly after, I gave Jimenez (Lopez) the same commands again to sit down.

Officer Mazariegos wrote that after Jimenez (Lopez) stood for the third time, she decided to detain him in handcuffs. "I feared that Jimenez's (Lopez) lack of cooperation was a precursor to him fleeing the area or attempting to engage in a physical altercation with Officer Nail or me." Officer Mazariegos wrote that because

31

## ADMINISTRATIVE PERSONNEL INVESTIGATION

there were only two officers at the scene and they were dealing with three subjects, it was imperative that they gain control of the situation by placing Jimenez (Lopez) in handcuffs.

Officer Mazariegos grabbed Mr. Jimenez's (Lopez) right arm while Officer Nail grabbed his left arm. Mr. Jimenez (Lopez) tensed his body and began to move his arms to prevent them from putting handcuffs on him.

Due to Mr. Jimenez's (Lopez) continuing resistance, Officer Nail put his right leg in front of Mr. Jimenez (Lopez), and he then pulled him to the ground over his leg. All three of them fell to the ground. Officer Mazariegos lost control of Mr. Jimenez's (Lopez) right arm and he swung his arm around to keep her from gaining control of it. Officer Mazariegos told Mr. Jimenez (Lopez) to stop.

Mr. Jimenez (Lopez) had hold of Officer Nail's outer vest carrier which contained his OC spray, collapsible baton, and taser. Officer Nail then punched Mr. Jimenez (Lopez) in his face.

At this point, Mr. Jimenez (Lopez) was on the ground with his hands tucked underneath him. Officer Mazariegos gave Mr. Jimenez (Lopez) commands to put his hands behind his back approximately five times. The officers were then able to pull Mr. Jimenez's (Lopez) hands behind his back while Officer Mazariegos put handcuffs on him.

Officer Mazariegos searched Mr. Jimenez (Lopez) and then she and Officer Nail put him in the back of her patrol car.

Officer Mazariegos wrote that Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ told her that the empty beer bottles on the ground, near them, belonged to them. She wrote that she directed Officer Gamble and Officer Ahlenslager to issue citations to both of them for drinking alcohol in public.

Officer Mazariegos wrote that she believed that Mr. Jimenez (Lopez) was under the influence of alcohol to the point of being unable to care for himself, a violation of Penal Code Section 647(f), because he was unable to follow her instructions and he decided to fight with the police.

Officer Mazariegos arrested Mr. Jimenez (Lopez) on the following charges:

- PC 647(f) – Drunk in public
- PC 148(a)(1) – Resisting arrest
- PC 69(a) – Obstructing an Executive Officer
- PC 243(b) – Battery on a Peace Officer
- BP 25620(a) – Open container of alcohol in public

32

## ADMINISTRATIVE PERSONNEL INVESTIGATION

The San Rafael Fire Department responded to the scene and provided medical attention to Mr. Jimenez (Lopez).  Officer Gamble transported Mr. Jimenez (Lopez) to the Marin General Hospital for a medical clearance and she then transported him to the jail.

Summary  of Officer Nail's written report

Officer Nail wrote that he responded to the scene to assist Officer Mazariegos.  When he arrived, he saw that Officer Mazariegos had contacted three subjects and they were all seated on the curb.  He observed numerous empty beer bottles on the ground near the three subjects.

Officer Nail wrote that he noticed that Mr. Lopez displayed objective signs of alcohol intoxication.

Officer Nail wrote that Officer Mazariegos was talking with the three subjects and it appeared to him that Mr. Lopez was arguing with Officer Mazariegos.  Mr. Lopez stood up several times and each time Officer Mazariegos told him to sit back down. When Mr. Lopez stood again, Officer Nail told him, in English, to sit down or he would be placed in handcuffs.  "Lopez acknowledged my commands and got into a squat position."  When Mr. Lopez stood again he and Officer Mazariegos decided to put him in handcuffs.

Officer Nail took control of Mr. Lopez's left arm while Officer Mazariegos grabbed his right arm.  Mr. Lopez tensed up and pulled his arms toward his chest.  Officer Nail then pulled Mr. Lopez over his leg to the ground.

Officer Nail wrote that once on the ground, Mr. Lopez escalated his behavior from resisting their efforts to handcuff him to actively fighting with him.  According to Officer Nail, Mr. Lopez tried to put him (Nail) into a headlock.  Officer Nail wrote that Mr. Lopez put his right arm around his neck and began to squeeze.  Officer Nail tucked his chin toward his chest and pushed Mr. Lopez away from him, "forcing his arm off the back of my neck".  "When Lopez lost control of my head, he began to swing his right hand at my head, striking me several times on the left side and back of my head."

Officer Nail wrote that Mr. Lopez grabbed hold of his outer vest carrier and he feared that Mr. Lopez could gain control of one of the weapons he keeps on his vest.  Officer Nail then punched him one time in the face.  At this point, according to Officer Nail, Mr. Lopez stopped his attack.  He and Officer Mazariegos were able to push Mr. Lopez on to his stomach and were eventually able to put him into handcuffs.

### 10. Subject Corporal O'Con's Summary Statement

CONFIDENTIAL                    COSR (Lopez) 001084

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Corporal O'Con stated that he has five years of sworn law enforcement experience and he has been a corporal with the San Rafael Police Department for just over one year.

He stated that corporals with the San Rafael Police Department serve as a senior officer in charge in the absence of a sergeant. He stated that when a sergeant is present on the patrol team a corporal handles a beat and responds to police calls for service. He confirmed that during the times when he supervises the patrol team, he is expected to fulfill all of the supervisory duties of a sergeant.

He stated that at the time of this incident, he was assigned to patrol team three, the weekday graveyard shift. He said that Sergeant Cleland was the sergeant on the patrol team. On the day of this incident, Sergeant Cleland was off work and he was acting in the capacity of the supervisor for the shift.

Corporal O'Con stated that the area of town where this incident occurred is known as the Canal District. He said that patrol officers have been asked by the police department's administration to provide extra patrol in this area of town. He described the area as having a higher crime rate than other areas of town. He said the area is populated by mostly Hispanic people with lower income.

Corporal O'Con stated that a common problem in this area of town is people congregating outside drinking alcohol. He said there are often complaints from nearby residents about noise and drinking in public.

Corporal O'Con said that drinking in public is a violation of a City Ordinance and is treated as an infraction.

Corporal O'Con confirmed that he responded to the scene of an arrest by Officers Mazariegos and Nail on July 27, 2022, at approximately 1900 hours, on Windward Way. He believed he was already driving in their direction when he heard their request for emergency assistance. He stated that upon his arrival at the scene, he believed the Fire Department was already on scene. He could not remember what officers were present.

Corporal O'Con confirmed that he was the supervisor at this scene, and he stated that no other San Rafael Police supervisors responded to this scene.

When asked to describe his responsibilities at the scene, Corporal O'Con stated that the first thing he did was to determine if anyone had been hurt during the incident and if they needed medical attention. He said the Fire Department was attending to Mr. Lopez.

He said that the next thing he did was to determine what investigative steps needed to be taken to support a criminal prosecution of the incident. He directed one of the officers at the scene to take photographs of the area, and of Mr. Lopez and his two

34

## ADMINISTRATIVE PERSONNEL INVESTIGATION

friends.  He did not remember who was assigned this task.  He said that he interviewed both Officer Mazariegos and Officer Nail to get a better understanding of what took place.  When asked he said he believes he interviewed both officers at the scene of the incident.  He did not record his interview with Officer Mazariegos on his body-worn camera but he recorded a portion of his interview with Officer Nail.  The Investigator asked why he did not record the entire interview with the two officers and Corporal O'Con said that he typically does not record these types of interviews.  He cited "tactical" considerations.  "But that's a guesstimate right now.  I don't know what was in my mindset at the time."

Corporal O'Con said that Officer Nail told him there was a brief struggle between the two officers and Mr. Lopez while they were trying to put him in a restrained detention.  Mr. Lopez was uncooperative.  Officer Nail took Mr. Lopez to the ground, and he punched Mr. Lopez once in his face.  Officer Nail and Officer Mazariegos were able to overcome the resistance from Mr. Lopez and they put him in handcuffs.

Corporal O'Con said that he could not remember if Officer Nail was talking directly to him, or if he was talking to another officer, when he (Nail) said that Mr. Lopez tried to put him in a headlock.  Corporal O'Con was asked if he was concerned that Officer Nail did not tell him that Mr. Lopez tried to put him in a headlock when they discussed the incident and he said he did not remember if he had any concern.  He said he intended to review the video from his body-worn camera to clarify what occurred.

Corporal O'Con said he could not remember what Officer Mazariegos told him about the incident.  However, he believed that the statements from both officers were consistent with each other.

Corporal O'Con said he had an administrative responsibility to conduct a use of force investigation.  He interviewed Mr. Lopez and he interviewed Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ as part of his use of force investigation.  He recorded all three of these interviews on his body-worn camera.  He did not advise them of their Miranda rights.

Corporal O'Con said that he could see that Mr. Lopez had an injury to his nose, though it was no longer bleeding.  He described Mr. Lopez as calm, polite, and willing to answer his questions.  He wanted to provide his side of what happened and appeared to be as detail oriented as he was capable.

Corporal O'Con said he could smell a slight odor of alcohol and he said that Mr. Lopez showed signs of intoxication, or at least that he had been consuming alcohol.  He said he was having difficulty remembering all of his observations, but he believed Mr. Lopez had red and watery eyes and his speech was slurred slightly.

> *Investigator: When you interviewed him (Lopez) did you think his speech was slurred?*

35

### ADMINISTRATIVE PERSONNEL INVESTIGATION

*Corporal O'Con: From what I recall, again, I'd have to look at my prior documentation to back it up. But I believe so.*

*Investigator: Well, we just watched your interview with him on video. Does that refresh your memory at all?*

*Corporal O'Con: Uh, slightly. Uh, it's more of observations that were at the time. But yeah. It sounds slightly slurred right now.*

*Investigator: Based on your conversation with him, did you believe that he was intoxicated to the point of being unable to care for himself?*

*Corporal O'Con: I believe so based on the signs and symptoms and the fact that he was uncooperative with my officers. I believe that it could have been, was unable to care for himself.*

*Corporal O'Con: He was exhibiting clear signs of alcohol consumption and then failing to comply with lawful orders and failing to, like simple and lawful orders to remain seated.*

When asked what Mr. Lopez told him, Corporal O'Con said that Mr. Lopez told him he was talking with the female officer. She asked for his identification and he had to stand to take his wallet out of his pocket. She told him one time to sit down. Mr. Lopez told him that was when the male officer then got involved. The male officer punched him, grabbed him, and threw him to the ground.

Mr. Lopez said that prior to being grabbed by the male officer he was following their commands. He said he was simply trying to get his identification out of his wallet, and he was not resisting the officers.

Corporal O'Con said that he primarily spoke to Mr. Lopez in Spanish but he said that Mr. Lopez told him that he can understand English. He did not believe that Mr. Lopez had any difficulty understanding his questions, though he said they went over many of the questions more than one time as he tried to get a complete understanding of what Mr. Lopez was telling him had occurred. Mr. Lopez told Corporal O'Con that he was able to understand both of the officers when they spoke to him.

Corporal O'Con could not remember if he asked Mr. Lopez how much alcohol he had consumed. He could not remember if he asked him how long he had been in the area before he was contacted by Officer Mazariegos.

Corporal O'Con could not remember if he asked either of Mr. Lopez's two friends how much alcohol Mr. Lopez had consumed.

Corporal O'Con said he could not remember specifically what each of Mr. Lopez's two friends told him. He said that he interviewed both of them and that from a

36

## ADMINISTRATIVE PERSONNEL INVESTIGATION

general perspective they told him the following: that Mr. Lopez was calm with the officers, that he was listening to the officers, and that he was trying to take out his identification when he was assaulted by the officers.

Corporal O'Con said that he spoke to them in Spanish.  He said they understood his questions and he was able to understand their answers.  He said they were untrained in providing detailed statements in chronological order, so he had to piece together what they were telling him.

Corporal O'Con said that Mr. ▮▮▮▮▮▮ told him that at one point during the struggle, Mr. Lopez was trying to pull his arms away from the officers.  He also said that Mr. Lopez was trying to defend himself.  Corporal O'Con said that information confirmed to him that Mr. Lopez was uncooperative and was fighting with the officers.

Corporal O'Con confirmed that Mr. ▮▮▮▮▮▮ and Mr. ▮▮▮▮▮▮ were released from the scene with citations for drinking alcohol in public.

Corporal O'Con could not remember when he reviewed the videos from Officer Nail's and Officer Mazariegos's body-worn cameras.  He said that he believed he looked at the videos before he approved their reports, but he was not certain.  Corporal O'Con then said that he recalled looking at Officer Nail's video on his (Nail's) cellular telephone.

> *Investigator: Have there been other investigations where you approved a use of force report without looking at the video first?*
>
> *Corporal O'Con: I don't believe so.  But I can't recall at this time.*

Corporal O'Con said he could not remember if he could observe Mr. Lopez strike Officer Nail or his attempt to put him in a headlock when he viewed the videos of the two officers.  (O'Con had just watched the videos at the beginning of this interview)

Later, Corporal O'Con said he did not see anything in either of the officer's videos that was inconsistent with what he read in their reports, though he acknowledged that he did not see Mr. Lopez hit Officer Nail in the back of the head or try to put him in a headlock while reviewing their videos.  He said that given their close proximity and that there were times in the video where the screen was black, it was likely these things occurred during those time periods.

Corporal O'Con could not remember if he had any follow up conversation with either Officer Nail or Officer Mazariegos after he reviewed their body-worn camera videos.

While Corporal O'Con could not state definitively that he reviewed the videos from Officer Nail and Officer Mazariegos's body-worn cameras prior to approving their reports, he said that not doing so could create a problem for the Police Department and a problem for the investigation.  He said that any discrepancy with a written

37

## ADMINISTRATIVE PERSONNEL INVESTIGATION

report and the video of the incident would reflect poorly on the officers and the Department.  He confirmed that it is a supervisor's responsibility to ensure this does not occur.

Corporal O'Con could not remember how many times he has looked at the videos from the two officers body-worn cameras.

> *Investigator: Did you see anything in the videos that caused you any concern?*

> *Corporal O'Con: Nothing really at the time.*

Corporal O'Con said that he did not question Officer Nail about his assertions that Mr. Lopez punched him in the back of the head several times and tried to put him in a headlock.  When asked if there was a reason, he did not question Officer Nail about this, given these details were not part of their original conversation, and they could not be seen on the videos, Corporal O'Con said, "Those are his independent observations and beliefs of how the incident took place."  Corporal O'Con added that body-worn camera videos do not always capture the entirety of what occurs during an incident.  He also said that it was common that an officer may remember additional details about a use of force incident moments or hours after the event.

Corporal O'Con confirmed he directed Officer Gamble to transport Mr. Lopez to the hospital for a medical clearance and then to book him at the jail.  When asked what other direction he gave to Officer Gamble, Corporal O'Con said that he believed he asked her to get a summary of Mr. Lopez's injuries and to take additional photographs of his injuries.

Corporal O'Con said he could not remember if he asked Officer Gamble to get a signed medical waiver from Mr. Lopez so that the police department could get a copy of Mr. Lopez's medical records for his treatment of his injuries.  "So, I don't recall at this time, if I asked and it wasn't done or if it just wasn't requested by me."

Corporal O'Con added that he typically directed an officer to get a signed medical waiver from a victim in a crime, not a suspect.  Corporal O'Con said, "I haven't seen somebody obtain a medical release or get a signed medical release for a suspect that was taken into custody on a use of force.  So for me, it hasn't been, like I haven't seen another supervisor do that or been trained to do that."

Corporal O'Con said he could not remember if he directed Officer Gamble to use a PAS device (Preliminary Alcohol Screening Device) on Mr. Lopez to determine his BAC (blood alcohol level).

Corporal O'Con said he could not remember if he directed Officer Gamble to find out at the hospital what Mr. Lopez's BAC was.

38

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

When asked if directed Officer Gamble to read Mr. Lopez his Miranda rights and attempt to interview him, Corporal O'Con said, "I don't believe so."

Corporal O'Con could not remember if he gave any direction, to any officer, while at the scene of the incident to conduct an area canvass to determine if there were any witnesses that could be interviewed.

Corporal O'Con said he did not believe any of the officers at the scene attempted to interview either of Mr. Lopez's two friends that were present at the scene and had witnessed the incident.

> *Investigator: Is one of your responsibilities as a supervisor to help limit the liability for the Police Department and for the City?*
>
> *Corporal O'Con: That's correct.*

When asked what steps he had taken to limit and/or reduce liability to the City, Corporal O'Con said he responded to the scene and delegated tasks, he interviewed the two officers about what had occurred, he ensured Mr. Lopez had received the appropriate medical attention, he directed photographs to be taken of the scene, he completed a use of force investigation, he reviewed the officer's videos from their body-worn cameras, and he reviewed and approved the officer's reports.

Corporal O'Con acknowledged that one of the responsibilities of a supervisor is to consider whether or not a suspect in a police use of force incident may try to sue the Department and the City. He stated that with this in mind, he ensured they had conducted a thorough criminal investigation.

Corporal O'Con said he directed the officers to review their body-worn camera videos prior to writing their reports and he told them to ensure their reports were accurate.

When asked if he felt it was appropriate that Officer Nail told Mr. Lopez to "sit the fuck down", Corporal O'Con said that perhaps the profanity could have been eliminated. But he said Mr. Lopez was not complying with their order to stay seated and talking to him sternly seemed appropriate.

When asked if he believed it was rude or discourteous toward Mr. Lopez when Officer Nail told him to sit the fuck down, Corporal O'Con said Officer Nail was "direct".

> Investigator: So, you did not think it was rude or discourteous?
>
> Corporal O'Con: *I believe it was -- it was -- could have been avoided and not used. But I believe that the statement, like we're talking about, was appropriate, the actual statement to sit down.*

39

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

> *Investigator: Okay. So, I'm trying to get a yes or no answer from you. Was it rude or discourteous toward Lopez when Nail told him to sit the fuck down?*
>
> *Corporal O'Con: Can I take a second?*
>
> *Investigator: Sure. You want a break?*
>
> *Corporal O'Con: Yes, please.*
>
> *Investigator: So, when we took our break, I was asking you if you believe Officer Nail was rude and/or discourteous toward Lopez when he said sit the fuck down.*
>
> *Corporal O'Con: Uh, uh, and to r -- you were asking me for a simple yes or no answer. And I think that statement is -- or that question is loaded to have more -- like my belief based on that and, uh, rude and discourteous, like, uh, uh –*
>
> *Investigator: So, why don't you give me either yes or no and then whatever explanation you want to provide?*
>
> *Corporal O'Con: Okay. Uh, no, because I believe -- I-I don't believe it was necessary to use, uh, a swear word during that situation. But that's the decision he made at the time.*
>
> *And I don't believe that situation, that-that one swear word guided the whole situation and deteriorated just on -- based alone just saying the F word to somebody. I believe he was giving him a direct order. And that-that enunciated the-the -- like that he needed to comply with that order at that time.*

Corporal O'Con admitted that Mr. Lopez did not like being talked to like that from Officer Nail, but he pointed out that the more significant factor was that Mr. Lopez was failing to comply with their direction to him.  When asked, Corporal O'Con said he did not believe that Officer Nail telling Mr. Lopez to sit the fuck down had anything to do with making the situation worse or more tense.  "I don't believe it caused any change…"

Corporal O'Con said he agreed with the officer's decision to put Mr. Lopez into a restrained detention and he believed it was necessary based on his refusal to follow the officer's commands.

> *Investigator: Your use of force policy requires officers to attempt to de-escalate a situation to avoid having to use force.  Did you see anything*

40

### ADMINISTRATIVE PERSONNEL INVESTIGATION

*from Officer Nail which would lead you to believe he tried to de-escalate the situation?*

*Corporal O'Con: I believe so.  I believe his use of just that jargon alone, he used a different tactic outside of what Officer Mazariegos was using…*

*Corporal O'Con: He used a tactic of being, uh, more direct and more stern.  Yes.*

Corporal O'Con said that when Mr. Lopez continued to disobey the officer's orders, they switched to a different tactic by placing him in handcuffs.  "And so, those were all, to me, de-escalatory like tactics used to gain further control."

*Investigator: Is it your opinion and your statement that, when Officer Nail said sit the fuck down, that was an attempt to de-escalate the situation?*

*Corporal O'Con: I believe it was a version of his belief at the time to de-escalate the situation.*

When asked if Officer Mazariegos employed any tactic to de-escalate the situation, Corporal O'Con said that she gave Mr. Lopez numerous commands.

When asked if either of the officers used any alternate tactic to avoid using force, Corporal O'Con said, "I just don't quite understand alternative tactics.  They used the tactics that they believed that they had to use at that necessary time."

When asked if he would do anything differently to supervise a similar incident in the future, Corporal O'Con said he believed he did what was appropriate given his training and experience.

Corporal O'Con said he did not remember if he briefed any other supervisor about this incident, but he completed a "department-wide shift log" and included information about this incident in his email message.

### 11. Credibility Assessment

It is important to note that before making a determination regarding the facts as alleged, the credibility of each witness was considered. In evaluating witness' credibility, many factors were considered, including possible bias or motivation to lie, the ability of a witness to recall information, the specificity of the information provided, whether the information provided was consistent with prior statements made by the witness and/or statements made by other witnesses, and the inherent plausibility of the information provided.

41

## ADMINISTRATIVE PERSONNEL INVESTIGATION

There was a total of five firefighters interviewed for this administrative investigation. Only Firefighter Lopes' statement was summarized in this report. The other firefighters had little or no contact with Mr. Lopez and did not provide any information related to this investigation.

Also, in addition to Officers Nail, Mazariegos, and Gamble, Officers Ahlenslager, Chiu, and Schraeder were interviewed for this investigation. However, their statements were not summarized in this report because they did not provide any information related to this investigation.

All interviews were recorded and transcribed.

The Investigator found the statement from Firefighter Lopes was credible. He appeared to answer all of the questions that were posed to him to the best of his ability. He was able to recall many of the details about his interactions with Mr. Lopez.

Officer Gamble's statement was also credible. She answered the questions that were posed to her, and her statement was consistent with her body-worn camera video.

The statement from Officer Mazariegos was credible. She was professional and appeared to answer all of the questions that were posed to her to the best of her ability. Officer Mazariegos admitted that she believed Officer Nail was rude and discourteous toward Mr. Lopez when he told him to "sit the fuck down".

The statement from Officer Nail strains credibility. He answered the questions that were posed to him but stated that he was not rude or discourteous toward Mr. Lopez when he told him to "sit the fuck down". Additionally, Officer Nail stated that he did not believe this statement to Mr. Lopez had any negative consequence on the outcome of this incident. When in fact, it appears to the Investigator that this statement from Officer Nail was a clear precursor to the subsequent physical struggle between Mr. Lopez and the two officers.

Mr. Charles Dresow, the attorney for Mr. Lopez, Mr. ████████, and Mr. ████████, declined to make his clients available for this administrative investigation. While the Investigator would like to have interviewed these subjects, the Investigator does not believe their unwillingness to provide a statement negatively impacted this administrative investigation. There are certainly questions for these subjects that went unasked by Officer Mazariegos and Corporal O'Con. However, the videos from the incident itself and the available evidence related to this incident were sufficient for the Investigator to reach his conclusions.

Corporal O'Con's interviews of the three subjects, which occurred outside of a Miranda waiver and were not part of the criminal investigation, were included in this administrative investigation. The Investigator found that, in general, the statements

42

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

obtained by Corporal O'Con from Mr. Lopez, Mr. ████████, and Mr. ████████ were credible.  The Investigator noted several discrepancies between the statements from Mr. Lopez, Mr. ████████, and Mr. ████████ and what can be viewed in the videos from the officer's body-worn cameras.  However, the Investigator does not believe these subjects intended to provide untruthful statements.

One such discrepancy was Mr. Lopez insisting that he was told only one time to sit down by the two officers.  However, he was told several times to sit down by Officer Mazariegos and Officer Nail as can be confirmed in the videos from their body-worn cameras.

The statement from Corporal O'Con strains credibility, though the Investigator does not believe Corporal O'Con made any attempt to be dishonest.  Corporal O'Con was shown the videos from the body-worn cameras of Officer Mazariegos and Officer Nail multiple times before his interview for this administrative investigation.  He was shown the videos of his own interviews with Mr. Lopez, Mr. ████████, and Mr. ████████.  In spite of this, Corporal O'Con answered that he "could not recall" on numerous occasions to many of the questions that were posed to him.  It is true that the incident occurred six months prior to his interview, and memories fade with time.  However, the Investigator believes that Corporal O'Con stating numerous times that he "could not recall" when answering questions that were posed to him, was an effort to not provide evidence in support of the allegations against him.

Examples of these instances are when Corporal O'Con was asked if he directed Officer Gamble to obtain a medical waiver from Mr. Lopez, or if he directed her to find out what his blood alcohol content was, or if he directed her to attempt to obtain a statement from Mr. Lopez, and when he was asked if he reviewed the body-worn camera videos prior to approving the police report.  Corporal O'Con answered these questions by stating he could not recall.  Officer Gamble stated that she was never directed to accomplish any of these tasks by Corporal O'Con.  A review of the evidence audit for the department's body-worn camera system revealed that Corporal O'Con did not look at the body-worn camera videos from Officer Mazariegos and Officer Nail until the week after the incident.

When asked questions about the actions he took and directions he provided that were favorable to him, Corporal O'Con had no difficulty answering the questions that were posed to him.

## 12.  Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Corporal O'Con failed to properly supervise the incident involving the arrest of Mr. Lopez by Officer Mazariegos and Officer Nail on July 27, 2022.  The conclusions are based on the totality of the available evidence.  All of the statements obtained for this

43

## ADMINISTRATIVE PERSONNEL INVESTIGATION

administrative investigation, the relevant documents, and videos from the involved officer's body-worn cameras were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Corporal O'Con failed to properly supervise the use of force incident involving the arrest of Mr. Lopez by Officer Mazariegos and Officer Nail.

On July 27, 2022, at approximately 1853 hours, Officer Mazariegos was on routine patrol and driving on Windward Way in the Canal District of the City when she observed three subjects that appeared to be drinking alcohol. Officer Mazariegos notified dispatch of her location and she asked for a "routine" back. Officer Nail was dispatched to assist her.

Mr. Lopez was standing near the open driver's side door of his pickup truck and he had a cellular telephone in his hand. Mr. ███████ and Mr. ███████ were standing behind the pickup truck on the sidewalk and both of them had an open beer bottle in their hands.

There were numerous empty beer bottles and cans on the pavement near where they were standing.

As Officer Mazariegos walked toward them, she directed all three of the subjects to sit on the curb. Mr. Lopez reacted first and while looking down at his telephone he walked to the curb and sat down.

Mr. ███████ and Mr. ███████ squatted down where they were standing, and Officer Mazariegos directed them to the curb and told them to sit down. Officer Mazariegos, who is a fluent Spanish speaker, spoke in both Spanish and English to the subjects.

Officer Mazariegos and Mr. Lopez had a conversation about whether or not he knew it was illegal to drink alcohol in public and why they were in this particular area drinking beer. Officer Mazariegos's demeanor is stern and somewhat confrontational. She does not make an attempt to develop any sort of rapport with the subjects.

Officer Nail arrived on the scene during this conversation.

Officer Mazariegos asked all three of the subjects for their identification. Mr. Lopez stood up and he appeared to take his wallet out from his front left pants pocket. Officer Mazariegos told him to sit back down. Mr. Lopez did not immediately sit down. He was smiling and looking at Officer Mazariegos. He began to explain why he was standing.

Officer Nail then stated, "Hey, sit the fuck down!" His demeanor was curt and confrontational.

44

## ADMINISTRATIVE PERSONNEL INVESTIGATION

Mr. Lopez then immediately looked at Officer Nail and stated, "Hey, you don't have to talk to me." Mr. Lopez then squatted down in the same place he was sitting previously.

Officer Mazariegos stated, "Well, I told you to sit down."

Mr. Lopez stated, "I know, I know," and Officer Nail stated, "You know what!?" Officer Nail's demeanor was aggressive and confrontational. Mr. Lopez sat back down.

Officer Mazariegos told Mr. Lopez several times to take out his identification. Mr. Lopez continued to attempt to explain that he had to stand to take out his identification. Mr. Lopez stood up again during his explanation.

Officer Mazariegos then grabbed hold of Mr. Lopez's right arm while Officer Nail grabbed hold of his left arm at the same time. Mr. Lopez attempted to pull his arms away from the two officers. Officer Nail tripped Mr. Lopez and pulled him to the ground, causing all three of them to fall to the ground.

Officer Mazariegos and Officer Nail's struggle to get control of Mr. Lopez lasted approximately one minute. Officer Nail stated that during the struggle, Mr. Lopez tried to put him in a headlock by wrapping his right arm around his neck and squeezing. Officer Nail stated that he prevented this from occurring by tucking his chin into his chest and then pushing Mr. Lopez's arm away from him. Officer Nail stated that Mr. Lopez then struck him several times in the back and on the side of his head.

Finally, Officer Nail stated that Mr. Lopez grabbed hold of his outer vest carrier. He stated that he feared that Mr. Lopez could gain access to one of the weapons he carries on his vest carrier. Because of this, Officer Nail struck Mr. Lopez one time in the face, causing his nose to bleed.

Shortly after Officer Nail punched Mr. Lopez, the two officers were able to push Mr. Lopez onto his stomach and Officer Mazariegos put handcuffs on him.

Officer Nail requested the San Rafael Fire Department respond to the scene to provide medical attention to Mr. Lopez.

Mr. ███████ and Mr. ███████ never moved from their seated positions during the Officer's struggle with Mr. Lopez.

Officer Mazariegos searched Mr. Lopez and then both officers put Mr. Lopez into the back of Officer Mazariegos's patrol car.

An engine and an ambulance from the San Rafael Fire Department responded to the scene and paramedic Lopes provided medical care to Mr. Lopez.

Corporal O'Con responded to the scene. He activated and turned off his body-worn camera four times during his supervision of this scene. Corporal O'Con checked on Mr.

45

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Lopez and the status of his injuries.  He then checked on the two officers and asked if they were injured.

Corporal O'Con interviewed Officer Nail and Officer Mazariegos about what occurred during the incident.  Corporal O'Con turned off his body-worn camera during his first discussion with Officer Nail.  A second conversation with Officer Nail about what occurred during the detention and arrest of Mr. Lopez was captured on Corporal O'Con's body-worn camera.

Corporal O'Con's interview of Officer Mazariegos was not recorded on either his camera or her camera.

Corporal O'Con talked with Officer Ahlenslager and ensured she had taken photographs of the scene and of Mr. ███████ and Mr. ██████.

Corporal O'Con interviewed Mr. Lopez, outside of a Miranda waiver, about what occurred during the incident.  His interview was recorded on his body-worn camera.

Mr. Lopez admitted that he stood up to retrieve his identification from his pocket, but he believed he had cooperated with Officer Mazariegos.  He said that he had been told only one time to sit back down.  He said that when he stood up Officer Nail threw him down to the ground and during the struggle Officer Nail punched him in the face.

Mr. Lopez complained of pain to his face, knees, shoulder and back.

Corporal O'Con interviewed Mr. ███████, outside of a Miranda waiver, about what occurred during the incident.  His interview was recorded on his body-worn camera.

Mr. ███████ told Corporal O'Con that Mr. Lopez stood up to take his wallet out and then the officers threw him down to the ground.  He said that Mr. Lopez had cooperated with the officers and he never resisted the officers or fought with them.  He said that Officer Nail punched Mr. Lopez in the face, causing his nose to bleed.

Corporal O'Con interviewed Mr. ███████, outside of a Miranda waiver, about what occurred during the incident.  His interview was recorded on his body-worn camera.

Mr. ███████ told Corporal O'Con he did not know how Mr. Lopez ended up on the ground with the officers struggling with him.  He said that Mr. Lopez had been cooperating with the officers when the incident began.  He said that Officer Nail punched him in the face.  Mr. ███████ said that Mr. Lopez resisted the officer's attempts to put handcuffs on him by moving his arms to keep the officers from controlling him.

Once it was determined that Mr. Lopez would not be transported to the hospital by ambulance, Corporal O'Con directed Officer Gamble to transport Mr. Lopez to the Marin General Hospital to obtain a medical clearance and then to transport him to the Marin

46

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

County Jail where he was booked on charges of drinking alcohol in public, public intoxication, delaying and obstructing an investigation, and two counts of assault on a peace officer.

Corporal O'Con left the scene shortly after giving this direction to Officer Gamble.

When asked what supervisory oversight he had provided during this incident, Corporal O'Con stated the following:

- He responded to the scene
- He ensured Mr. Lopez had received medical attention
- He interviewed Officers Mazariegos and Nail about what occurred
- He interviewed Mr. Lopez, Mr. ████████, and Mr. ████████ about what occurred
- He ensured photographs had been taken of the scene and involved parties
- He directed an officer uninvolved in the incident, Officer Gamble, to transport Mr. Lopez to the hospital and then to the jail
- He completed a supervisor's Use of Force Analysis Form

Corporal O'Con stated that he believed he had fulfilled his supervisory obligations and that he supervised this incident in the manner he had been trained.

The Investigator finds there are a number of additional investigative and supervisory steps Corporal O'Con should have considered during his supervision of this incident. Corporal O'Con should have been more curious about how an investigation into an open container of alcohol in public could lead to the suspect having to be treated for injuries at the hospital and being booked into the jail on a felony charge of assault on a police officer. Corporal O'Con's primary role while on the scene of an incident involving force is to ensure the department's policies, and the law, were followed by the officers involved in the incident. If he had performed his primary function as a supervisor, he would have taken additional investigative steps to confirm the policies were followed. Additionally, if he had objectively evaluated the facts as a supervisor, he would have added a level of accountability which also has the potential of limiting liability to the City and police department.

In addition to the supervisory steps he took, Corporal O'Con should have ensured a canvass of the area had been conducted in an effort to locate additional witnesses to the incident. Officer Mazariegos stated that at the time of her arrival in the area, there were approximately ten other subjects in this general area. Any identified witnesses should have been interviewed and these interviews should have been recorded on an officer's body-worn camera.

Corporal O'Con's interviews of Mr. Lopez, Mr. ████████, and Mr. ████████ were superficial. Corporal O'Con's questions of these subjects failed to go beyond asking the

47

## ADMINISTRATIVE PERSONNEL INVESTIGATION

subjects what happened and why Mr. Lopez failed to stay seated.  Corporal O'Con should have asked these subjects questions specifically related to the use of force by Officer Nail and Officer Mazariegos.  He should have asked all three subjects questions about Officer Nail's assertion that Mr. Lopez tried to put him into a headlock and that he punched him several times in the back of his head.

Corporal O'Con's interviews with Mr. Lopez, Mr. ▓▓▓▓▓▓▓, and Mr. ▓▓▓▓▓▓▓ provided little information that was useful to evaluate whether or not the officer's use of force was, or was not, within department policy.

Corporal O'Con should have ensured that Mr. ▓▓▓▓▓▓▓ and Mr. ▓▓▓▓▓▓▓ were interviewed as part of the criminal investigation conducted by the officers.  They should have been read Miranda to ensure their statements were voluntary and admissible in a court of law.  The witnesses should have been asked how much alcohol had been consumed by Mr. Lopez and they should have been questioned about their observations during his detention and arrest.  Their interviews should have been recorded on an officer's body-worn camera.  These interviews should have been conducted by an officer other than Officers Mazariegos and Nail.

Corporal O'Con should have directed Officer Gamble to read Mr. Lopez his Miranda rights and attempt to obtain a statement from him to be included in the criminal investigation.  The interview should have been recorded on Officer Gamble's body-worn camera.

All interviews from witnesses and Mr. Lopez should have been memorialized in Officer Mazariegos's written report.

While still at the scene, Corporal O'Con should have directed Officer Gamble to utilize a PAS device (Preliminary Alcohol Screening device) to determine Mr. Lopez's blood alcohol content.  An alternative to this investigative step would have been to direct Officer Gamble to obtain from the hospital Mr. Lopez's blood alcohol content.

Corporal O'Con should have directed Officer Gamble to obtain a medical waiver from Mr. Lopez so that the police department could obtain a copy of his medical records related to the treatment for his injuries from this incident.

Corporal O'Con should have reviewed Officer Nail's and Officer Mazariegos's videos from their body-worn cameras, prior to reading and approving their police reports.  Corporal O'Con stated that he viewed Officer Nail's video on Officer Nail's cellular telephone on the day of the incident.  However, the screen on a typical cellular telephone is too small to adequately observe and evaluate the actions of the two officers to determine they were within policy during this incident.

As noted previously in this administrative report, a review of the evidence audit for the department's body-worn camera video system revealed that Corporal O'Con first

48

## ADMINISTRATIVE PERSONNEL INVESTIGATION

reviewed Officer Nail's and Officer Mazariegos's videos from this incident on August 2, 2022, nearly one week after he read and approved their police reports.

The Investigator finds it to be particularly troubling that Corporal O'Con could read and approve a police report of a use of force incident resulting in the suspect being treated for sustained injuries at a hospital and subsequently booked into the jail on charges of a felony assault on a peace officer without reviewing available body-worn camera videos from the involved officers.

Equally troubling to the Investigator is that after reviewing the officer's body-worn camera videos, Corporal O'Con failed to consult with his supervisor about this incident.

Corporal O'Con should have followed up with Officer Nail regarding the language he used during his initial communication with Mr. Lopez.  The Investigator finds Officer Nail's comment to Mr. Lopez, when he told him to "sit the fuck down", was rude and discourteous toward Mr. Lopez.  Additionally, the Investigator finds that Officer Nail's statement did not de-escalate the situation as he said was his intent.  Corporal O'Con failed to identify that this statement from Officer Nail was not only rude and discourteous, but also a potential violation of the department's use of force policy.

Officer Nail should have been questioned about why it was necessary to talk with Mr. Lopez in this manner.  He should have been advised this did not meet the department's performance expectations.  Corporal O'Con should have discussed with his supervisor whether or not Officer Nail's statement to Mr. Lopez to "sit the fuck down" warranted additional investigation into a potential violation of department policy.  Minimally, the incident should have been documented and if further instances of similar behavior became apparent, additional steps should be taken to correct this behavior.

Corporal O'Con should have ensured a patrol lieutenant had been advised of the incident.  This notification should have minimally included a summary of what occurred, the steps he had taken to supervise the incident and ensure a thorough investigation had occurred, the police report number, and a notification that videos were available from the involved officer's body-worn cameras.

Corporal O'Con had not completed a supervisor's Use of Force Analysis form nearly four weeks after the incident.  On August 23, 2022, once she became aware the form/use of force investigation had not been completed, Lieutenant Holton directed Corporal O'Con to complete the form immediately.

The Investigator finds that Corporal O'Con should have recorded his interviews with Officer Mazariegos and Officer Nail, while at the scene, on his body-worn camera.  Corporal O'Con cited "tactical considerations" as the reason he did not record these interviews.  He stated that it has been his practice not to record similar interviews with officers.  In fact, the involved officers also turned off their video cameras when Corporal O'Con first approached to ask them what happened.

49

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Not recording these interviews raises suspicion about what the officers may have said to Corporal O'Con about what occurred.  To eliminate this suspicion, and to provide full transparency, consideration should be given to change this practice.  Similar interviews should be video recorded in the future.

In addition to reviewing the body-worn camera videos of the involved officers before approving their reports, Corporal O'Con should have more critically evaluated their reports.  The Investigator believes, based on the video evidence, there is a lack of evidence to support a charge of PC 647(f).  A subject who is found guilty of public intoxication must be so intoxicated as to be unable to care for their own wellbeing.  While Mr. Lopez most certainly had been drinking alcohol, the Investigator questions whether or not his speech was slurred, as was reported, and whether or not he was unsteady on his feet, as was reported, to the point of being unable to care for his own safety.

Corporal O'Con should have followed up with Officer Nail about his documentation in his written supplemental report, regarding Mr. Lopez attempting to put him into a headlock and punching him in the back of his head.  These physical assaults by Mr. Lopez are not observed on either officer's body-worn camera videos.  The fact that these assaults could not be seen on the video should have been documented and explained in Officer Nail's written report.

Corporal O'Con is a relatively new supervisor, with only five years of law enforcement experience and one year as a supervisor.  The Investigator does not believe that Corporal O'Con's failure to adequately supervise this incident was a result of deliberate indifference.  Conversely, the Investigator finds that his failures are a result of a lack of experience and a lack of strategic thinking.

These conclusions are supported by the available evidence.


### 13.  Findings Upon Alleged Policy Violations


Corporal O'Con was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

SRPD Policy 300 - Use of Force

    300.8 Supervisor Responsibilities

    A supervisor shall respond to any reported use of force, when the supervisor is reasonably available. The responding supervisor is expected to (Government Code § 7286(b)):

50

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(g) Determine if there is any indication that the subject may pursue civil litigation.

> 1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

SRPD Policy 320 – Standards of Conduct

### 320.3.2 Supervisor Responsibilities

Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

(a) Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control.

### 320.5 Causes for Discipline

The following are illustrative of causes for disciplinary action. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient department service:

### 320.5.1 Laws, Rules and Orders

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

### 320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

City Personnel Rule 12.3 Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

a. Negligence of duty.

51

## ADMINISTRATIVE PERSONNEL INVESTIGATION

e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

q. Other acts inimical to the public service.

As set forth above, the Investigator finds that Corporal O'Con violated the above policies of the San Rafael Police Department and the City of San Rafael during his supervision of an incident involving a use of force by Officer Mazariegos and Officer Nail on July 27, 2022.

**These allegations are Sustained**

Additionally, Corporal O'Con was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

SRPD Policy 300 - Use of Force

300.8 Supervisor Responsibilities

A supervisor shall respond to any reported use of force, when the supervisor is reasonably available. The responding supervisor is expected to (Government Code § 7286(b)):

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated.

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her Miranda rights, the following shall apply:

1. The content of the interview should not be summarized or included in any related criminal charges.

2. The fact that a recorded interview was conducted should be documented in a property or other report.

52

## ADMINISTRATIVE PERSONNEL INVESTIGATION

3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

SRPD Policy 320 – Standards of Conduct

320.5.1 Laws, Rules and Orders

(c) Violation of federal, state, local or administrative laws, rules or regulations.

As set forth above, the Investigator finds that Corporal O'Con did not violate the above policies of the San Rafael Police Department and the City of San Rafael during his supervision of an incident involving a use of force by Officer Mazariegos and Officer Nail on July 27, 2022.

**These allegations are Unfounded**

**Allegation 2:** Corporal O'Con failed to complete a supervisor's Use of Force Analysis Form until specifically directed to do so by Lieutenant Holton nearly one month after the incident.

## 1. Summary of Email Communication From Lieutenant Holton

Lieutenant Holton sent an email message on August 23, 2022, to Captain Leon in which she described the incident that is the subject of this administrative investigation. Lieutenant Holton wrote that on this date she became aware of the incident involving the arrest of Mr. Lopez by Officer Mazariegos and Officer Nail. Additionally, she was advised that Corporal O'Con had not yet authored a supervisor's Use of Force Analysis form.

Lieutenant Holton talked with Corporal O'Con who told her he had just been talking with Officer Nail about his court appearance on this case and realized that he had not completed the supervisor's Use of Force Analysis form. Corporal O'Con told Lieutenant Holton he would complete the report before the end of his shift.

## 2. Subject Corporal O'Con's Summary Statement

53

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

Corporal O'Con confirmed that he authored a supervisor's Use of Force Analysis form for this incident.  When asked, he said he authored the report "several days" after the incident.  He confirmed that he was directed by Lieutenant Holton to complete the use of force report, but he added that he was already working on the report when he was given this direction.  When asked why it had taken so long to complete the report, Corporal O'Con said that he had been busy with other responsibilities.  He also said that it was common for other supervisors to take several days to complete a supervisor's use of force report.

### 3.  Credibility Assessment

The Investigator found that Corporal O'Con's statement strains credibility.  As with the previous allegation, Corporal O'Con minimized his wrongdoing.  In this case, he stated that he authored his supervisor's use of force report a "few days" after the incident.  When asked specifically when he wrote the report, he could not recall the date.  While it seems reasonable that Corporal O'Con may not remember the specific date Lieutenant Holton directed him to complete the report, he refused to admit that it was nearly one month after the incident.

Again, the Investigator finds that Corporal O'Con was not necessarily attempting to be dishonest.  Rather, the Investigator believes that Corporal O'Con was attempting to keep from providing evidence that was unfavorable to him.

### 4.  Substantive Factual Findings

The following are the Investigator's conclusions regarding the allegation that Corporal O'Con failed to complete a supervisor's use of force analysis form until he was specifically directed to do so by Lieutenant Holton nearly one month after the incident.  The conclusions are based on the totality of the available evidence.  The statement from Corporal O'Con, the email message from Lieutenant Holton and the supervisor's Use of Force Analysis form written by Corporal O'Con were evaluated and compared by the Investigator to reach a conclusion.

The Investigator finds, based on the evidence adduced in this investigation, that Corporal O'Con failed to author a supervisor's Use of Force Analysis form until he was specifically directed to do so by Lieutenant Holton nearly one month after the incident.

The use of force incident occurred on July 27, 2022.  It occurred at approximately 1853 hours.  Nearly the entire shift remained and was available to Corporal O'Con to

54

## ADMINISTRATIVE PERSONNEL INVESTIGATION

complete the supervisor's Use of Force Analysis form.  If the activities of the day prevented Corporal O'Con from completing this report, he should have made time to complete the report during his next shift.  The form was not completed until August 23, 2022.

During his interview for this administrative investigation, Corporal O'Con pointed out that the department's written procedure for a supervisor's Use of Force Analysis form did not include a specific timeline in which the report had to be completed.  He added that other supervisors had also failed to complete the form until "several days" after the incident.

The Investigator finds that in spite of the ambiguity of the written procedure, Corporal O'Con violated the policy by not completing the report until he was specifically directed to do so by Lieutenant Holton.  The policy directs a supervisor to complete the supervisor's Use of Force Analysis form.  While it may be reasonable to complete the form during one of the next few shifts, waiting nearly one month to complete the form is not reasonable and in the Investigator's opinion, violates the intention of the policy.

This conclusion is supported by the available evidence.


### 5.  Findings Upon Alleged Policy Violations


Corporal O'Con was alleged to have violated the following San Rafael Police Department and City of San Rafael policies:

SRPD Policy 300 - Use of Force

    300.11 Administrative Review

    The supervisor shall attach a completed "Use of Force Analysis Form" to a copy of the associated incident report and route through the chain of command for staff review and recommendations. If the incident involved the use of a Conducted Energy Weapon (CEW), then the supervisor shall complete and attach an "CEW Use Form", along with the Electro Muscular Disruption Technology (EMDT) data download.

SRPD Policy 320 – Standards of Conduct

    320.5.1 Laws, Rules and Orders

55

## ADMINISTRATIVE PERSONNEL INVESTIGATION

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

320.5.7 Efficiency

(a) Neglect of duty.

(b) Unsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse.

City Personnel Rule 12.3 Causes for Disciplinary Action

Causes for disciplinary action against any employee may include, but shall not be limited to, the following:

a. Negligence of duty.

e. Inability, unwillingness, refusal or failure to perform work as assigned, required or directed.

l. Violation of any of the provisions of these working rules and regulations or departmental rules and regulations.

As set forth above, the Investigator finds that Corporal O'Con violated the above policies of the San Rafael Police Department and the City of San Rafael when he failed to complete a supervisors use of force analysis form until he was specifically directed to do so by Lieutenant Holton nearly one month after the use of force incident.

**These allegations are Sustained**

## VII.    CONCLUSION

Based on the foregoing, the allegation that Corporal O'Con failed to adequately supervise an incident involving a use of force by Officer Mazariegos and Officer Nail on July 27, 2022 is sustained.

56

**CONFIDENTIAL**                              **COSR (Lopez) 001107**

**ADMINISTRATIVE PERSONNEL INVESTIGATION**

The allegation that Corporal O'Con failed to complete a supervisor's Use of Force Analysis form until he was specifically directed to do so by Lieutenant Holton nearly one month after the incident is sustained.

57