Exhibit F

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4   JULIO JIMENEZ LOPEZ and YESENIA CRUZ, )
                                          )
5           Plaintiffs,        )
                                          )
6           vs.               )Case No.
                             )3:23-CV-03652-VC
7   CITY OF SAN RAFAEL; SAN RAFAEL POLICE )
    DEPARTMENT; DAISY MAZARIEGOS; BRANDON )
8   NAIL; and DOES 1-50, inclusive,      )
                                          )
9           Defendants.        )
    _____)

10

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                   DAVID SPILLER

16               FRIDAY, AUGUST 15, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  85934

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 2

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    JULIO JIMENEZ LOPEZ and YESENIA CRUZ, )
                              )
5           Plaintiffs,         )
                              )
6           vs.              )Case No.
                    )3:23-CV-03652-VC
7    CITY OF SAN RAFAEL; SAN RAFAEL POLICE )
     DEPARTMENT; DAISY MAZARIEGOS; BRANDON )
8    NAIL; and DOES 1-50, inclusive,      )
                              )
9           Defendants.         )
     _____)

10

11

12

13

14          The remote videoconference deposition of DAVID

15   SPILLER, taken on behalf of the Plaintiffs, beginning at 9:59

16   a.m., and ending at 12:12 p.m., on Friday, August 15, 2024,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 10

1  sergeant's absence I would be responsible for reviewing force

2  applications and preparing summaries for command staff.

3          That also took place during my role as a police

4  sergeant.  And as a lieutenant I then became a reviewer of

5  those incidents in the City of Pleasanton, and then as the

6  division commander of the City of Pleasanton, I reviewed all

7  of the uses of force while I was assigned to the Patrol

8  Division.

9    Q.   And in that position when you would review the uses

10  of force, would you come to some determinations or

11  recommendations, for example, as to whether you thought the

12  force used was in policy or out of policy?

13    A.   Yes.

14    Q.   And who would you submit your findings or

15  recommendations to?

16    A.   That would depend on my role.  As an example, as a

17  unit supervisor or a supervisor I would provide the review

18  and finding, if you will, to my supervisor who was a

19  lieutenant.  As a lieutenant I would provide my review to a

20  captain.  As the captain of the patrol division at that time,

21  I would provide the summary and the overall review to the

22  police chief.

23    Q.   And would the police chief at the time make the

24  ultimate decision as to whether he agrees or not with the

25  recommendation and findings?

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 11

1    A.   That's typical, yes.

2    Q.   And then after Pleasanton, is that when you had the

3  interim position at Menlow Park?

4    A.   Yes.  That's correct.

5    Q.   And during your tenure there were you involved at

6  all in reviewing use of force incidents?

7    A.   Yes.

8    Q.   And what was your involvement at Menlow Park?

9    A.   As the interim police chief or the acting agency

10  head, I would review the entire use of force incident and

11  ensure that it was reviewed up the chain from the unit

12  supervisor to the commander of the division.  And it was a

13  different command structure.  And then after the commander

14  reviewed it, I would review it.

15    Q.   And would you then be in the position so that the

16  commander or some of your people under your supervision would

17  make recommendations and findings, and then you would review

18  it and see if you agreed or disagreed with those?

19    A.   Yes.

20    Q.   And if there was discipline or potential discipline

21  involved in any of the incidents, were you involved in either

22  those recommendations or that decision?

23    A.   Yes.

24    Q.   And how would you be involved as the interim police

25  chief?

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 12

1      You had the final say at that point?

2      A.  Yes.  So in review of a force incident, I would

3    ensure that everybody in the chain had reviewed and made

4    their findings that it was within policy or outside of

5    policy.  If it was outside of policy, a deeper investigation

6    would take place, and then that finished investigation would

7    come to me for the imposition of discipline.

8      Q.  And then when you started in your current position

9    as police chief, I take it you have also been involved in

10   reviewing as they come up the chain of command force

11   incidents?

12     A.  Yes, that's correct.

13     Q.  And at some point did you review the incident

14   involving police officer Brandon Nail?

15     A.  Yes.

16     Q.  And I take it there are different categories of

17   reportable uses of force in your department?

18     A.  Yes.

19     Q.  And if you know, for example, is a take-down

20   considered a reportable use of force?

21     A.  Yes, it is.

22     Q.  And then punches to the face or other parts of the

23   body would also be reportable uses of force?

24     A.  Yes, absolutely.

25     Q.  And if there is a reportable use of force, can you

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 19

1    A.  Yes.

2      Q.  And did you have an understanding in this matter

3    whether that is what caused the Internal Affairs

4    investigation to be triggered and/or something else?

5      A.  It was I think there were a number of factors.

6        The commands staff's review of the use of force,

7    command staff's review of the body-worn cameras, and

8    statements and allegations made in court.  And while the

9    lieutenant and the captain were processing the use of force

10   or reviewing the use of force, based on the e-mail that I had

11   received, I ended up reading the police report; I ended up

12   looking at body camera, and had made the determination that I

13   was going to investigate it, conduct an investigation as

14   well.

15     Q.  And why did you yourself want to conduct an

16   investigation based on your initial review of the materials

17   and the body camera footage?

18     A.  It was basically, you know, my observations, the

19   officer's actions, the application of force.  In this

20   particular case looking at the body camera video, you know,

21   there is observations or conclusions you can make, but it

22   takes time and diligence to really not necessarily

23   frame-by-frame, but there is a lot you can't see, and there's

24   some things that you can see.  And based on what I saw, it

25   warranted a deeper dive, hence the investigation.

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 21

1  a significant amount of public dissatisfaction, communicated

2  disdain for the officers' behavior in this incident.

3        And to ensure objectivity in conversations that

4  I had with the City Attorney, I made the determination to use

5  an outside investigator.

6     Q.   And who did you use?

7     A.   A retired law enforcement individual's name is Paul

8  Henry who does these types of investigations for a living.

9     Q.   And do you have any general estimate as to when you

10  became aware of the public dissatisfaction?

11     A.   Well, the initial information that we had as it

12  related to public dissatisfaction occurred in the courtroom.

13  There were supporters of the subject who was arrested and the

14  force was used who were there in support of the defendant at

15  the time.  That was the first indication of dissatisfaction.

16  And then shortly after, there was a pretty high profile news

17  story that was run on the incident.

18        And in the wake of that I would describe the

19  environment around the police department was basically it had

20  exploded, and the community both locally, people throughout

21  the state, throughout the country reached out via social

22  media, via e-mail, phone calls, and there was a pretty

23  significant and sustained campaign of anti-San Rafael Police

24  Department sentiment.

25     Q.   And that was something as the chief you had to deal

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 24

1   sure if he had done any work with San Rafael Police

2   Department prior to my employment here.

3       Q.   Did you understand Mr. Henry to be sort of police

4   practice expert?

5       A.   Yes.  By reputation I knew that.

6       Q.   Would it be fair to say given your background,

7   experience, and expertise in law enforcement, you had certain

8   impressions yourself about the incident even before you

9   reached out to Mr. Henry?

10      A.   Yes.

11      Q.   But you wanted just to make sure for transparency

12   purposes and objectivity, you wanted to have an independent

13   individual also look at it; is that what you were thinking?

14      A.   Yes.

15      Q.   And eventually, did Mr. Henry write some type of a

16   report with his findings and recommendations?

17      A.   Yes, he did.

18      Q.   And that was sent to you?

19      A.   It was, yes.

20      Q.   Did you essentially agree with his findings and

21   recommendations?

22      A.   Based on my review of his investigation, I found it

23   to be thorough and detailed, and I found it to be reflective

24   of the information and facts presented, and I concurred with

25   his findings -- or yeah, with his determinations of the

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 25

1   potential policy violations.

2      Q.   And I know you explained the normal chain of command

3   with it going from supervisor to lieutenant to commander and

4   then to chief.

5          Did that happen in this case, or was there some

6   interruption because of the Internal Affairs aspect or you

7   sending it to Mr. Henry?

8      A.   I believe if you're referring to the use of force

9   analysis document, I believe that stopped at the --

10     Q.   Yes --

11     A.   -- Captain Leon's level.  I don't think the use of

12   force analysis ever made it to me.  I've seen it subsequent

13   to the Internal Affairs investigation, but in terms of the

14   standard review, it stopped at the captain's level.

15     Q.   And were there recommendations made then to you

16   about what others viewed to have been out of policy with

17   regards to this incident?

18     A.   So Mr. Henry actually -- his investigation resulted

19   in three separate and distinct investigations.  One involving

20   Officer Nail and potential policy violations based on his

21   behavior, one for Officer Daisy Mazariegos, and potential

22   policy violations based on her actions and behavior at the

23   scene, and the third investigation centered on Corporal O'Con

24   and his responsibilities and potential policy violations

25   basic on his supervisory responsibility.

**JULIO JIMENEZ LOPEZ, ET AL. vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 28

1    A.   No.

2    Q.   In your work as a law enforcement officer over many

3   years, have you ever been aware of an incident that you

4   reviewed where the supervisor took 30 days to submit the

5   report?

6    A.   In extreme cases centered on, perhaps, an

7   officer-involved shooting or more protracted administrative

8   review of the use of force, it would not at all be unusual

9   for a report to come in with that kind of a delay.

10        But that's -- I would describe that as being

11  actively investigated.  In the case of a take-down, a control

12  hold, those types of things, it's very normal for that to be

13  more proximate to the date or shift of the incident.

14   Q.   Did you ever learn in the course of the

15  investigation what Officer O'Ocon's reason or reasons were

16  for not submitting his report till approximately 30 days

17  later?

18   A.   I don't recall if he articulated an excuse.

19        I just don't remember.

20   Q.   That's fine.  How about with Officer Mazariegos,

21  what was your general understanding of her violations?

22   A.   So Officer Mazariegos and Officer Nail were both

23  engaged with Mr. Lopez.  The misconduct allegations in her

24  specific case were centered on potential use of excessive

25  force, potential false reporting or information that's not

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 29

1  factual being included in the police report, probably conduct

2  and professionalism policies.

3      Q.   And then how about Officer Nail, what was the issues

4  with whether he violated any policies?

5      A.   Similar to Officer Mazariegos, the allegations were

6  centered on the use of excessive force, false information in

7  a police report, specifically I think his statements that

8  somebody was, you know, he felt somebody was trying to choke

9  him or the suspect was trying to choke him and the veracity

10  of that statement, lack of professionalism, use of profanity,

11  those were the issues, those were the main policy areas at

12  issue with his misconduct in this investigation.

13      Q.   And ultimately, was it your finding that Officer

14  Nail did, in fact, violate policies of your department?

15      A.   In the review of Mr. Henry's investigation, I

16  concurred with the findings that he asserted in that some of

17  the policies were, in fact, violated; others were not.

18      Q.   And how about Officer Mazariegos, was that similar?

19         There were some policy violations?

20      A.   Yes.

21      Q.   And the ones that Mr. Henry thought had been

22  violated, did you concur with those?

23      A.   Yes, I did.

24      Q.   And then Officer O'Ocon, were there also some

25  findings of violations?

**JULIO JIMENEZ LOPEZ, ET AL. vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

1  A.  Yes, there were.

2  Q.  And you also concurred with those?

3  A.  Yes, I did.

4  Q.  Now, did you ultimately have to make a decision as

5  to whether there should be any discipline with respect to any

6  of these officers?

7  A.  Yes.  That falls under my responsibilities as the

8  police chief.

9  Q.  And what discipline, if any, did you decide was

10  appropriate?

11      We'll start with Officer Nail.

12  A.  I recommended termination.

13  Q.  And why did you recommend termination?

14  A.  The interaction, the conduct, and how his behavior

15  reflected on the organization was a significant impact to the

16  trust and relationship building that this police department

17  has been endeavoring to build within the community.

18      His actions and behavior undermined our mission and

19  our objectives as an organization and not reflective of our

20  values as an organization.

21  Q.  And do you know if your recommendation was followed?

22  A.  Yes.

23  Q.  How about Officer Mazariegos, what was your

24  recommendation with respect to discipline, if any, for her?

25  A.  Officer Mazariegos in the wake of this incident was

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 31

1    released as a probationary release.

2        Q.   What does that mean, generally?

3        A.   So she was on probation as a newer police officer.

4            Her probation was actually extended as a result of a

5    medical leave during her original probation period.  She was

6    still within that probationary evaluation period, and in the

7    wake of this incident, she was released and let go, released

8    from employment with the City.

9        Q.   How about Officer O'Ocon, was there any

10   recommendations with regards to that officer?

11       A.   Yes.  I recommended a suspension for Officer O'Ocon,

12   for Corporal O'Ocon -- excuse me.

13       Q.   Okay.  And we're going to take our break now.

14           But would it be a fair statement, Chief, that you as

15   the chief of police worked -- were working very hard to

16   establish, you know, trust between your department and the

17   community and were trying hard to build that?

18       A.   Yes.  I would describe that as a never-ending

19   responsibility of law enforcement organizations as, you know,

20   subordinate to our community, we have to build trust and

21   trusting relationships, and that task is never-ending, and we

22   continue to pursue a deeper trusting relationships with the

23   community that we serve.

24       Q.   And when you viewed the conduct of Officer Nail and

25   Officer Mazariegos with respect to Mr. Lopez, both in looking

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 32

1  at the reports, viewing the body-worn camera footage

2  including the additional investigation by Mr. Henry, is it

3  fair to say that you viewed their conduct as sub-standard?

4      A.  Yes.

5      Q.  And in violation of the policies of your

6  department?

7      A.  Some of them, yes.

8      Q.  Okay.

9          MR. GALIPO:  Is this a good time for us to take

10  about a 15-minute break so I can take care of my issue and

11  come back maybe at 11:00 or shortly thereafter?

12          MR. ALLEN:  Yes.

13          (Recess taken.)

14  BY MR. GALIPO:

15      Q.  So I'm going to try to put up a document and

16  share-screen, and I'm hoping we can look at it together as I

17  ask the chief some questions about it.

18          And I'll mark it as Exhibit 1.

19          (Exhibit 1 was marked for identification.)

20  BY MR. GALIPO:

21      Q.  I think it relates to Brandon Nail and notice of

22  intent to terminate.

23          MR. GALIPO:  So Ben, can you try to put the document

24  up and can you enlarge it a little bit for those of us whose

25  eyes are not what they used to be?

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 37

1   Page 3, and it says, "On July 27, 2022, you violated multiple

2   City and SRPD policies resulting in the unnecessary

3   escalation at a scene you were dispatched to as a cover

4   officer."

5        Do you see that section?

6   A.  Yes.

7   Q.  And based on your review of the materials, the

8   body-worn camera footage, the investigation, did you find,

9   Chief, that there was an unnecessary escalation at the scene

10  of this incident with Mr. Lopez?

11     A.  Yes.

12     Q.  And what are some of the factors that at least from

13  your perspective as the chief, that you felt it was an

14  unnecessary escalation by Officer Nail?

15     A.  Our officers are trained and expected to de-escalate

16  potential scenarios that might result in, you know, hands-on

17  situation.  Time and distance often allows for that

18  de-escalation.  Based on my recollection of the incident,

19  Officer Nail appeared to be -- to engage very quickly; to

20  agitate or trigger the subject, Mr. Lopez, and from basically

21  getting out of his car and engaging with Mr. Lopez, his

22  behavior escalated the situation.

23     Q.  And part of it was his use of language; is that

24  fair?

25     A.  Part of it was, but it wasn't just the language.

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 38

1      It was just his engagement and his, you know, his

2   engagement, his behavior.  And I would describe it as

3   aggressive nature.

4      Q.   And I think you mentioned earlier that Officer

5   Mazariegos was still on probation at the time?

6      A.   Yes, she was.

7      Q.   And it sounds like her probation may have been

8   extended for some medical issue?

9      A.   Yes.  It was a maternity leave.

10         So in order to not lose the valuable window of

11   observation for a new employee, we typically would extend an

12   employee's probation for such a reason.

13      Q.   So in this case was Officer Nail in essence the

14   training officer for Officer Mazariegos?

15      A.   No.

16      Q.   Just happened that she was on probation?

17      A.   Yes.

18      Q.   Okay.  Thank you.

19         And then in the last paragraph on that page there is

20   a sentence that says, "Mr. Lopez took offense to your

21   language and calmly told you that you did not have to talk to

22   him in that manner."

23         Do you see that sentence?

24      A.  I do.

25      Q.   And I'm assuming that you reviewed this document

Page 41

1    A.  I do.

2    Q.  And some of this relates to the concept of

3   escalation; is that fair, Chief?

4    A.  Yes.

5    Q.  Because -- and I think you've already said this, but

6   the training and the hope is that your officers would

7   de-escalate a situation when they can safely do so?

8    A.  Absolutely.  That's the training and that's -- as

9   you characterized, the hope.

10    Q.  And when a situation like this is unnecessarily

11   escalated, it sometimes leads to bad results for everyone?

12    A.  Yes.

13    Q.  And you reference as the paragraph goes on, the

14   punch in the nose.

15        You were aware that Officer Nail punched Mr. Lopez

16   in the nose?

17    A.  Yes.

18    Q.  And I think you probably saw it at some point in the

19   body-worn camera footage, the bleeding from Mr. Lopez?

20    A.  I did, yes.

21    Q.  I take it that punching someone in the face is

22   obviously a reportable use of force?

23    A.  Yes, absolutely.

24    Q.  And you want to make sure when your officers are

25   punching someone in the face, there is circumstances that

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 42

1    justify that; is that fair?

2        A.  Yes.

3        Q.  From your perspective did you feel it was

4    appropriate for Officer Nail to punch Mr. Lopez in the

5    face?

6        A.  Based on my review of the independent investigation,

7    Mr. Henry's work, and my review of the video, it was

8    determined that the punch or the strike or the distraction

9    blow where Officer Nail struck Mr. Lopez in the nose was not

10   out of policy and was appropriate based on the circumstances

11   presented, including Officer Nail's frame of mind.

12       Q.  Do you know who paid the reviewer?

13           Did the City pay him for his work on the review, Mr.

14   Henry?

15       A.  Did the City pay Mr. Henry for his investigative

16   work?

17       Q.  Yes.

18       A.  Yes, the City did.

19       Q.  Do you have any recollection what that amount was,

20   approximately, that he was paid?

21       A.  I don't recall if I even was aware of how much it

22   was.  It was likely paid by the City Attorney's Office.

23       Q.  And do you know if Mr. Henry ever did a prior

24   investigation in use of force incident for your department

25   before you were chief?

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 56

1    Q.  Now, are you aware that the officer is attempting to

2   get his job back?

3    A.  I'm aware.

4    Q.  And there is procedures put in place for an officer

5   to attempt to do that with counsel if they so choose?

6    A.  Yes.

7    Q.  Have you been asked to participate in those

8   proceedings in any way?

9    A.  I have.

10    Q.  And I don't want to violate any communications with

11   any attorney of yours, but in what manner are you

12   participating?

13    A.  I have been asked to provide testimony and that's --

14   backing up a step.  So we are Police Officers Associations

15   enjoys binding arbitration.  So as Officer Nail's final

16   appeal, he is attempting to get his job back through the

17   arbitration process.  The arbitration is in progress.  I have

18   been asked to provide testimony, and I have been sitting in

19   through the entire proceeding.

20    Q.  And are you still supportive of the decision you

21   made?

22    A.  Yes.

23    Q.  And I take it that I think you've already said this,

24   but you independently agreed with the findings in Henry's

25   report?

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 57

1    A.  Yes.

2    Q.  So you didn't look at one of his findings where he

3  felt there was a violation and come to a different opinion

4  where you called Henry and said, no, I disagree with you?

5    A.  I did not.

6    Q.  And you actually agreed with his findings based on

7  your training and experience and knowledge?

8    A.  That's correct.  I concurred with the findings of

9  his investigation.

10    Q.  Now, are officers generally trained that if they act

11  outside of policy or inappropriately, they're not only

12  potentially subject to discipline, but they also could be

13  accountable for their actions if they unnecessarily injure

14  individuals?

15    A.  Yes.

16    Q.  Okay.

17      MR. GALIPO:  Is it okay if we take our last break

18  now for about ten minutes, and then I'm going to kind of get

19  on the phone with my co-counsel so they can tell me all the

20  questions I forgot to ask the Chief.

21      I'm just kidding a little bit.  And then we'll come

22  back and finish up.

23      Does that work for everyone?

24      MR. ALLEN:  Thanks, Dale.

25      MS. WILKINSON:  Yes, it does.

**JULIO JIMENEZ LOPEZ, ET AL.vs CITY OF SAN RAFAEL, ET AL.**
**David Spiller - Morning depo on 08/15/2024**

Page 60

1  punch someone in the face, do you?

2     A.  No, we do not.

3     Q.  And officers are trained, I'm assuming, that

4  punching someone in the face could cause serious injury to

5  that person?

6     A.  Yes.

7     Q.  With respect to Mazariegos, we talked about her

8  briefly in the beginning.  But I guess she was on probation.

9  So she was -- I mean what was it essentially?

10         Was it terminated from probation or probation

11  discontinued?  What would be the right verbiage?

12     A.  She was released from employment as a probationary

13  employee.

14     Q.  And were there certain findings with respect to her

15  as to whether she inappropriately handled the situation?

16     A.  There were findings in Mr. Henry's investigation

17  about her conduct, yes.

18     Q.  And did you agree essentially with those findings?

19     A.  I did.

20     Q.  And did that support your decision to terminate her

21  employment?

22     A.  Yes.

23     Q.  Okay.  And then lastly, we're going to try --

24  sometimes this works, sometimes this doesn't to briefly show

25  a portion of the video.  I think we'll label it Exhibit 2,