# Exhibit J

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4   JULIO JIMENEZ LOPEZ and YESENIA CRUZ, )
                                           )
5        Plaintiffs,       )
                           )
6        vs.               ) Case No.
                           ) 3:23-CV-03652-VC
7   CITY OF SAN RAFAEL; SAN RAFAEL POLICE )
    DEPARTMENT; DAISY MAZARIEGOS; BRANDON )
8   NAIL; and DOES 1-50, inclusive,      )
                                         )
9        Defendants.       )
   _____)
10

11

12

13

14       REMOTE VIDEOCONFERENCE DEPOSITION OF

15              THOMAS CHAPLIN

16          WEDNESDAY, OCTOBER 30, 2024

17

18

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  111708

Page 2

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   JULIO JIMENEZ LOPEZ and YESENIA CRUZ, )
                                            )
5          Plaintiffs,        )
                              )
6          vs.                ) Case No.
                              ) 3:23-CV-03652-VC
7   CITY OF SAN RAFAEL; SAN RAFAEL POLICE )
    DEPARTMENT; DAISY MAZARIEGOS; BRANDON )
8   NAIL; and DOES 1-50, inclusive,     )
                                        )
9          Defendants.        )
    _____)
10

11

12

13

14       The remote videoconference deposition of THOMAS

15  CHAPLIN, taken on behalf of the Plaintiffs, beginning at

16  10:07 a.m., and ending at 1:45 p.m., on Wednesday, October

17  30, 2024, before Jinna Grace Kim, Certified Stenographic

18  Shorthand Reporter No. 14151.

19

20

21

22

23

24

25

Page 31

1   Do you see that portion of the sentence?

2   A.  Yes, I do.

3   Q.  Do you believe that Officer Nail failed to
4   de-escalate the situation?

5   A.  Yes.  I believe that Officer Nail could have
6   employed a different approach and different tactics to
7   de-escalate, and did not do so.

8   Q.  Do you believe that Officer Nail escalated the
9   situation in some respects?

10   A.  Yes, I do.

11   Q.  And are officers generally trained to attempt to
12   de-escalate a situation when they can safely do so?

13   A.  Yes.  That is standard training.  That's part of the
14   POST perishable skills training, and I would offer that in
15   30-plus years of working in law enforcement, de-escalation
16   has always existed although it might not have been, you know,
17   named as such.

18       They absolutely are trained to do so, and it's part
19   of the policy.

20   Q.  Would it be fair to say that's an important part of
21   police training?

22   A.  Yes.

23   Q.  And are officers generally trained not to
24   unnecessarily escalate a situation if they can avoid it?

25   A.  I would offer that that is pertinent and part of the

1  de-escalatory framework, is to avoid escalating a

2  situation.

3   Q.  And is it your understanding from reviewing the

4  materials that at some point Officer Nail used profanity

5  towards Mr. Lopez?

6   A.  Mr. -- yes.  If I may clarify, profanity was used.

7     I believe the phrase was, "Hey, sit the fuck down."

8     You know, I think there is a question as to if

9  that's used or directed at, but it was certainly used.

10   Q.  And is it your understanding that using profanity

11  was a violation of one of the policies of the department?

12   A.  Yes.  There is a policy that I reviewed for the San

13  Rafael Police Department that speaks directly to using

14  obscene language, and, you know, which includes profanity

15  absolutely under the Standards of Conduct Policy.

16   Q.  Did your departments have similar policies?

17   A.  Yes.  I think that's -- especially with Lexipol, I

18  think that's -- that language is consistent.  I would offer

19  that majority, if not all, have similar language.

20   Q.  And was it your understanding that the City of San

21  Rafael generally use Lexipol for their policy language?

22   A.  Yes, sir.

23   Q.  And do you believe the use of profanity by Officer

24  Nail was part of the escalation?

25   A.  I don't believe that the evidence supports that the

1   Q.  And what specific actions of Officer Nail are you

2   critical of?

3   A.  I am -- I do not appreciate when people engaged in

4   what I will sometimes refer to as the subtle act of

5   escalating a situation, and whether that's in this case being

6   overbearing, being hasty and quick to act, not working to

7   establish a rapport or to explain to people that are being

8   spoken to why they're being requested to do something like

9   sit down.

10       So that is -- those are the some of the contributory

11  factors that I don't, you know, appreciate and approve of.

12   Q.  And I take it you also thought the use of profanity

13  was unnecessary?

14   A.  I thought it was gratuitous and unnecessary.

15   Q.  And now with respect to Officer Mazariegos, why are

16  you in agreement of her termination from the perspective of

17  Chief of Police?

18   A.  Well, I start from the standpoint that the Chief of

19  Police is armed with more information than I am, you know,

20  and that is, perhaps, outside of this report, you know, in

21  terms of somebody's performance.

22       And based on a, you know, the sustained findings

23  here, you know, I agree with Mr. Stiller's decision.

24   Q.  Okay.  That's fine.

25       MS. WILKINSON:  Dale, if I may, just belatedly

1   Q.  And the last sentence appears to be a quote from
2   POST Learning Domain 20.  "Unreasonable force occurs when the
3   type, degree, and duration of force employed was not
4   necessary or appropriate."
5       Do you see that?
6   A.  Yes.
7   Q.  Is that the general definition of unreasonable force
8   at least in POST?
9   A.  I think that's a general definition.
10  Q.  Did you review the reports of the involved officers,
11  their police reports?
12  A.  Yes.
13  Q.  Did you find that any information in those reports
14  was inconsistent with your view of the video or other
15  evidence?
16  A.  Yes.
17  Q.  What did you find was in consistent with your review
18  of the video or other evidence that the officers included in
19  their reports?
20  A.  There was reference to the resistance from Mr. Lopez
21  that I did not see on the video when I reviewed it.
22  Q.  And what do you remember more specifically what the
23  reference to the resistance was?
24      Was it general or specific?
25  A.  It involved some form of strike to Mr. Nail's head,

1  and I think what was described as a potential chokehold to

2  Officer Nail from Mr. Lopez.

3     Q.  So generally speaking, when officers are involved in

4  a use of force, are they required to write a report

5  explaining what force they used and the reasons for it?

6     A.  Yes.

7     Q.  And when officers do that, is it appropriate in your

8  opinion for them to include levels of resistance by a suspect

9  that are inaccurate or didn't occur to try to justify the use

10  of force?

11     A.  So I understand the last half of the that question,

12  but I would like -- can I have that again?

13     Q.  Sure.  Let's just say hypothetically, an officer

14  puts in his report that, you know, he was punched, and there

15  was an attempt to chokehold or headlock.  He puts in his

16  report to explain or justify his use of force.

17        Are you with me so far?

18     A.  Yes.

19     Q.  But let's assume hypothetically that never happened,

20  the punch or the attempt to chokehold never happened, but the

21  officer decided to include it in his report anyway.

22        Are you with me?

23     A.  Yes, I am.

24     Q.  I take it generally that would not be appropriate,

25  to include things in the report that an officer knows are

Page 51

 1   attributable to Corporal O'Con that, "You're giving me great

 2   experience with use of force, dude."

 3       That's about five lines down from the bottom of that

 4   paragraph.

 5   A.  Yes, sir.

 6   Q.  And Corporal O'Con is the one you understood was in

 7   charge of reviewing the use of force?

 8   A.  Yes, sir.

 9   Q.  Now, with regard to Mr. Henry, did you have an

10   understanding that he was being compensated by the City for

11   his review of the case?

12   A.  Yes.

13   Q.  And do you have any idea how much he was

14   compensated?

15   A.  No, I don't.

16   Q.  And did you have an understanding as to whether Mr.

17   Henry had been compensated by the City on a previous occasion

18   for review of a case?

19   A.  I only -- what I read in Chief Stiller's deposition,

20   was that to his understanding, that was the only case he had

21   worked for the City of San Rafael.  I had no knowledge to the

22   contrary.

23   Q.  Was it your understanding that Officer Nail was a

24   field training officer?

25   A.  Yes.  I learned it in the reports.

Page 53

1  approached this incident the way I was trained to, I take it
2  your response would be either the training is not good or
3  you're misunderstanding how you were trained?
4     A.  That's fair.  I think follow-up is required to
5  determine what the training was.
6     Q.  Opinion Number 9 on Page 13 of Mr. Clark's report
7  talks about profanity.  We've talked some about that; you're
8  familiar that they had a policy regarding that?
9     A.  Yes.
10    Q.  It sounds like you're not a big fan of officers
11 using profanity unless it's absolutely necessary?
12    A.  I would answer that when an officer is with a member
13 of the public, that it diminishes the professionalism of the
14 agency and the officer.
15    Q.  And would you agree it would be inappropriate for an
16 officer to discriminate against someone based on their race;
17 for example, if someone was Hispanic or black, it would be
18 inappropriate for the officer to handle that situation
19 differently simply because of the person's race?
20    A.  Yes, sir.
21    Q.  Now, in your opinion did the chief in this case have
22 the authority to despite what the findings of Mr. Henry were,
23 determine that the use of force was inappropriate?
24    A.  In my experience and training and my time as a
25 police chief, I would offer that the chief is the ultimate

Page 54

1  decision maker with regards to, you know, administrative
2  personnel and investigations.
3     Q.  So is it your understanding in this case that the
4  chief ultimately decided that the use of force against Mr.
5  Lopez was appropriate and not a violation of their policy or
6  training?
7     A.  That's not my conclusion, no.
8     Q.  What is your opinion in that regard?
9     A.  My opinion is that the investigation which followed
10 best practices and a sound methodology did not result in
11 evidence that would either approve a policy violation or
12 disprove a policy violation.
13    Q.  So your understanding is that the reviewer, Mr.
14 Henry, thought there was insufficient evidence to prove or
15 disapprove it?
16    A.  Yes, sir.
17    Q.  And it's your understanding that the chief went
18 along with that finding?
19    A.  Yes.
20    Q.  And therefore, did not find that there was a policy
21 violation with respect to the use of force?
22    A.  Correct.
23    Q.  And I guess what I was wondering, you may have
24 already answered this, if the chief disagreed with that, he
25 had the authority to say I disagree with that; is that

1  fair?

2     A.  I think that's fair, yes.

3     Q.  I mean assuming the chief sent this out to two

4  different individuals, and they came back with different

5  conclusion, the chief would be in the position where you have

6  to consider their opinions but decide for himself?

7     A.  The answer is yes.

8     Q.  Okay.  So I would like to look at your report if we

9  can.  And I'm going to go about another ten minutes and take

10  our last break.

11        Do you have your report handy?

12     A.  Yes, sir.  I have it right now.

13     Q.  You mentioned a few times in your report and just

14  recently about the methodology of Mr. Henry.

15        What generally do you understand about the

16  methodology he used?

17     A.  Essentially, that he interviewed every witness that

18  he had access to; that he reviewed all relevant documentary

19  evidence to include reports generated by officers; and that

20  he reviewed media evidence in the form of body-worn cameras;

21  that he reviewed the policies that were being assessed and

22  examined for potential policy violations; and that he also

23  interviewed emergency services personnel that responded to

24  the scene.

25        And so the methodology would be really all the

1	MR. ALLEN:  No furniture questions.

2	MR. GALIPO:  Okay.  I have some follow-up based on

3	those questions.

4	             EXAMINATION

5	BY MR. GALIPO:

6	Q.  So let me start with the video.

7	    Before today when was the last time you saw the

8	body-worn camera videos?

9	A.  Yesterday.

10	Q.  And did you ever note anywhere in your report about

11	this issue counsel have brought up after our break about

12	pressure from the baton against the neck?

13	A.  No, sir.

14	Q.  Did you ever even notice that in any of the videos

15	before you wrote your report?

16	A.  No, sir.

17	Q.  When was that first brought to your attention?

18	A.  I was able to review the video frame-by-frame and

19	was able to observe that.

20	Q.  When was that brought to your attention?

21	A.  I apologize.  Yesterday.

22	Q.  Okay.  So going back to the report or supplemental

23	report of Officer Nail, do you have that available still?

24	A.  If you could give me one second, sir.

25	Q.  Take your time.

1   A.   Yes, sir.  I'm there.

2   Q.   So five paragraphs down, the same paragraph counsel

3   was referring to, the second sentence says, "Lopez reached

4   his right arm around the back of my neck."

5        Do you see that?

6   A.   Yes, sir.

7   Q.   Did you see anywhere in the video Lopez reaching his

8   right arm around the back of Nail's neck?

9   A.   No, sir.

10   Q.   And you looked at it frame-by-frame?

11   A.   Yes.

12   Q.   And then he says, "And started to squeeze in an

13   attempt to put me in a headlock."

14        Did you see anywhere in the video Mr. Lopez starting

15   to squeeze the back of Mr. Nail's neck in an attempt to put

16   him in a headlock?

17   A.   No, sir.

18   Q.   Would you say at a minimum, those statements in the

19   report are inaccurate?

20   A.   I did not see anything that could corroborate nor

21   confirm those statements.

22   Q.   And then he writes, "Before Lopez was able to gain

23   control of my head, I was able to tuck my chin into my chest,

24   pushed Lopez away from me, forcing his arm off the back of my

25   neck."

Page 98

1      Did you ever see Lopez's arm on the back of Officer

2   Nail's neck?

3      A.  I don't believe so, no.

4      Q.  Then he says, "When Lopez lost control of my head,

5   he began to swing his right hand at my head."

6      Did you ever see Lopez swinging his right hand at

7   Nail's head?

8      A.  I don't believe so.

9      Q.  "And he continues striking me several times on the

10  left side and back of my head."

11      Did you see any strikes from Lopez's hand to Officer

12  Nail's left side and back of his head?

13      A.  No, sir.

14      Q.  Those would also be inconsistent with what you saw

15  on the video?

16      A.  Yes, sir.

17      Q.  And you're indicating that yesterday you looked at

18  it frame-by-frame?

19      A.  I looked at a portion frame-by-frame, yes.

20      Q.  And I think you told me earlier it's inappropriate

21  for an officer to write a false police report, true?

22      A.  Yes, sir.

23      Q.  In terms of the review by Mr. Henry, have you ever

24  seen situations where an independent police agency does a

25  review, like a County Sheriff's Department, Department of