ANTHONY L. LABEL (SBN 205920)
THEO J. EMISON (SBN 209183)
**THE VEEN FIRM LLP**
20 Haight Street
San Francisco, CA 94102
Tel.: +1 415 673 4800
Fax: +1 415 771 5845
al.team@veenfirm.com
t.emison@veenfirm.com

**LAW OFFICES OF DALE K. GALIPO**
DALE K. GALIPO (SBN 144074)
dalekgalipo@yahoo.com
BENJAMIN S. LEVINE (SBN 342060)
blevine@galipolaw.com
21800 Burbank Blvd, Suite 310
Woodland Hills, CA 91367
Telephone (818) 347-3333
Facsimile (818) 347-4118

Attorneys for Plaintiffs JULIO JIMENEZ LOPEZ and YESENIA CRUZ CRUZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JULIO JIMENEZ LOPEZ and YESENIA CRUZ CRUZ,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN RAFAEL; SAN RAFAEL POLICE DEPARTMENT; DAISY MAZARIEGOS; BRANDON NAIL; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO. 3:23-CV-03652-VC<br><br>*Hon. Vince Chhabria*<br><br>**DECLARATION OF ROGER A. CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION AS TO THE THIRD THROUGH SIXTH (*MONELL*) CAUSES OF ACTION** |

# DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department. I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training ("P.O.S.T.") Advanced Certificate, and I am a graduate of the P.O.S.T. Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the P.O.S.T. accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the P.O.S.T. syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on

the use of force and officer involved shootings.

8. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, use of force issues, and bullet casings in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

9. In forming my opinions in this matter, I have reviewed the photographs, police reports, videos, deposition transcripts, and other related material prior to forming my opinions in this case.

10. The Officers, including Officer Nail, engaged in inappropriate tactics prior to using force against Mr. Lopez. Officer Nail negligently failed to de-escalate the situation, or allow Officer Mazariegos to do so, instead using profanity toward Mr. Lopez and intervening even though he was the designated cover officer and so should not have spoken to Mr. Lopez at all. Officer Nail's conduct and language toward Mr. Lopez directly escalated the situation, leading to his and Officer Mazariegos's separately unnecessary and inappropriate decision to make physical contact with Mr. Lopez by grabbing his arms. Police Officers are trained that escalating the situation with an individual can result in the unnecessary use of force, which is what occurred in this case.

11. The Officers inappropriately, and consistently throughout the period while they were on scene following Mr. Lopez's arrest, made light of and joked about the Officers' uses of force against Mr. Lopez and of the injuries Mr. Lopez suffered as a result. Officer Nail joked to another officer that Mr. Lopez "had a bad day" and that Mr. Lopez's "face [wa]s blown up" as a result of Officer Nail's use of force against him. In the presence of other officers and her own supervisor, and just outside of the police vehicle in which Mr. Lopez was seated, Officer Mazariegos laughed audibly at firefighters' suggestion that they should wipe Mr. Lopez's blood off of his face. Upon learning that Officer Nail had gotten blood on his uniform and that the blood had come from Mr. Lopez, Officer Gamble responded, "Oh good. Well, sorry about your uniform!" When Corporal Ocon was preparing to leave

the scene, Officer Nail mocked Corporal Ocon's authority and suggested that he knew Corporal Ocon would take no meaningful action in response to Officer Nail's use of force or recommend discipline (indicated by Officer Nail's slap-on-the-wrist gesture), and Officers Nail and Mazariegos laughed. Corporal Ocon, who was Acting Sergeant and Officer in Charge, appeared to endorse Officer Nail's conduct in responding, "You're giving me great experience with use of force, dude." These statements occurred in spite of Corporal Ocon's repeated reminders that his body-worn camera was on, which served as implied admonitions to the Officers to act appropriately while on camera. Corporal Ocon failed to take seriously his responsibilities to report inappropriate uses of force by his subordinates and instead ratified the Officers' uses of force against Mr. Lopez.

12. In my extensive law enforcement experience, including in my work as an expert who has reviewed the practices and policies of numerous departments as well as hundreds of Officer use of force incidents, the conduct and attitudes described above, and their frequency, when demonstrated by Officers who have years of experience and service at a given department – including Officers who are Field Training Officers and Officers who have been promoted to higher ranks with leadership responsibilities, including Corporal – including in front of their own supervisors and in front of a trainee, does not exist absent either a tacit or explicit understanding and practice within that department of tolerating and condoning, or even endorsing, the use of inappropriate and unnecessary force against members of the public. The Officers' conduct during the use of force against Mr. Lopez, while at the incident scene after Mr. Lopez's arrest, and during the subsequent investigations, demonstrate at minimum a culture of indifference to use of inappropriate and unnecessary force by Officers, and is consistent with a culture that endorses such uses of force.

13. Through a combination of training and apparent tacit understandings about de-escalation practices, Officer Nail and Corporal Ocon incorrectly believed that it is an appropriate police tactic to intentionally escalate a situation with an individual, including through the use of profanity (in violation of SRPD policy), in an attempt to de-escalate the situation

and thereby avoid use of force. This is wrong and contrary to proper police practices. Escalating a situation with an individual, intentionally or otherwise, generally increases the threat of harm to those involved and thereby increases the likelihood that force will be used, rather than decreasing that likelihood. That these Officers believed such a practice is appropriate indicates a failure by the SRPD to properly train its Officers on de-escalation and is consistent with the existence of a departmental custom and practice of escalating situations with members of the public with whom they interact rather than de-escalating as is proper practice.

14. SRPD policy prohibits use of profanity toward members of the public. This policy recognizes, in part, that use of profanity may escalate situations with members of the public, increasing the risk that force is used against them. Despite this policy and the reasons for it, the San Rafael Police Department accepts and condones (as demonstrated in part by Officer Nail's conduct and the deposition testimony of Lieutenant Scott Eberle, as Person Most Knowledgeable for the City of San Rafael and the SRPD), tacitly or otherwise, the use of profanity by its Officers toward members of the public, in violation of its own policy, including for purposes of attempting to de-escalate situations with members of the public despite this being an inappropriate police practice, as explained above.

15. Despite the inappropriate and unreasonable nature of the Officers' uses of force against Mr. Lopez, as described above, SRPD leadership inappropriately approved of and ratified those uses of force. In determining to review this incident, the SRPD's Chief of Police, David Spiller, employed the services of an outside investigator, Paul Henry. Although Mr. Henry determined that Officer Nail and Officer Mazariegos violated certain SRPD policies during and after the incident with Mr. Lopez, Mr. Henry determined that neither Officer used inappropriate or excessive force against Mr. Lopez. Chief Spiller, in reviewing Mr. Henry's determinations, adopted them entirely. Reflecting this agreement, in notifying Officer Nail that Chief Spiller intended to terminate his employment with the SRPD as a result of Officer Nail's conduct, Chief Spiller stated that Officer Nail's conduct had violated various SRPD policies and standards, but did not state that Officer Nail had used

inappropriate or excessive force against Mr. Lopez. Chief Spiller's ratification of the Officers' uses of force against Mr. Lopez also indicates that the use of unreasonable force by SRPD Officers is an accepted practice that is not controversial within the department.

Executed on November 21, 2024, at Santee, California.

_____
Roger A. Clark